UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAHMOAD ABDAH, et al.,

Petitioners,

v.

BARACK H. OBAMA, et al,

Respondents.

Civil Action No. 04-1254 (HHK)

MEMORANDUM OPINION

Uthman Abdul Rahim Mohammed Uthman (ISN 27), a Yemeni citizen, has been held by the United States at the naval base detention facility in Guantanamo Bay, Cuba since January 2002. Uthman contends he is unlawfully detained and has accordingly filed a petition for a writ of habeas corpus. Respondents in this case, President Barack H. Obama and other high-level officials in the United States Government, argue that Uthman is lawfully detained and should remain in U.S. custody. Both parties have filed cross-motions for judgment on the record and appeared before this Court for hearings on those motions on January 27 and 28 and February 1, 2, and 3, 2010. Upon consideration of the motions and oral presentations of the parties as well as the record of this case, the Court concludes that respondents have not demonstrated that the detention of Petitioner Uthman is justified. Therefore, Uthman's petition shall be granted.

I. LEGAL STANDARDS

A.  Scope of the Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), provides that the President may "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided

the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. at 224. Although the U.S. Supreme Court has held that the District Court for the District of Columbia has jurisdiction over petitions for writs of habeas corpus brought by detainees held at Guantanamo Bay pursuant to the AUMF, *see Boumediene v. Bush*, 128 S. Ct. 2229, 2274 (2008); *Rasul v. Bush*, 542 U.S. 466, 483-84 (2004), it has provided "scant guidance" as to whom respondents may lawfully detain under the statute, *Al-Bihani v. Obama*, 590 F.3d 866, 870 (D.C. Cir. 2010) (noting that the Supreme Court has "consciously le[ft] the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion" (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion of O'Connor, J.); *Boumediene*, 128 S. Ct. at 2276)).

In the absence of controlling law on this matter, the Court shall rely on the reasoning of other Judges of this Court who have thoroughly and thoughtfully addressed the question of by what standard to evaluate the lawfulness of the detention of the individuals held at Guantanamo Bay. Accordingly, as Judge Bates ruled in *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009), the government may detain "those who are 'part of' the 'Taliban or al Qaida forces,'" *id.* at 69-70,[1] and as Judge Walton ruled in *Gherebi v. Obama*, 609 F. Supp. 2d 43 (D.D.C. 2009), "[t]he key question is whether an individual 'receive[s] and execute[s] orders' from the enemy force's combat apparatus," *id.* at 69 (alterations in original).[2]

---

[1] "It is not in dispute that Al Qaeda is the organization responsible for September 11," *Al-Bihani*, 590 F.3d at 873, and is therefore among the entities to which the AUMF refers.

[2] There are, of course, unresolved questions about the scope of the government's detention authority, but this case does not require the Court to address any of them.

2

B.  **Burden of Proof**

As stated in the Amended Case Management Order that governs this case, "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008). Accordingly, Uthman need not prove that he is unlawfully detained; rather, respondents must produce "evidence which as a whole shows that the fact sought to be proved," that Uthman was part of Al Qaeda, "is more probable than not." *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 & n.2 (D.C. Cir. 1994)); *see also Al-Bihani*, 590 F.3d at 878 (rejecting Guantanamo Bay detainee's argument that use of the preponderance of the evidence standard in his habeas case was unconstitutional). If respondents fail to meet this burden, the Court must grant Uthman's petition and order his release.

C.  **Evidentiary Issues**

The Court notes at the outset two issues regarding the evidence in this case.

First, as explained in an order entered in this case on August 26, 2009 [#606], the Court has permitted the admission of hearsay evidence but considers at this merits stage the accuracy, reliability, and credibility of all of the evidence presented to support the parties' arguments. This approach is consistent with a directive from the D.C. Circuit. *See Al-Bihani*, 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits."). The Court's assessment of the weight properly accorded to particular pieces of evidence appears throughout this memorandum opinion.

Second, the nature of the evidence before the Court is atypical of evidence usually

3

presented in federal actions. Respondents have offered a variety of types of documents produced and used by government intelligence agencies that are not the direct statements of the individuals whose personal knowledge they reflect. The Court also heard from one live witness, an investigator for a federal law enforcement agency called the Criminal Investigation Task Force ("CITF"), whose testimony is described below.

## II. ANALYSIS

Uthman's activities between his schooling in Yemen and seizure preceding his detention at Guantanamo Bay are in dispute and are the focus of this case. In sum, respondents argue that Uthman traveled to Afghanistan to join Al Qaeda, and once there, he trained to be a fighter, fought against forces seeking to overturn the Taliban's regime, and became a bodyguard for Usama bin Laden. Uthman contends that he went to Afghanistan to teach the Quran to children and was not part of Al Qaeda.

At the Court's request, the parties identified five contested issues of fact before the merits hearing commenced and structured their presentations to address each issue in turn during that hearing. This opinion similarly addresses each issue in turn, and it then considers the reliable evidence as a whole to explain the Court's conclusion that respondents have failed to demonstrate by a preponderance of the evidence that Uthman was part of Al Qaeda.

### A. Issue One: Whether Uthman Served as a Bodyguard For or Was Part of the Security Detail of Usama Bin Laden

Respondents' primary argument in this case is that Uthman acted as a bodyguard for Usama bin Laden. The evidence they present in support of this contention fails to convince the Court that it is more likely than not that Uthman was a bodyguard.

#### 1. Statements of Hajj (ISN 1457) and Kazimi (ISN 1453)

Respondents' most important pieces of evidence regarding this issue are intelligence

4

reports, referred to as FM40s, reporting statements of two other detainees currently held at Guantanamo Bay. In light of the abusive circumstances of the detention of these men and serious questions about the accuracy of their identifications of Uthman, the Court finds these statements to be unreliable and will not consider them in evaluating whether the detention of Uthman is lawful.

The statements are quite damning on their faces. Sharqwi Abdu Ali Al-Hajj, identified as ISN 1457, is a member of Al Qaeda often called, among other aliases, Riyadh the Facilitator. Respondents presented evidence, in an FM40, that Hajj identified a photograph of Uthman as "Hudaifa al Adani," a name respondents contend Uthman used as an alias, and stated that Uthman "became a bodyguard for [Usama bin Laden] a couple of months prior to the September 11, 2001 attacks." Joint Exhibit ("JE") 29 at 4.[3] Hajj also stated that in traveling within Afghanistan just after September 11, 2001, he encountered "Hudaifa al Adani," one of several Usama bin Laden guards, at a particular location near a meeting Usama bin Laden attended. JE 70 at 5.[4]

Sanad Yislam Ali Al Kazimi, ISN 1453, is also a member of Al Qaeda. An FM40 summarizing an interrogation of Kazimi indicates that he stated that a picture of Uthman "looks like Hudaifa Al Yemeni" and stated that "he heard" Uthman became a bodyguard for Usama bin Laden. JE 28 at 5.

i. **Torture**

The Court will not rely on the statements of Hajj or Kazimi because there is unrebutted

---

[3] In several of the intelligence reports quoted in this opinion, the text appears in all capital letters. For ease of reading, the Court reproduces all quoted text in lowercase regardless of its appearance in the source.

[4] The relevant FM40 is split into two parts: JE 29 is the first part and JE 70 is the second.

5

evidence in the record that, at the time of the interrogations at which they made the statements, both men had recently been tortured.

### a. Evidence of torture

Uthman has submitted to the Court a declaration of Kristin B. Wilhelm, an attorney who represents Hajj, summarizing Hajj's description to her of his treatment while in custody. The declaration states that while held in Jordan, Hajj "was regularly beaten and threatened with electrocution and molestation," and he eventually "manufactured facts" and confessed to his interrogators' allegations "in order to make the torture stop." JE 142 at 2. After transfer to a secret CIA-run prison in Kabul, Afghanistan, Hajj was reportedly "kept in complete darkness and was subject to continuous loud music." *Id.* at 3.

Uthman has also submitted a declaration of Martha Rayner, a Professor at Fordham University Law School who represents Kazimi, regarding Kazimi's description of his treatment in detention. Rayner reports that while Kazimi was detained outside the United States, his interrogators beat him; held him naked and shackled in a dark, cold cell; dropped him into cold water while his hands and legs were bound; and sexually abused him. Kazimi told Rayner that eventually "[h]e made up his mind to say 'Yes' to anything the interrogators said to avoid further torture." JE 145 ¶ 13. According to Rayner's declaration, Kazimi was relocated to a prison run by the CIA where he was always in darkness and where he was hooded, given injections, beaten, hit with electric cables, suspended from above, made to be naked, and subjected to continuous loud music. Kazimi reported trying to kill himself on three occasions. He told Rayner that he realized "he could mitigate the torture by telling the interrogators what they wanted to hear." *Id.* ¶ 34. Next, Kazimi was moved to a U.S. detention facility in Bagram, Afghanistan, where, he told Rayner, he was isolated, shackled, "psychologically tortured and traumatized by guards'

desecration of the Koran" and interrogated "day and night, and very frequently." *Id.* ¶ 37. Kazimi told Rayner that he "tried very hard" to tell his interrogators at Bagram the same information he had told his previous interrogators "so they would not hurt him." *Id.* ¶ 42.

### b. Failure to rebut

Respondents replied to these declarations by presenting as a witness a criminal investigator for CITF, but the testimony of the investigator fails to effectively rebut the evidence of abuse of Hajj and Kazimi. The investigator conducted interviews of Hajj and Kazimi in June 2004 at the Air Force Base in Bagram, Afghanistan at which both men were then held, as well as later that year in Guantanamo Bay. The FM40s that report each man's identification of a photograph of Uthman as Hudaifa, an Usama bin Laden bodyguard, are the investigator's summaries of the Bagram interviews. *See* JE 28 at 1; JE 29 at 1.[5] The investigator's testimony added to the record persuasive evidence that the investigator herself did not mistreat Hajj or Kazimi and that the investigator did not observe any torture, or even any signs of abuse in the demeanor or physical state of either man, while the investigator was with them. But the investigator has no knowledge of the circumstances of either detainee's confinement before his arrival at Bagram and quite limited knowledge of his treatment there. The investigator testified to meeting with each man in an interrogation room on several days for approximately four hours at a time. The investigator did not see Hajj or Kazimi other than during those four-hour sessions and did not inquire of them, or anyone else, about their treatment in the various prisons in which they were held.

Respondents also ask the Court to disregard Wilhelm and Raynor's declarations because

---

[5] The FM40s resulting from the interviews of Hajj and Kazimi that the investigator conducted at Guantanamo Bay after those men were transferred there are part of the record before the Court, but they do not contain any information about, or possibly about, Uthman.

7

they are not direct, sworn statements of the detainees themselves.[6] The Court shall not do so. As noted above, the nature of these proceedings is unique, and the Court is forced to rely on evidence that would normally not be accorded weight in the legal system. Respondents themselves ask the Court to detain Uthman on the basis of hearsay. Without a reason to doubt the veracity of the declarations, the Court cannot ignore them.

### c. Legal analysis

Uthman asserts that the proximity in time between the torture Hajj and Kamizi described and their interrogations by the CITF investigator, however cordial, renders their statements unreliable. In general, "resort to coercive tactics by an interrogator renders the information less likely to be true." *Mohammed v. Obama*, 2009 WL 4884194, at *23 (D.D.C. Dec. 16, 2009) (citing *Linkletter v. Walker*, 381 U.S. 618, 638 (1965)). To determine admissibility in analogous situations criminal cases, courts assess the voluntariness of statements made after the application of coercive techniques based on a totality of the circumstances test. *Id.* (citing *United States v. Karake*, 443 F. Supp. 2d 8, 87 (D.D.C. 2006)); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances."). Judges of this Court have adopted this test in the cases of other Guantanamo Bay detainees seeking release. *See, e.g., Mohammed*, 2009 WL 4884194, at *23; *Anam v. Obama*, — F. Supp. 2d —, 2010 WL 58965, at *4 (D.D.C. Jan. 6, 2010). The test calls for considering, *inter alia*, "the time that passes between confessions, the change in place of interrogations, and the change in identity of the

---

[6] In addition, respondents object to the unauthenticated statements regarding abuse that appear in a third document containing evidence of torture, which Uthman presents as the translation of a letter written by Hajj. *See* JE 144. Because there is other, unrebutted evidence of torture in the record, the Court need not resolve the question of whether to take this exhibit into consideration.

interrogators." *Mohammed*, 2009 WL 4884194, at *23 (quoting *Oregon v. Elstad*, 470 U.S. 298, 310 (1985)) (internal quotation mark omitted).

Respondents do not argue that the alleged torture of Hajj and Kazimi is sufficiently attenuated from the interviews at which they gave the relevant statements to support a conclusion that despite the coercion, the statements are nonetheless reliable.[7] The interviews on which the relevant FM40s are based occurred in Bagram, where torture of Hajj was ongoing and where Kazimi had arrived directly from the CIA prison, at which he was tortured, only about a month earlier. *See* JE 145 ¶ 36; JE 28 at 1. Therefore, the Court concludes that there has been no "break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before." *Clewis v. Texas*, 386 U.S. 707, 710 (1967). Accordingly, the Court will not treat Hajj and Kazimi's statements as true.

### ii. Reliability of identification

Furthermore, there are serious questions as to whether Hajj and Kazimi's statements, even if considered outside the context of the coercion that limits their value, constitute significant evidence that Uthman was a part of Al Qaeda. Specifically, the assertions that "Hudaifa" was a bodyguard for Usama bin Laden are only relevant if "Hudaifa" is an alias for Uthman.

According to the Defense Intelligence Agency, members of Al Qaeda use aliases, often referred to as kunyas, to "conceal[] the individual's identity" and "as a security, denial and deception measure." JE 2 at 2. Therefore, it would not be surprising that, were Uthman a former

---

[7] Respondents do offer reasons the statements appear to be reliable. Specifically, they refer to (1) the CITF investigator's testimony that the investigator believed Hajj and Kazimi were truthful in response to questions and (2) Kazimi's statement in an interview with the investigator at Guantanamo Bay in November 2004 that he was unfairly accused of more charges than other detainees because he had been truthful with interrogators. GE 8 at 2. But these indicia of reliability do not outweigh the reasons to infer, based on the coercive circumstances so close in time to the interrogation, that they are unreliable.

9

bodyguard for Usama bin Laden, he had an alias by which Al Qaeda fighters knew him. But respondents have not demonstrated a link between Uthman and the name "Hudaifa."[8]

They offer one piece of evidence to support the contention that Uthman used Hudaifa as an alias, but the Court will not consider it. The D.C. Circuit has made clear that hearsay evidence "must be presented in a form, or with sufficient additional information, that permits [the factfinder] to assess its reliability." *Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008). Here, the relevant document contains limited information about its source. Therefore, the Court does not have "knowledge as to the circumstances under which the source obtained the information." *Boumediene v. Bush*, 579 F. Supp. 2d 191, 197 (D.D.C. 2008) (concluding that "the information in the classified intelligence report[] relating to the credibility and reliability of the source . . . is *not* sufficient for the purposes for which a habeas court must now evaluate it" where "the Court has no knowledge as to the circumstances under which the source obtained the information" on which respondents rely); *see also Anam*, 2010 WL 58965, at *8 (declining to rely on an intelligence report of which "[t]he source (or sources) . . . is unknown" and another that "lacks any indicia of reliability"). Because the Court cannot evaluate whether the information in document is credible, it will not rely on it.

Moreover, it is not clear that the name by which Kazimi referred to the photograph of Uthman was consistent with an identification of Uthman. Respondents produced a copy of the photograph the CITF investigator showed to Kazimi during the investigator's interview with him; on the back of that photo, Kazimi wrote a line of text in Arabic. GE 2. At some point after

---

[8] "Hudaifa al Adani," the name Hajj used when shown the photograph of Uthman, means Hudaifa from Aden. JE 2 at 7. "Hudaifa Al Yemeni," the name in the FM40 of Kazimi's interview, means Hudaifa from Yemen. *Id.* at 12. Because Uthman is from Aden, which is in Yemen, these descriptors are appropriate to him, but they do not alone constitute an identification. Many people, including many suspected or admitted Al Qaeda members about whom there is evidence in the record currently before the Court, are from Aden, Yemen.

10

the interview, someone wrote a translation of that line in English just beneath it, which reads: "He is Arab, and Looks Like Huthaifa Al-Anzi." *Id.* Uthman obtained a declaration of a professional translator who stated that the line of Arabic reads: "Shafai Adani looks like Khuthaifa Al Anzi." PE 4 (Declaration of Masud Hasnain).[9] Whatever the significance of the inconsistencies in translations on Kazimi's intended meaning and the accuracy of the investigator's recording of Kazimi's statements, both English versions of the text indicate that Kazimi wrote "Al Anzi." Al Ansi, according to an undisputed definition from Wikipedia, "is an ancient and prolific Arab tribe, originating in the Hadhramaut region of Yemen." PE 5. There is no evidence in the record that Uthman has any connection to this tribe or has used an alias that includes this reference. The Court therefore cannot conclude that Kazimi recognized Uthman from the photograph or was talking about Uthman when he said Hudaifa Al Anzi was a bodyguard for Usama bin Laden.[10]

2. **Other evidence**

   i. **Statement of Bukhari (ISN 493)**

Respondents offer as additional evidence that Uthman was a bodyguard for Usama bin Laden another statement, this one recorded in an intelligence report resulting from an interrogation of Abd Al Hakim Abd Al Karim Amin Bukhari, ISN 493. Bukhari stated that Uthman "was a member of the Usama bin Laden . . . security detail." JE 77 at 2.

---

[9] Respondents have not rebutted this alternative translation.

[10] Uthman places great weight on the statement in the FM40 of Kazimi's interrogation that the photograph "looks like Hudaifa." JE 28 at 5. He reasons that the assertion that an individual "looks like" a particular person falls short of being an identification. Although this language certainly does not assist respondents in making their case, it is not clear to the Court whether it compromises the identification. In any event, because the Court will not consider the statement as weighing against Uthman's petition for the reasons explained above, resolution of this issue is unnecessary.

11

The Court finds this evidence unpersuasive for two reasons. First, it is not clear that Bukhari's statement is based on personal knowledge. Bukhari stated in testimony before the Combatant Status Review Tribunal that he was only in Afghanistan for ten days after the September 11 attacks and that before then, he had been in Saudi Arabia. JE 149 at 8. If this information is correct, Bukhari could not have observed Uthman acting as a bodyguard in Afghanistan before September 11. In reply to this logic, respondents point to a report containing intelligence the Department of Defense received from Bukhari; Bukhari described a speech Usama bin Laden gave in Kandahar, Afghanistan "approximately three months before 9/11." JE 150 at 1. Respondents infer that Bukhari's presence at this speech means he and Uthman were in Kandahar at the same time. Even accepting that inference as true, there is no evidence in the record that the two men were at the same speech, in the same building, or ever even saw each other in Kandahar. Without more information as to how Bukhari came to believe that Uthman was part of Usama bin Laden's security detail, the Court cannot evaluate the credibility of the statement and therefore cannot rely on it. *See Boumediene*, 579 F. Supp. 2d at 197; *Anam*, 2010 WL 58965, at *8.

### ii. Opportunity to become a bodyguard

Respondents have presented a variety of other statements to support the proposition that Uthman had the necessary contacts to become a bodyguard for Usama bin Laden. These contacts are relevant, respondents assert, because according to Hajj, "those who were bodyguards would try to get people they knew, or people who were from their hometown, to be bodyguards," JE 29 at 4, so one of these men may have recommended Uthman.

This evidence, even if accepted as true, does not demonstrate that Uthman was a bodyguard for Usama bin Laden. It might assist in corroborating or explaining other evidence of

12

such a fact were there indications in the record from reliable sources supporting the proposition. But, as explained, there are not. The ability to become a bodyguard is simply not proof, even under the preponderance of the evidence standard, that Uthman actually took the opportunity. In sum, because respondents have not presented evidence on which the Court can rely to demonstrate that, more likely than not, Uthman was a bodyguard for Usama bin Laden, the Court cannot find that Uthman is lawfully detained on that basis.

**B.     Issue Two: Whether Uthman's Seizure Near the Site of the Battle of Tora Bora is Incriminatory**

By his own admission, Uthman was seized in late 2001 in the general vicinity of Tora Bora. JE 10 at 3; JE 13 at 2-3. He was with a group of approximately thirty other men, a few of whom he knew from Yemen. JE 10 at 3; JE 13 at 2.

Respondents argue that these circumstances—in particular, Uthman's location and the identities of some of his fellow travelers—are evidence of his affiliation with Al Qaeda. Respondents question why Uthman would choose to stay in Afghanistan after September 11, 2001 if he were not involved in Al Qaeda. They assert that Uthman's proximity at the time of his capture to the site of an ongoing battle and a known location of Usama bin Laden, a cave complex called Tora Bora, strongly suggests he was coming from the complex.[11] Additionally, at least some of the men with whom Uthman traveled—in particular, the ones he knew—were admitted, or at least alleged, Al Qaeda members, some of whom were likely coming from Tora Bora. *See* JE 10 at 3; JE 13 at 2; JE 93 at 9; JE 29 at 4, 5.

---

[11]     After the September 11 attacks, Al Qaeda fighters went to Tora Bora, which is in eastern Afghanistan, "to make a last stand in their fight against the United States and its allies." JE 63 at 1-2. Tora Bora was the target of air strikes, the "most intense" of which occurred from December 10 through 17, 2001. *Id.* at 2. As the battle went on, many fighters escaped the cave complex. *Id.* at 3. Because the call for fighters to join Usama bin Laden at Tora Bora was "widely known," "few, if any noncombatants would have been in the vicinity during this time." *Id.* at 4.

13

Uthman rejoins first that respondents have presented no direct evidence that Uthman was at Tora Bora. Second, he argues that insofar as respondents have identified circumstantial evidence suggesting that he was present at the battle there, the inferences necessary to so conclude assume the truth of the allegation that Uthman was a bodyguard for Usama bin Laden. Third, despite reiterating that the burden is on respondents to prove their case rather than for Uthman to prove anything, he argues that the information from other detainees is consistent with Uthman's assertion that he was in Khost, Afghanistan, rather than Tora Bora, before being seized.[12]

On balance, the Court accepts respondents' evidence, which is largely based on and consistent with Uthman's own admissions, as true and will consider it in evaluating whether the evidence as a whole supports the continued detention of Uthman.

### C. Issue Three: Whether Uthman Fought on the Front Lines and was Present at an Al Qaeda/Taliban Guesthouse in Kabul, Afghanistan

Respondents argue in further support of their contention that Uthman was part of Al Qaeda that (1) he fought with Al Qaeda members alongside the Taliban in Kabul, Afghanistan against forces trying to overturn the Taliban regime in that country and (2) he stayed at an Al Qaeda guesthouse in Kabul. As evidence of their first allegation, respondents point to a statement by Kazimi during an interview with the CITF investigator at Bagram that Uthman "was in Kabul on the front line." JE 28 at 5. An intelligence report also indicates—perhaps based on the CITF investigator's interview—that Kazimi identified a picture of Uthman as "Hudayfah []Al-Adani[]," who Kazimi "believe[d] was fighting on the front lines." JE 43 at 3. Another intelligence report indicates that a different detainee identified a photograph of Uthman as

---

[12] According to Uthman, after September 11, he went to the village of the man who was his translator while he was a tutor, located outside the city of Khost, to escape the bombing of Kabul. JE 103 (Decl. of Uthman) ¶ 12.

14

"Yasser Al-Madani (Yemeni)" and indicated that he was at the "Omar Seif position," a location on the front lines, in Kabul. JE 44 at 2. Regarding the second allegation, respondents note that the intelligence of which Kazimi is the source indicates that Kazimi stated he "last saw" Hudayfah at a guesthouse in Kabul in "early 2001." JE 43 at 3.

Uthman attacks each piece of evidence. As to Kazimi's statements, Uthman argues they are tainted by torture and therefore unreliable. He also argues that Kazimi does not explain how he came to "believe[]" Uthman was on the front lines, JE 43 at 3, rendering the information unreliable, and that Uthman asserts he was not in Kabul until March 2001, JE 10 at 2, which is inconsistent with Kazimi's having seen him there in "early" 2001, JE 43 at 3. As to the statement of the other detainee, Uthman argues the use of the name "Yasser" as well as "al-Madani," which refers to someone from Medina, Saudi Arabia, demonstrate that the identification is inaccurate.

The Court agrees with Uthman as to most of this evidence. As explained above, the Court cannot appropriately rely on the information of which Kazimi is the source, primarily because Kazimi's statements are not sufficiently attenuated from torture, of which there are unrebutted allegations in the record, by other interrogators. The other detainee's reference to "Yasser al-Madani" calls into serious question his identification of Uthman. Even assuming at respondents' suggestion that "al-Madani" is an erroneous transcription of "al-Adani," respondents have identified no indication anywhere in the record that Uthman used "Yasser" as an alias. Because there is so little reason to believe Uthman was a fighter in Kabul, the Court will not conclude it is more likely than not that this allegation is true.

D. **Issue Four: Whether Uthman Attended an Al Qaeda Training Camp and Was Present at an Al Qaeda Guesthouse in Kandahar, Afghanistan**

Respondents also contend that Uthman took part in Al Qaeda-sponsored activities in

Kandahar, Afghanistan before going to Kabul, which, respondents reason, is consistent with and reinforcing of the proposition that Uthman was a bodyguard for Usama bin Laden. Specifically, they assert that he attended a training camp for Al Qaeda fighters and, as in Kabul, stayed at an Al Qaeda guesthouse. Respondents base their training camp allegation largely on an intelligence report that the contents of a "document issued by the Office of Mujahideen Affairs" that, according to the report, "lists over 150 Al-Qaeda members scheduled for tactics, artillery, security, snipers and anti-aircraft training." JE 51 at 2.[13] The name "Abu Huthayfah Al-'Adani" appears in a list of individuals who were to attend a tactics class on March 24, 2001.[14] *Id.* at 7.

Uthman makes three arguments regarding the training roster. First, he argues that respondents have not shown that Hudaifa is a kunya Uthman used. Second, even had they so demonstrated, Uthman asserts that the inclusion of "Abu" in the name on the list distinguishes it from the name by which Kazimi and Hajj referred to the photograph of Uthman. Abu means "father of," so the name immediately following it is normally the name of a man's first-born child, not his own name. JE 2 at 2. Uthman reasons that even if a man with no children uses Abu in his kunya to conceal his identity, the name following Abu would not be the same name he uses to identify himself in another kunya. Third, he points to references in the record of this case to two other men who used the alias Abu Hudaifa. *See* JE 154 at 1; JE 23 at 2.

The Court concludes that this evidence, although not necessarily unreliable, is not persuasive as to the contention respondents seek to support. As discussed above, there is no reliable evidence linking Uthman to the name Hudaifa. Therefore, the appearance of that name

---

[13] The list "was recovered by U.S. Coalition Forces from an Al-Qaeda house in Kandahar." JE 51 at 3.

[14] The document uses the Islamic Calendar, but the parties agree the relevant date corresponds to this day on the Gregorian Calendar.

16

on the training list, especially without corroboration from any other source that Uthman might have been at a training camp, does not make it more likely than not that Uthman attended the tactics course. That Abu Hudaifa was an alias for other men, whether or not the particular men identified were likely to have attended this particular training, further weakens the proposition that the list itself can support respondents' allegation.

As to the guesthouse allegation, a summary of an interrogation of Richard Dean Belmar, ISN 817, indicates that when shown a picture of Uthman, Belmar stated that he "may have been a lower amir," or leader, "in the Kandahar guest house." JE 36 at 2.[15]

Again, Uthman attacks all of respondents' evidence. Uthman discounts the recollection of Belmar, who (1) was not Arab, (2) indicated by saying the photo "may have been" of an amir that he was unsure of his statement, and (3) was not in Kandahar at the same time as Uthman. *See* PE 7 at 3 (summarizing Belmar's statements before the Combatant Status Review Board in November 2004, including an admission that he "traveled from the United Kingdom to Kandahar, Afghanistan around July 2001"); JE 10 at 2 (reporting that Uthman asserted he left Yemen for Afghanistan in March 2001 and about a week after arriving in Kandahar went to Kabul).

The allegation that Uthman was an amir at an Al Qaeda guesthouse is not as easily dismissed as the training camp allegation. Because Belmar's statement is not a definitive identification, it is not strong evidence of Uthman's presence at such a guesthouse. But it is not so unreliable that the Court disregards it entirely.

---

[15] To explain this allegation that Uthman was not just a guest at, but a lower leader of, a guesthouse, respondents infer that Uthman likely traveled to Afghanistan before 2001, when he asserts he arrived, JE 103 ¶¶ 6-8, such that he was able to train, fight in Kabul, rise to a position of some prominence at a guesthouse, and serve as a bodyguard during that year.

17

E.  **Issue Five: Whether Uthman's Prior Associations, Travel Route to Afghanistan, and Other Circumstances Further Support that He Was Part of Al Qaeda.**

Respondents present a variety of additional evidence and arguments to support their case, and Uthman responds to each point. For example, Uthman argues that giving weight to the undisputed fact that he might have known some men who became involved in terrorism constitutes inappropriately permitting respondents to prove guilt by association.

Respondents also attach significance to the fact that Uthman traveled from Yemen to Afghanistan along a route—a flight from Yemen to Karachi, Pakistan; a stay at a hotel in Karachi; a bus from Karachi to Quetta, Pakistan; a ride to Kandahar, Afghanistan—that Al Qaeda members also took. *See* JE 103 ¶¶ 6-7 (recounting Uthman's trip); GE 7 at 1 (citing to interrogation reports of other alleged Al Qaeda members who described similar travel routes). Uthman asserts that travel to Afghanistan, which did not have a functioning international airport in 2001, required an indirect route, and proceeding on the same path as Al Qaeda members is not evidence of participation in Al Qaeda.

Uthman has not disputed the factual accuracy of most of these contentions, instead arguing that they are not sufficient to demonstrate that he is lawfully detained.[16] The Court therefore accepts each of respondents' allegations as true and discusses their significance below.

---

[16] Respondents also argue that Uthman now offers an implausible alternative account of his activities in Afghanistan. The Court has considered the version of events Uthman describes and notes that some aspects of the story he tells are less than entirely believable. In particular, Uthman asserts he taught children in Afghanistan, but he does not know Pashtu, the primary language spoken in that country. But Uthman offers two explanations of this questionable detail: because the Arabic spoken in Yemen is "considered to be the closest to the classical language of the Quran," "knowledge of Yemeni Arabic is a bona fide job skill in the educational sector in . . . Afghanistan," JE 114 ¶ 16(f), and Uthman "depended on [a man who served as a translator for him] for communication," JE 103 ¶ 10. Overall, Uthman's account is not so incredible as to lead the Court, in weighing all the evidence before it, to conclude the respondents have met their ultimate burden of showing by a preponderance of the evidence that Uthman was part of Al Qaeda.

## G. Conclusion

In sum, the Court gives credence to evidence that Uthman (1) studied at a school at which other men were recruited to fight for Al Qaeda; (2) received money for his trip to Afghanistan from an individual who supported jihad; (3) traveled to Afghanistan along a route also taken by Al Qaeda recruits; (4) was seen at two Al Qaeda guesthouses in Afghanistan; and (5) was with Al Qaeda members in the vicinity of Tora Bora after the battle that occurred there.

Even taken together, these facts do not convince the Court by a preponderance of the evidence that Uthman received and executed orders from Al Qaeda. Although this information is consistent with the proposition that Uthman was a part of Al Qaeda, it is not proof of that allegation. As explained, the record does not contain reliable evidence that Uthman was a bodyguard for Usama bin Laden or fought for Al Qaeda. Certainly none of the facts respondents have demonstrated are true are direct evidence of fighting or otherwise "receiv[ing] and execut[ing] orders," *Gherebi*, 609 F. Supp. 2d at 69,[17] and they also do not, even together, paint an incriminating enough picture to demonstrate that the inferences respondents ask the Court to

---

[17] The Court notes that the D.C. Circuit has suggested that evidence that a detainee "visited Al Qaeda guesthouses . . . would seem to overwhelmingly, if not definitively, justify the government's detention" of that individual. *Al-Bihani*, 590 F.3d at 873 n.2. But this statement is dicta, and it appears in an opinion reviewing a case in which respondents presented significantly stronger evidence supporting the detention of the individual in question than they have here—including that the detainee had "accompanied and served a paramilitary group allied with the Taliban . . . which fought on the front lines against the Northern Alliance," *id.* at 869—and noting explicitly that the Circuit Court did not rely on evidence regarding guesthouses in affirming denial of the petition. *id.* at 873 n.2. Furthermore, respondents have not argued that Uthman's detention is justified based solely on his having been seen at Al Qaeda guesthouses. In addition, there is evidence in the record, albeit not specific to Al Qaeda guesthouses, that "[t]he fact that a young Yemeni stays at 'guest houses' while in . . . Afghanistan does not itself imply anything menacing or illicit" because it is common for such a man traveling abroad to seek economical, safe accommodations. JE 114 (Decl. of Dr. Sheila Carapico) ¶ 15. Moreover, there is no evidence before the Court that Uthman did anything more incriminatory than appear at Al Qaeda guesthouses. For these reasons, the Court sees no basis for detaining Uthman on the minimally incriminating facts before it.

make are more likely accurate than not. Associations with Al Qaeda members, or institutions to which Al Qaeda members have connections, are not alone enough to demonstrate that, more likely than not, Uthman was part of Al Qaeda. *See Ahmed v. Obama*, 613 F. Supp. 2d 51, 63-64 (D.D.C. 2009) (granting the habeas petition of a Guantanamo Bay detainee where the evidence that remained after excluding unreliable evidence amounted to "essentially a charge of guilt by association").

Respondents have presented some evidence that, at first blush, is quite incriminating of Uthman and supportive of the position that he is lawfully detained. Upon close examination of that evidence, however, the Court finds that there is reason not to credit some of it at all and reason to conclude that what remains is not nearly as probative of respondents' position as they assert. Therefore, the evidence against Uthman is not sufficient to carry respondents' burden.

### III. CONCLUSION

For the foregoing reasons, Uthman's petition for a writ of habeas corpus shall be granted. An appropriate order accompanies this memorandum opinion.

_____
Henry H. Kennedy, Jr.
United States District Judge