UNCLASSIFIED//FOR PUBLIC RELEASE

FILED WITH THE
COURT SECURITY OFFICER.
CSO: ~~Walker~~
DATE: 4/8/10

~~SECRET~~

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| MAHMOAD ABDAH, et al., |
| Petitioners, |
| v. |
| BARACK H. OBAMA, et al, |
| Respondents. |

Civil Action No. 04-1254 (HHK)

## MEMORANDUM OPINION

Yasein Khasem Mohammad Esmail (ISN 522), a Yemeni citizen, was taken into custody in Afghanistan in late 2001. The United States has held him at the naval base detention facility in Guantanamo Bay, Cuba since May 2002. Contending that he is unlawfully detained, Esmail has filed a petition for a writ of habeas corpus. Respondents in this case, President Barack H. Obama and other high-level officials in the United States Government, argue that Esmail is lawfully detained and should remain in U.S. custody. The parties filed cross-motions for judgment on the record and appeared before this Court for a hearing on the merits of Esmail's petition on March 9, 10, and 11, 2010. Upon consideration of the motions and the evidence presented at the merits hearing, the Court concludes that respondents have demonstrated that the detention of Petitioner Esmail is lawful. Therefore, Esmail's petition shall be denied.

## I. LEGAL STANDARDS

### A.    Scope of the Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorizes the President to "use all necessary and appropriate force against those

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

nations, organizations, or persons he determines planned, authorized, committed, or aided the

terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons,

in order to prevent any future acts of international terrorism against the United States by such

nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. at 224. The U.S. Supreme

Court has held that the District Court for the District of Columbia has jurisdiction over petitions

for writs of habeas corpus brought by detainees held at Guantanamo Bay pursuant to the AUMF.

*See Boumediene v. Bush*, 128 S. Ct. 2229, 2274 (2008); *Rasul v. Bush*, 542 U.S. 466, 483-84

(2004). The Supreme Court has provided "scant guidance," however, as to whom respondents

may lawfully detain under the statute. *Al-Bihani v. Obama*, 590 F.3d 866, 870 (D.C. Cir. 2010)

(noting that the Supreme Court has "consciously le[ft] the contours of the substantive and

procedural law of detention open for lower courts to shape in a common law fashion" (citing

*Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion of O'Connor, J.);

*Boumediene*, 128 S. Ct. at 2276)).

In the absence of controlling law governing the question of by what standard to evaluate

the lawfulness of the detention of the individuals held at Guantanamo Bay, the Court shall rely

on the reasoning of other Judges of this Court who have thoroughly and thoughtfully addressed

this issue. Accordingly, as Judge Bates ruled in *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C.

2009), the government may detain "those who are 'part of' the 'Taliban or al Qaida forces,'" *id.*

at 69-70,[1] and as Judge Walton ruled in *Gherebi v. Obama*, 609 F. Supp. 2d 43 (D.D.C. 2009),

"[t]he key question is whether an individual 'receive[s] and execute[s] orders' from the enemy

---

[1]      "It is not in dispute that Al Qaeda is the organization responsible for September
11," *Al-Bihani*, 590 F.3d at 873, and is therefore among the entities to which the AUMF refers.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

force's combat apparatus," *id.* at 69 (alterations in original).

**B.      Burden of Proof**

As stated in the Amended Case Management Order that governs this case, "[t]he

government bears the burden of proving by a preponderance of the evidence that the petitioner's

detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6,

2008). Accordingly, Esmail need not prove that he is unlawfully detained; rather, respondents

must produce "evidence which as a whole shows that the fact sought to be proved," that Esmail

was part of Al Qaeda, "is more probable than not." *United States v. Mathis*, 216 F.3d 18, 28

(D.C. Cir. 2000) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 & n.2 (D.C. Cir.

1994)); *see also Al-Bihani*, 590 F.3d at 878 (rejecting Guantanamo Bay detainee's argument that

use of the preponderance of the evidence standard in his habeas case was unconstitutional). Only

if respondents meet this burden may the Court deny Esmail's petition.

**C.      Evidentiary Issues**

The Court notes at the outset two issues regarding the evidence in this case.

First, as explained in the Court's order of August 26, 2009 [#606], the Court has

permitted the admission of any hearsay evidence the parties seek to present and considers at this

merits stage the accuracy, reliability, and credibility of the evidence on which the parties rely to

support their arguments. This approach is consistent with a directive from the D.C. Circuit. *See*

*Al-Bihani*, 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with

hearsay is not whether it is admissible—it is always admissible—but what probative weight to

ascribe to whatever indicia of reliability it exhibits."). The Court's assessment of the weight

properly accorded to particular pieces of evidence appears throughout this memorandum opinion.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Second, the nature of the evidence before the Court is atypical of evidence usually presented in federal actions. Respondents have offered a variety of types of documents produced and used by government intelligence agencies that are not the direct statements of the individuals whose personal knowledge they reflect. Several of the crucial pieces of evidence in this case are Intelligence Information Reports ("IIRs"), Summary Interrogation Reports ("SIRs"), Field Documents ("FD-302s") ███████████████████████ IIRs are Department of Defense documents for recording information derived from human sources. █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ FD-302s are forms completed by FBI agents summarizing interviews. ████████████████████████

## II. ANALYSIS

Esmail, or ISN 522,[2] grew up in a village near Ibb, Yemen, where his family had a sheep farm. In approximately 1998, he graduated from a high school in Ibb, where he had studied Islamic law. In 1999, upset that he was not able to marry a particular woman, Esmail left home and traveled to Afghanistan. It is undisputed that while there, he stayed in guesthouses and attended training camps at which he learned to use weapons and employ warfare techniques. The parties also agree that Esmail was held in United States custody at a detention facility in Bagram, Afghanistan beginning in January 2002, was transferred to another detention facility in Kandahar, Afghanistan on February 2, 2002, and has since May █ 2002 been detained at

---

[2]     ISN stands for Internment Serial Number. *See* Joint Exhibit ("JE") 28 at 1. Each detainee at Guantanamo Bay has been assigned with such a number.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Guantanamo Bay. The parties disagree, however, as to what occurred between the September 11

attacks on the United States and Esmail's initial detention and as to whether Esmail's actions in

Afghanistan amount to his having been part of Al Qaeda.

Pursuant to an order of the Court, the parties identified the issues in dispute to be

addressed at the merits hearing and structured their presentations to address each issue in turn

during the hearing. This opinion first addresses the reliability of statements Esmail made to

interrogators while in U.S. custody and on which respondents rely heavily to make their case,

then addresses each contested issue, and finally considers the reliable evidence as a whole to

explain the Court's conclusion that respondents have demonstrated by a preponderance of the

evidence that Esmail was part of Al Qaeda.

## A.   Reliability of Esmail's Statements to His Interrogators

Respondents base their argument that Esmail is lawfully detained in significant part on

statements Esmail made to interrogators and in declarations submitted to the Court. Esmail

argues that the Court should disregard the statements he made while in U.S. custody at Bagram

and in Kandahar because, he alleges, they are the product of coercive abuse.[3]   Respondents

---

[3]      The Court agrees with Esmail's underlying legal argument: statements that are the
product of torture are unreliable. *See Mohammed v. Obama*, 2009 WL 4884194, at *23 (D.D.C.
Dec. 16, 2009) ("[R]esort to coercive tactics by an interrogator renders the information less likely
to be true." (citing *Linkletter v. Walker*, 381 U.S. 618, 638 (1965))). To determine admissibility
in analogous situations in criminal cases, courts assess the voluntariness of statements made after
the application of coercive techniques based on a totality of the circumstances test. *Id.* (citing
*United States v. Karake*, 443 F. Supp. 2d 8, 87 (D.D.C. 2006)); *see also Schneckloth v.
Bustamonte*, 412 U.S. 218, 226 (1973) ("In determining whether a defendant's will was
overborne in a particular case, the Court has assessed the totality of all the surrounding
circumstances."). Judges of this Court have adopted this test in the cases of Guantanamo Bay
detainees seeking release. *See, e.g., Mohammed*, 2009 WL 4884194, at *23; *Anam v. Obama*, —
F. Supp. 2d —, 2010 WL 58965, at *4 (D.D.C. Jan. 6, 2010).

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

dispute the credibility of Esmail's allegations of torture. The Court concludes that although it is

likely some abuse of Esmail occurred, it is appropriate, for reasons that shall be explained, to

take Esmail's statements into account in evaluating the respondents' justification for his

detention.

### 1.    Allegations of torture

There is evidence in the record to support the contention that Esmail was subjected to

mistreatment while in United States custody.

### a.    CSRT hearing

The earliest indication in the record that Esmail was subjected to abuse while detained by

the United States appears in the summary of his September 2004 testimony before the Combatant

Status Review Tribunal ("CSRT").[4] At his hearing, he told the Tribunal that once in American

custody, "whenever [the detainees] spoke to the interrogators [they] were punished," explaining

that he was "hit and tortured" and, specifically, "they broke [his] nose." Joint Exhibit ("JE") 60

at 2. Upon arrival at Guantanamo Bay, Esmail alleged, he was hit again, including "on the

shoulder," which was "very painful, it was dislocated or something." *Id.*

### b.    Esmail's January 2009 declaration

Esmail provided a more detailed explanation of the abuse he allegedly suffered in a

declaration dated January 28, 2009 ("First Declaration"). JE 24. He stated that at Bagram, he

was "held outdoors in extremely cold conditions," explaining that "[t]he jumpsuits and blankets

they gave [the detainees] were not enough because of how freezing cold it was" and the detainees

---

[4]      Esmail alleged as early as February 2002 that "the guards beat and tortured him"
while he was held by Afghan soldiers before he was transferred to U.S. custody. JE 8 at 5.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

"had no shoes, only socks." *Id.* ¶ 17. Furthermore, Esmail alleges that American soldiers beat and kicked him and "stood on [his] back and knees." *Id.*

Esmail alleged that while detained in Kandahar, he also faced abuse. His mistreatement there allegedly included "religious abuse, such as disrespecting the Koran and beating or interfering with [him] as [he] prayed," being "searched and beaten regularly," and receiving electric shocks. Guards also allegedly forced Esmail "to remain on [his] knees in the heat of summer," "stripped [Esmail] naked while [his] head was hooded," threatened to shoot him, and "used dogs frequently to terrorize [him]." *Id.* ¶ 18.

Finally, the declaration indicates that when Esmail arrived at Guantanamo Bay, "guards threw [him] from the plane up into the air while [he] was still bound and shackled, and [he] fell to the ground unable to protect [him]self," at which point they "stomped on [him]." *Id.* ¶ 19. He allegedly "suffered a broken shoulder and torn muscles" as a result of the beatings. *Id.* During his time at Guantanamo Bay, he was allegedly made to suffer through "extreme sleep deprivation; being left in front of a running air conditioner for 18 hours; and unwelcome contact with a female interrogator." *Id.* ¶ 20. He also alleged that at some unspecified time, American guards or interrogators broke his nose. *Id.* ¶ 21.

  c. **Esmail's 2010 declaration**

Esmail submitted another declaration to the Court, this one transcribed during in-person and telephonic conversations with his attorneys that occurred on February 28, March 1, and March 4, 2010 ("Second Declaration"). PE 1 at 1-2; *Id.*, Ex. D. This declaration describes Esmail's allegations of abuse in greater detail than is included in the First Declaration.

The Second Declaration contains allegations that while in Afghani custody, Esmail faced

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

verbal threats of death from the guards and was at one point held still while "someone put a knife to [his] throat." PE 1, Ex. D ¶¶ 13-14.  Because the Afghans "threatened to kill [Esmail] if [he] did not confess to being a part of Al Qaeda," *id.* ¶ 15, Esmail "started inventing things" to appease them, *id.* ¶ 16.

Esmail stated that next, he was held at an Afghani prison in Kabul where at times he was "in total darkness," *id.* ¶ 21, he was given "just barely enough food to keep [the detainees] from dying," *id.* ¶ 22, and he was "tortured every day," including by having his head "slammed . . . against a cement wall five or six times" every time he was taken to the toilet as well as being "beat[en] with chains" on "boney areas" of the body, "whipped" on the back with electrical wires, hit with sticks, and "punched, slapped, and kicked," *id.* ¶ 25.  He also alleged that "[a]t night I could hear the crying, screaming, and moaning of other prisoners being tortured because the torture room was right above my cell." *Id.* ¶ 28.  Because he was afraid for his life, Esmail allegedly told the interrogators in Kabul lies so that they would stop torturing him. *Id.* ¶ 29. Esmail stated he was interrogated by an American while at this prison and, on orders from his Afghani captors and because guards pointed guns at his head during the interview, he repeated the same false story he had already told. *Id.* ¶ 31, 34.

While in transit to Bagram and upon arrival there, Esmail was allegedly beaten.  Because guards "threw [him] out of the helicopter and onto the ground" while his "hands and feet were still bound," Esmail landed on his face and broke his nose. *Id.* ¶ 37.  The guards who processed his entry to Bagram "kicked [him], pointed guns at [him], and stripped [him] naked." *Id.* ¶ 38. In detention there, he was cold and his feet became so swollen that he later had trouble walking. *Id.*  His first interrogation at Bagram allegedly took place while he was naked and in a ditch used

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

as a toilet. *Id.* ¶ 40. During this interrogation, he "repeated the lies that had saved [him] in" Afghani custody; during later interrogations, he "invented names" of people he had known in Afghanistan. *Id.* ¶¶ 42, 45. In preparation for his transfer to Kandahar, the guards shackled his hands, put a wool mask and hood that interfered with his breathing over his head, tied a rope around his arms in a tight and painful manner, "hit, slapped, and kicked" him, and put him on a plane. *Id.* ¶¶ 49-50.

Upon arrival at Kandahar, Esmail was allegedly beaten immediately, stripped naked, and told to make confessions, although he does not recall what he was forced to say. *Id.* ¶¶ 52-54. Other than this first interrogation, "all interrogations took place at night, maybe after 11:00 pm." *Id.* ¶ 57. On one occasion, Esmail allegedly tried to tell his interrogators that the information he had provided before was false, but guards "buried [him] up to [his] neck" in a hole in the ground until he resumed telling lies. *Id.* ¶ 58.

At Guantanamo Bay, Esmail allegedly again made consistent, untrue statements out of fear he would otherwise be tortured or abused. *Id.* ¶ 59. There too, he was allegedly beaten, including when he was taken from the plane upon arrival and was hit on his left shoulder. *Id.* ¶ 61.

### d.    Other sources

Esmail has also submitted documents from a variety of sources that corroborate the general practice of torture at the U.S. detention facilities in Bagram and Kandahar. *See* PE 2 at 1 (McClatchy Newspapers article dated October 6, 2009 reporting that "[f]ormer guards and detainees whom McClatchy interviewed said Bagram was a center of systematic brutality for at least 20 months, starting in late 2001"); PE 3 at 1 (New York Times article dated May 20, 2005

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

describing the death of an Afghani detainee at the Bagram detention center and a file containing

"ample testimony that harsh treatment by some interrogators was routine and that guards could

strike shackled detainees with virtual impunity"); PE 4 at 34-39 (Human Rights Watch report

dated March 2004 describing, *inter alia*, mistreatment of detainees at Bagram, including their

subjection to sleep deprivation and shackling in painful positions, and at Kandahar, including

kicking and punching); PE 6 at 19, 23 (report of the Human Rights Center at the University of

California, Berkeley and the International Human Rights Law Clinic at that institution's law

school describing the humiliation of detainees brought to Kandahar, where upon arrival they

"were hurled, one by one, into a three-sided sandbag 'pin-down'" and mistreatment at Bagram,

where at least some detainees were severely beaten).

Esmail's allegations and this additional evidence are sufficient for the Court to credit the

proposition that at some point during his time in U.S. custody, Esmail was mistreated.

**2.      Reasons to doubt the severity of Esmail's mistreatment**

Despite crediting evidence that Esmail was mistreated, the Court finds reason to believe

that Esmail's descriptions of abuse, particularly the most recent ones made to his attorneys

shortly before the merits hearing, are exaggerated.

**a.      [3] ██████ and [3] ████ declarations**

To rebut Esmail's allegations, respondents have submitted declarations from two

members of the United States military who were present at the Bagram and Kandahar detention

facilities, respectively, while Esmail was held at each location: [3] ██████████ and [3] ███████

[3] ███████ an interrogator for the United States Army, interviewed Esmail at Bagram

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Airbase on January 21, 23, 24, and 28, 2002. JE 59 ¶¶ 1, 5.[5] In his declaration, ███ first described procedures for the arrival of new detainees, which he oversaw. He explained that the standard procedure when detainees arrived at Bagram was to hood and handcuff them. Id. ¶ 6. The hoods served the purpose of preventing detainees from "learning possible routes of escape or observing other sensitive areas during transport." Id. Next, detainees were "searched for weapons by both a pat-down and a visual strip search." Id. The declaration also contains statements regarding the lack of abuse of detainees at Bagram, during interrogations and at other times. ███ asserted that "[w]hen [he] interrogated detainees, they were not stripped, hooded, or shackled" and he "did not threaten the detainees with harm to themselves or to their families." Id. ¶¶ 7, 10. He "did not employ any coercive interrogation techniques," nor did he see any other "interrogators or others employ coercive interrogation techniques." Id. ¶ 10.[6] He "saw no detainees, including ISN 522, struck, physically punished, or abused during [his] tour at Bagram." Id. ¶ 14.[7] He further noted that the only injuries he observed were those from which newly arriving detainees already suffered. Id.

---

[5]     These interviews are summarized in SIRs, referenced extensively in Part II.B of this opinion, on which respondents rely in making their case that Esmail is lawfully detained.

[6]     ███ noted in his declaration that he was conducting interviews in order to collect information about "potential military targets." JE 50 ¶ 7. Respondents argue that this fact is significant because it signals that commanders in the United States military believed the detainee's statements were reliable enough to take into account in making decisions about combat. The Court is not persuaded by this argument. The level of confidence the military has in particular information has no bearing on whether that information meets relevant evidentiary standards for purposes of this judicial proceeding.

[7]     ███ explained that the detention facility, a converted hangar, was "a large open space[ with] minimal privacy for someone who would have wanted to use violence against any of the detainees" and noted that he spent "12 to 18 hours each day" there. JE 59 ¶ 14. These assertions support the premise that ███ knew not only how he treated detainees but also how others behaved toward them.

11
SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

In addition,[3] ▮▮▮▮ declaration indicates that "[t]here were no dogs present" when he conducted interviews at Bagram. *Id.* ¶ 7. Regarding the temperature at the detention facility, [3] ▮▮▮▮ stated that "it was chilly" despite having heat because the door of the hangar stayed open and the floors were concrete. *Id.* ¶ 13. He also noted that "[t]o prevent detainees from using boots as weapons, they were given heavy wool booties equivalent to those that one would wear as a liner for a heavy hiking boot." *Id.*

In a supplemental declaration submitted in response to Email's Second Declaration, [3] ▮▮▮▮ specifically denied "thr[owing] any detainee in a latrine" or ever seeing or "otherwise obtain[ing] knowledge of, a detainee being thrown in or interrogated in a latrine." GE 1 ¶ 1. He also explained that the ditch used as a toilet to which Esmail referred in his declaration was covered with heavy boards or pallets that would have made throwing a detainee into the ditch "very difficult." *Id.* ¶ 2-3.

[3] ▮▮▮▮ a Special Agent with the FBI, conducted intake interviews and other interrogations at the Kandahar detention facility from February 7, 2002 until March 21, 2002. JE 63 ¶¶ 1, 3.[8] He stated in his declaration that he "never used threats, coercive techniques, or promises with a detainee when conducting interviews, nor [was he] aware that other interrogators did so." *Id.* ¶ 8. [3] ▮▮▮▮ who "never entered the detention facility" because his interviews of detainees "took place in a group of tents located approximately 30 ft. to 40 ft. outside of the detention facility," *id.* ¶ 6, "never saw any evidence that a detainee at the [Kandahar] facility had been abused," *id.* ¶ 9. He never saw "detainees without clothing" other than during the intake

_____

[8]      An SIR of an interrogation [3] ▮▮ conducted of Esmail is one of the exhibits on which respondents rely in this case. Part II.B of this opinion addresses its contents in some detail.

12
SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

process, "military dogs being used to threaten any detainee," or "any military personnel or others interfering with the detainees' prayer time or disrespecting the Koran." *Id.* In particular, he stated that "[d]uring [his] interview of [Esmail] on February 2█ █2002, [Esmail] did not complain to [him] of mistreatment or abuse while in U.S. custody," "[n]or did █ █ observe any circumstances or conditions to substantiate these allegations of physical abuse or mistreatment." *Id.* ¶ 12.

In a supplemental declaration submitted in response to Esmail's Second Declaration, █ █ described the intake process at Kandahar in more detail. He stated that "detainees were instructed to disrobe" upon arrival, but he "never saw a detainee's clothing cut off or forcibly removed" and, although detainees were interviewed right away, detainees were only "on occasion . . . questioned while naked, before they received their camp uniforms" rather than after they dressed. GE 2 ¶ 2. He also noted that he "never observed detainees hooded during this questioning." *Id.* █ █ further stated that he "did not recall" conducting interviews after 11:00 p.m. and only conducted interviews after 6:00 p.m. if he had follow-up questions. *Id.* ¶ 4. Finally, █ stated that while he was at Kandahar, he "did not see any holes that could accommodate burying a man up to his neck in dirt" as Esmail alleged happened to him. *Id.* ¶ 5.

Esmail disputes the value of both men's declarations. Esmail argues that █ █ declaration does not refute all of Esmail's allegations: it does not address the condition of Esmail's nose, nor does it state that █ █ was present at Esmail's intake at Bagram such that he would necessarily have seen the events that occurred upon Esmail's arrival or his being thrown in a ditch used as a toilet shortly afterwards. █ █ even admits, Esmail emphasizes, that he does not remember Esmail specifically. JE 59 ¶ 5. Esmail also argues that changes to the

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

SIRs—handwritten edits to indicate that the interrogation first labeled "fourth" was actually "2nd," JE 3 at 1, "fifth" was "3rd," JE 4 at 1, and "sixth" was "5th," JE 7 at 1—call into question how many interrogations actually occurred at Bagram and is consistent with the theory that other, unreported interrogations took place. As to ███ statements, Esmail argues that because ███ was not present at the Kandahar facility until February 7, 2002, JE 63 ¶ 3, he cannot refute Esmail's allegations about the conditions of his trip to Kandahar or interrogations that occurred between Esmail's arrival there on February 2 and his own five days later. Furthermore, Esmail emphasizes that ███ admits to never having entered the detention facility itself, instead remaining at the location outside it at which interviews took place. JE 63 ¶ 6.

The Court finds the declarations of ███ and ███ believable and relevant. ███ in particular explained his opportunity to see any mistreatment of detainees, including Esmail, that may have occurred at Bagram. Neither man witnessed the severe events Esmail reported. Although the declarations confirm some portions of Esmail's description of his treatment, such as being forced to be naked in the presence of guards and being held in a cold location, they discredit the possibility of other, more serious allegations, such as Esmail's being threatened with dogs or thrown in a ditch of waste. The declarations do not directly disprove each of Esmail's significant allegations, but the demonstration, particularly by ███ declaration, that at least some of them are entirely untrue serves to cast serious doubt on the validity of all of Esmail's assertions of serious abuse.

**b.    Medical records**

Respondents have also produced evidence that calls into question Esmail's assertions about the severity of injuries that resulted from his alleged mistreatment. As noted above,

14

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Esmail's declarations include statements that his nose was broken upon his arrival at Bagram and that his shoulder was dislocated or broken upon his arrival at Guantanamo Bay. Respondents argue that medical records from Guantanamo Bay and an analysis of them by a physician prove that Esmail's assertions are fabricated.

Respondents point in particular to a "Report of Medical Examination" dated May ██ 2002 and completed at the Camp Delta Medical Clinic at Guantanamo Bay. JE 111. This document indicates that it contains the results of an "in processing physical" of Esmail. *Id.* at 2. The report contains a chart in which the person completing it can check a box labeled "normal" or one labeled "abnormal" next to each of a variety of body parts. Next to "Nose," the "normal" box is checked. Handwritten notes below the chart and on another page of the record describe, using medical abbreviations, an injury to Esmail's shoulder. A declaration by ██████████ ██ M.D., submitted by respondents, explains the notes:

> [A]brasions of the Petitioner's left anterior shoulder were noted to be 6cm by 4cm (approximately 2 inches by 3 inches) with no granulation tissue, indicating that the abrasions were not deep and did not penetrate the epidermal layer, similar to a scraped knee. The examination also noted mild tenderness to palpation of the left anterior shoulder over the area of abrasion. Petitioner's shoulder was observed to be of normal strength and neurovascular intact. There were no motor or neurological deficits. The abrasions were dressed with Bacitracin and 4X4 gauze, with no reports of bleeding, drainage or odor, and were healed by May 11, 2002.

JE 58 ¶ 5.

██████████ declaration also addresses the lack of correlation between the injuries Esmail described in his First Declaration[9] and the information in the medical records. ██████████

---

[9]   ██████████ declaration was prepared before Esmail submitted his Second Declaration. The Court agrees with respondents' contention that because the allegations of abuse in Esmail's later declaration are more severe, ██████████ reasoning and conclusions, described below, are nevertheless probative of whether the injuries the medical records reflect are

15

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

concludes that "the medical records do not show evidence of abuse, especially of the extreme nature alleged." *Id.* ¶ 17. Had Esmail been subjected to the mistreatment described in his declaration, his "medical examinations would reflect some physical evidence of this alleged treatment, such as bruising, scabbing, or range of motion deficits." *Id.* ███ noted that nothing in the records indicate "any injuries consistent with a broken nose, broken shoulder and/or torn muscles." *Id.* ¶ 18. Further, "none of the examinations and evaluations showed any type of ligament/tendon injury or other physical trauma normally associated with the type of abuse as alleged in Petitioner's Declaration." *Id.*

In response, Esmail argues that because the medical records were produced so shortly before the merits hearing in this case, he was unable to obtain independent review of them. He notes, though, that the records reflect that Esmail's shoulder was injured such that it required ten days of treatment and contain no suggestion of the source of that injury. He further notes that the records are exclusively from Guantanamo Bay, where Esmail did not arrive until five months after he was first detained and his nose was broken, so he asserts it is not surprising that they do not mention what was by May 2002 an old injury. Esmail also points to a notation in his intake form from Kandahar that he arrived with back pain, JE 1 at 4, which he contends is consistent with his having been tortured while and before being held at Bagram.

The Court accepts the conclusions of the physician who reviewed Esmail's medical records. Even if Esmail's nose injury had healed by the time he arrived at Guantanamo Bay, it is apparent from the records and ███ conclusions about them that he exaggerated the severity of his shoulder injury. Furthermore, the records apparently contain no evidence of the

_____

consistent with abuse.

16

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

repeated beatings to which Esmail asserts he was subjected, calling into serious question the truthfulness of Esmail's most serious allegations of torture.

### c.   Esmail's declarations

Esmail's First Declaration, which was not the result of interrogation by any guards, describes less graphic and less sensational abuse than his Second Declaration. Respondents argue that the additional allegations, were they truthful, would have appeared in the earlier declaration because Esmail's counsel would have made the tactical decision to provide as much information as possible about torture in creating their traverse.[10] The Court finds nothing probative about any strategic decision an attorney makes in representing a client and will not discredit Esmail's statements for this reason.

In considering the motivations behind Esmail's decisions, rather than those of his attorneys, however, the Court finds that the nature of the differences between the First and Second Declarations serve to undercut the credibility of Esmail's allegations of torture. Although Esmail has asserted over a long period of time that he was abused in detention, he has made serious allegations in his Second Declaration—including of being given electric shocks, hit with chains, and almost fully buried in the ground—no hint of which appear in his earlier one. It is reasonable to infer based on the late addition of allegations that could reasonably be expected to appear in the First Declaration that Esmail has embellished his statements with false allegations in an effort to create an advantage for himself in this litigation.

---

[10]   Pursuant to the Amended Case Management Order that governs this case and the deadlines set by the Court in this matter, Esmail filed "a traverse containing the relevant facts and evidence supporting the petition," *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § I.G (Nov. 6, 2008 & Dec. 16, 2008), on July 24, 2009.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

### c.  Esmail's admissions

Several facts about Esmail's statements to his interrogators give the Court reason to doubt the veracity of Esmail's most severe allegations of torture.

First, the Court agrees with respondents that the summaries of Esmail's interrogations do not read as they likely would were the interviewee speaking out of fear.  Most notably, in an SIR of one of the interrogations of Esmail at Bagram, the author noted that the interrogators thought Esmail was holding back information; the author reported that Esmail stated that "he might know more, but that he was not going to tell us more, due to religious reasons" and that "he didn't care what we did to him, or how long he sat here, even if it was 100 years, that he wasn't talking."[11] JE 3 at 1. SIRs from later dates continue to indicate that the interrogators did not believe Esmail was sharing with them all the information he had.  See JE 4 ("Assessment: [Esmail] is cooperative when talking about almost any subject except other Yemenis he knew in Afghanistan. . . . Continue to interrogate."); JE 7 ("[We] still think that [Esmail] may be holding back information on associates in Afghanistan.").  The Court rejects Esmail's contrary contention that the apparent frustration of the interrogators is evidence that Esmail was subject to severe pressure to fabricate information to please them.[12]

Second, some of the information Esmail provided to his interrogators is independently

---

[11]     In this and several other intelligence reports quoted in this opinion, the text appears in the exhibit in all capital letters.  For ease of reading, the Court reproduces the quoted text in lowercase.

[12]     As to Esmail's related argument that inconsistencies in his statements—specifically, regarding the circumstances under which he saw Usama bin Laden—suggest that he was trying to tell his interrogators what they wanted to hear, the Court is unconvinced.  There are far more consistencies across his statements, regarding a range of topics, than discrepancies.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

corroborated, confirming the truthfulness of at least some of his statements and calling into

question the contention in his Second Declaration that he had "invented" names and otherwise

told lies to avoid abuse. In particular, Esmail stated during interrogations at Bagram and

Kandahar that he was encouraged to travel to Afghanistan by an Al Qaeda member named Abu

Khalud. JE 6 at 1; JE 8 at 2. During the relevant interrogation at Bagram, Esmail reportedly

noted that Abu Khalud had "lived in Bosnia before traveling from Afghanistan to Yemen." JE 6

at 1. An FD-302 summarizing an interview of Esmail at Kandahar reports that Esmail described

Abu Khalud as having a "[r]ound scar in middle of forehead from bullet injury." JE 8 at 2. In an

IIR summarizing an interrogation of a different detainee—ISN 1457—held at Guantanamo Bay,

the detainee referred to Abu Khalud as a facilitator of travel for Al Qaeda and noted that Abu

Khalud "was shot in the head in [Bosnia]." JE 31 at 3; *see also id.* at 2 (noting that the

abbreviation used in this sentence is meant to indicate a reference to Bosnia).[13]

Finally, the admissions Esmail made while at Bagram date to shortly after his arrival

there in late January 2002.[14] *See* JE 2 (SIR of first interrogation of Esmail at Bagram, dated

January █ 2002); JE 3 (SIR of interrogation of Esmail at Bagram on January █ 2002); JE 4

(same, dated January █ 2002); JE 6 (same, dated January █ 2002); JE 7 (same, dated January

---

[13]      In a previous opinion regarding the habeas petition of another detainee, this Court
found it appropriate to disregard certain statements of ISN 1457 as unreliable based on evidence
that they were the product of torture. The evidence on which the Court relied to make that
determination is not part of the record in Esmail's case. And the Court did not conclude that no
statement of this individual could ever be worthy of credence. Here, the similarity between the
statements of ISN 1457 and Esmail regarding Abu Khalud is specific enough that each
corroborates the other.

[14]      It is not clear from the record on what date Esmail arrived at Bagram.
Respondents have guessed that he arrived on January █ 2002. In any case, the parties agree that
he arrived before January █ 2002, the date of the earliest SIR.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

2002). Based on the timing of these interviews, there was little opportunity for Esmail to be affected by mistreatment in U.S. custody such that his statements became unreliable.[15]

In sum, nothing about the summaries of Esmail's statements suggests to the Court that they are the product of coercion, whereas there are indications to the contrary.

### 3. Conclusion

Although the Court is not convinced that Esmail was not subjected to mistreatment by his American captors, for the various reasons explained above, it finds that he did not endure the severe abuse he describes. Therefore, because the Court concludes that Esmail's will was not overborne during his interrogations, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (holding that a voluntary statement may be used against a defendant in a criminal case without offending due process, whereas an involuntary statement may not), it will not disregard the statements Esmail made during his interrogations at Bagram, Kandahar, or Guantanamo Bay. Accordingly, the Court will consider Esmail's admissions, as well as arguments about the credibility of particular assertions contained therein, in evaluating whether respondents have met their burden of proof in making their case that Esmail is lawfully detained by the United States.

### B. Issues of Fact

The Court next addresses the issues the parties identified as the material facts in dispute.

---

[15]     Although respondents have not disproved Esmail's allegations that he was first subjected to abuse in Afghani custody, any such abuse is less relevant to the Court's analysis than abuse by American guards. Factors to consider in evaluating the voluntariness of a statement include "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Mohammed*, 2009 WL 4884194, at *23 (quoting *Oregon v. Elstad*, 470 U.S. 298, 310 (1985)) (internal quotation mark omitted). Here, all of the statements were made after Esmail was no longer in Afghani custody and after he had been transported to a different location where different people interrogated him.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

1. **Issue One: Whether Esmail traveled from Yemen to Afghanistan to receive military training for jihad at the urging and with the assistance of a known Al Qaeda recruiter.**

    a. **Respondents' evidence**

Respondents argue that Esmail's admissions, and some additional evidence that corroborates them, are sufficient for the Court to find that Esmail traveled from Yemen to Afghanistan at the urging of an Al Qaeda recruiter and for the purpose of training for jihad. They point to several SIRs of Esmail's interrogations at Bagram in late January 2002.[16] Collectively, they indicate that Esmail told his interrogators that an individual named Abu Khalud, who was affiliated with Al Qaeda, arranged Esmail's travel to Afghanistan and that Esmail went to Afghanistan for the purpose of preparing for jihad in Chechnya. *See* JE 2 at 1 ("[Esmail] entered Afghanistan approximately two years ago in order to join the Chechen jihad."); JE 6 at 1 ("Abu

---

[16]    Esmail argues that the Court should not consider the statements in the SIRs to be the equivalent of testimony because (1) there are indications in the record that the SIRs are ███████████████████████ (2) in some instances, an IIR and SIR purportedly based on the same interrogation contain different or even conflicting information, and (3) according to ██████████ declaration, they were written by unidentified personnel based on ███████████ notes, which are not available. *See* JE 59 ¶ 8 ("I took notes during the interviews and then created an intelligence report recounting the information gathered. I did not keep my notes after the intelligence report was completed. The SIRs [submitted in this case] were prepared by other personnel from the information contained in my reports."). The Court does not disagree that there are legitimate critiques to be made about the forms of the evidence before it. But the Court must accept these atypical types of evidence in order to resolve this case. Furthermore, Esmail's specific critiques fail to persuade the Court to discount this evidence in particular. First, that an SIR lacks certain details does not make the information it does include inaccurate. Second, none of the minor discrepancies to which Esmail points—which concern topics such as the source of information about who paid for Esmail's travel and whether Esmail knew how the man who met him in Pakistan to assist with the next leg of his trip identified Esmail—are sufficiently important to have bearing on the Court's determinations regarding the main, relevant facts. Finally, that the SIRs were transcribed from ████████ reports may make small errors likely but similarly does not call into serious question the accuracy of the reporting of Esmail's most significant admissions.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Khalid made travel arrangements for [Esmail]."); JE 8 at 1 ("[Esmail] believed [Abu] Khalud
supported Al-Qaeda and the jihad against America.").

Respondents highlight that in the FD-302 of ▆▆▆[3] interrogation of Esmail at Kandahar
in late February 2002, which is the longest and most detailed of the interview summaries, Esmail
is reported to have said that he met Abu Khalud at a mosque attached to an Islamic school in
Taiz, Yemen and that "[h]e believed [Abu] Khalud supported Al-Qaeda and the jihad against
America." JE 8 at 1. Esmail went on to explain that he "felt angered" when Abu Khalud told
him "that the Russians were invading Chechnya and innocent civilians were being killed," so he
"decided to go to Chech[nya] to help the civilians fight back." *Id.* at 2. Because Abu Khalud
"explained that [Esmail] should first go to Afghanistan where he could receive the proper
military training," Esmail gave Abu Khalud his passport and awaited a phone call with
instructions regarding his departure. *Id.* Esmail ultimately departed for Afghanistan from Sanaa,
Yemen in winter 1999. *Id.*

As noted above, another Guantanamo Bay detainee told his interrogators certain details
about Abu Khalud's background that are consistent with information Esmail provided in his
interviews. Of note here, respondents argue, is that detainee's confirmation that Abu Khalud was
an Al Qaeda "facilitator," or someone who helped others travel to Afghanistan. JE 31 at 3.

The Court finds that Esmail traveled to Afghanistan with the assistance of Abu Khalud, a
member of Al Qaeda. The Court has considered Esmail's several arguments regarding this issue
and these particular statements but, for the reasons described immediately below, is not
convinced otherwise by any of them.

22

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

b.    **Petitioner's response**

Esmail first responds to respondents' contentions as to this issue by arguing that his motive for traveling to Afghanistan two years before being detained is not relevant to the ultimate question of whether he was part of Al Qaeda's command structure at the time he was taken into custody.

The Court does not accept this logic. Although Esmail's motive for traveling to Afghanistan cannot alone prove respondents' case, it is not irrelevant to the analysis the Court must undertake. Esmail's knowledge of Al Qaeda's role in his trip and activities in Afghanistan, upon which the initial impetus for his travel can shed light, are among the issues the parties dispute. Accordingly, the Court will not ignore evidence relevant to Esmail's reasons for leaving Yemen.

Next, Esmail asserts that his true reason for making the trip to Afghanistan appears in an SIR of an interview of Esmail at Guantanamo Bay █████████, as well as in his First Declaration. The declaration states simply that after graduation from high school, Esmail "was in love with a girl in Yemen, but [he] was not able to marry her" so he "decided to leave Yemen." JE 24 ¶ 5. The SIR explains in more detail that Esmail had been in love with a girl ████████ ████ but, in part because Esmail told a ███████████████████████████ ██ instead. PE 9 at 2. When████████████████████████████████████ ████████ Esmail was "embarrassed and heart-broken," left for "an Islamic school in another part of Yemen," and from there went to Afghanistan. *Id.*

The Court has no basis to disbelieve these allegations and therefore will accept them as true. They only explain, however, Esmail's desire to leave his hometown or perhaps his home

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

country. They do not explain why he chose to go to Afghanistan rather than to some other destination or why he accepted the assistance of Abu Khalud.

Third, Esmail argues that even if his motive for traveling to Afghanistan had to do with jihad, his interest was in Chechnya, not in fighting the United States. Insofar as Esmail's statement that he "believed" Abu Khalud supported Al Qaeda and the jihad against the United States, JE 8 at 1, suggests that his intent was to join Al Qaeda, Esmail contends that the statement is (1) uncorroborated by any other information in the record and (2) not significant because of statements elsewhere that he refused to join Al Qaeda. *See* JE 7 at 1 (SIR reporting that Esmail stated he "was, indeed approached by Abu Khoulud to join Al Qaida, [but Esmail] claims that he refused"); JE 13 at1 (FD-302 dated January 2003 reporting that Esmail "stated he has never been asked to join Al Qaeda and, if he had been asked, he would have refused.").

Just as the resolution of this issue cannot alone support a finding that respondents have met their burden of demonstrating that Esmail is lawfully detained, it cannot alone defeat their attempt to do so. The Court will accept Esmail's assertion that he did not leave Yemen with the intent to fight the United States, but it will go on to consider whether Esmail nevertheless ultimately did do so. *See Al-Adahi v. Obama*, — F. Supp. 2d —, 2010 WL 811280, at *7 (D.D.C. March 10, 2010) ("[T]he Government need not show that a petitioner knew or intended from the moment his journey began that it would end in al-Qaida and/or Taliban membership. It is both possible and probable that an individual would obtain such knowledge or form such intent over the course of a journey, as training and indoctrination are undertaken and political views are crystallized. The fact that an individual may have been initially motivated to travel abroad for innocent reasons, or that an individual's knowledge or intent was less than clear at the inception

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

of his journey, does not defeat the Government's case." (internal citations omitted)). The information in Esmail's statements suggests that he knew at the time he began his trip to Afghanistan that he was doing so with the assistance of members of Al Qaeda and that Al Qaeda was a militant group. Even if Esmail at some point refused to join Al Qaeda, his actions in Afghanistan are far more important than any isolated statement of intent in reaching a decision in this case.

Fourth, Esmail argues that the statement of ISN 1457 corroborating the contention that Abu Khalud was a facilitator is not as helpful to respondents' case as they suggest. Esmail notes that ISN 1457 said that Abu Khalud was a facilitator from 1995 to 1997, JE 31 at 2, but the parties agree that Esmail did not go to Afghanistan until 1999. Furthermore, that Esmail mentioned and knew some details about Abu Khalud is consistent with, Esmail argues, his having met or heard about Abu Khalud while in Afghanistan. Under this theory, Esmail used information he had acquired about Abu Khalud to fabricate the story he told and thereby appease his interrogators.

First, the Court finds Esmail's statements about Abu Khalud's assistance with his trip, which are fairly detailed and are based upon personal knowledge, more persuasive than ISN 1457's assertions about Abu Khalud's general actions over the course of several years. Second, the Court has already rejected the notion that Esmail's statement were coerced. It will not now assume that a particular admission is false solely because there is another plausible way Esmail could have learned some of the details he recited.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

**2.     Issue Two: Whether Esmail received military training at Al Qaeda's Al Farouq training camp and at the Malek training camp and stayed at known Al Qaeda guesthouses between his training camp sessions.**

Respondents contend that while in Afghanistan, Esmail attended two military training camps and stayed at Al Qaeda guesthouses.

**a.     Training camps**

Again, respondents rely on Esmail's statements to show that he received military training as well as other evidence to corroborate information in Esmail's admissions about the training camps and the courses offered at them. Esmail repeatedly told his interrogators that he attended training courses at the Al Farouq training camp, *see, e.g.*, JE 2 at 1; JE 6 at 1; JE 9 at 2, the Malek training camp, JE 2 at 1; JE 8 at 4; JE 9 at 2; JE 10 at 2, and the Asil location of the Al Farouq camp, JE 2 at 1; JE 8 at 4. He stated that his courses covered topics including light weapons, rocket propelled grenades, machine guns, explosives, topography, antiaircraft weapons, and mines. JE 2 at 1; JE 6 at 1; JE 8 at 4; JE 9 at 2; JE 10 at 2. Esmail named a variety of specific weapons he learned to use. *See, e.g.*, JE 2 at 1 (naming PK machine gun); JE 6 at 1 (naming Kalishnikov rifles); JE 8 at 4 (naming surface-to-air SAM-7 weapons).[17] Esmail's First Declaration admits the receipt of "some weapons training" at the Al Farouq camp and the Asil location of that camp. JE 24 ¶¶ 10, 13.

Respondents have also submitted the declaration of an intelligence analyst with the

---

[17]     Respondents also note, for the purpose of emphasizing the credibility of Esmail's statements, the detail with which he was able to discuss weapons. When an interrogator at Guantanamo Bay showed Esmail photographs of several kinds of mines in June 2004, Esmail made specific comments about the differences between one of them and a mine he learned to use at training. JE 19 at 3 ("It did not have the spikes and the top portion was longer. The mine is set-up by tying a wire from the mine to a tree or something similar.").

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Defense Intelligence Agency ("DIA") that provides information about terrorist training camps.

JE 25. The DIA indicates that █████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ *Id.* at 2. █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████      *Id.* The DIA's declaration does not name the Malek training camp, but it does

state generally that █████████████████████████████████████████████████

███████████████████████████████ *Id.* at 4.

Another detainee at Guantanamo Bay, ISN 2, made statements about Al Farouq, reported

in an FD-302, that are consistent with Esmail's description of the training he received.  JE 29.

ISN 2 stated that "[a]ll students that take the basic training class at Al Farouq get the same type

of training," which consists of two weeks each of "weapons training," "basic commando course,"

"topography," and "explosives."  *Id.* at 1.  After basic training, ISN 2 reported, students can "sign

up for advanced training," "go home," or "go to the front line and fight Jihad."  *Id.* at 1-2.

Esmail does not now deny that he attended Al Farouq.[18]  Instead, he offers reasons that

---

[18]      He does deny attending the Malek training camp.  JE 24 ¶ 26; JE 60 at 4 (report of
statement at CSRT hearing that Esmail "never went to Malek").  ███████████████████████████
███████████████

███████      Because whether Esmail received any training in addition to that to which he admits

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

his participation in training courses do not prove that he was part of Al Qaeda.

First, Esmail asserts that he did not know that the training sessions he was attending were sponsored by Al Qaeda. In his First Declaration, he states:

> I had no idea at the time whether the al Farouq camp had anything to do with Osama bin Laden or al Qaeda. No one asked me whether I was a member of al Qaeda or the Taliban before letting me get the training. You did not have to be a member of any particular group to participate. . . . No one ever tried to recruit me to be a fighter for the Taliban or to become a member of al Qaeda or any other group.

JE 24 ¶ 11. These assertions are consistent with statements reported in an FD-302 from February 2003 and in the summary of the CSRT proceedings, in which Esmail contended that he did not know for several months after beginning training that Al Qaeda was responsible for the courses. *See* JE 14 at 1 ("[Esmail] stated he only found out the name of the organization which supported the camp after he had been at Al Faroq for seven months."); JE 60 at 5 ("Q: Who did you think was running the camp when you went for training? A: When I got my training I don't know who was running the place. About five or six months after being there I heard about Al-Qaida. I didn't hear the name Usama Bin Laden for about another five or six months later.").

Respondents rejoin that these assertions are not credible. They point to a statement in an FD-302 summarizing the interrogation of a different Guantanamo Bay detainee, ISN ▇▇▇ that "all books used in the Faruq camp were marked with 'Al Qaida.'" JE 28 at 7. This indication that Al Qaeda was not secretive about its role in running the Al Farouq training camp, respondents reason, refutes the idea that Esmail could have been ignorant of it. Esmail responds

_____

is not relevant to the outcome of this case, the Court makes no finding as to Esmail's attendance at Malek.

28

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

that the statement is a single piece of hearsay describing the situation at a different location of the camp than Esmail attended; therefore, Esmail asserts, it does not demonstrate that Esmail observed any indication that his training was sponsored by Al Qaeda.

Second, Esmail argues that attendance at Al Farouq was not limited to members of Al Qaeda. The DIA declaration on which respondents rely, Esmail notes, includes a statement that some Al Farouq trainees had only █████████████████████████████████████

████████████████████ JE 25 at 1. Furthermore, ISN 1457 reportedly stated during a 2004 interrogation that "everyone attended Al Farouk," JE 91 at 6,[19] which, according to Esmail, means that even individuals without Al Qaeda connections were welcome. To this point, respondents rejoin that ISN 1457's reference to "everyone" referred only to all the people about which ISN 1457 had been asked over the course of his interrogation.

Although the parties make much of this second part of Esmail's argument, the Court sees no need to resolve the general question of who attended Al Qaeda training camps. Only Esmail's actions and knowledge are significant to the outcome of this case. It is undisputed that Esmail attended military training courses at two locations of Al Qaeda's Al Farouq training camp. It would require a suspension of disbelief for the Court to find that Esmail was not aware while attending these courses that Al Qaeda ran them. By his own admission in his First Declaration, Esmail spent over a month in training. Based on his statements to interrogators, the Court suspects that estimate is an understatement. *See, e.g.*, JE 3 at 1 ("[Esmail] has received much

---

[19]    Although, as noted, Esmail argues primarily that the Court should disregard all statements of ISN 1457, he asserts that if the Court chooses to consider information of which this detainee is the source where that information benefits respondents, the Court must also consider this piece of evidence that benefits Esmail.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

more training tha[n] the average fighter in Afghanistan."); JE 8 at 4 ("The training [at Al Farouq] was four months in duration."). As respondents note, the purpose of training camps, beyond teaching skills to be used in warfare, was indoctrination. JE 25 at 2. It is simply not believable that at no time during Esmail's several courses did the subject of against whom or for what purpose the trainees might fight arise. The Court therefore finds that Esmail knowingly received instruction from Al Qaeda.[20]

### b.   Al Qaeda guesthouses

Respondents argue that Esmail stayed at Al Qaeda guesthouses while in Afghanistan and that this fact supports the proposition that Esmail was part of Al Qaeda. Again, their evidence comes largely from Esmail's own admissions. They point to Esmail's statement that when he first arrived in Kandahar after traveling from Yemen, he was taken to a guesthouse where Abu Khalud was awaiting him. JE 8 at 3. Esmail noted that the guesthouse was "[d]iagonally across the street from" the Haji Habash Mosque. *Id.* Respondents contend that Esmail must have been referring to the Haji Habash guesthouse, described by the DIA as "a transition point ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ for individuals going to train at various training camps, ▮▮▮▮▮▮▮▮▮ JE 27 at 3; *see also* JE 90 at 2 (FD-302 of an interrogation of ISN 1457 reporting that the detainee stated that "Hajji Habbash [guesthouse] was close to the Hajji Habbash mosque").

Respondents also rely on Esmail's statements that he stayed at the Azam guesthouse in

---

[20]     At least one other member of this Court has reached a similar conclusion. In his decision in *Anam v. Obama*, — F. Supp. 2d —, 2010 WL 58965 (D.D.C. Jan. 6, 2010), Judge Hogan found that a petitioner who spent twenty-five days at Al Farouq "must have known that al-Farouq was an al-Qaida weapons training camp. Petitioner was trained to fight. He learned to use multiple firearms and received theoretical instruction on [rocket propelled grenades]. Certainly he realized he was not being prepared for charitable work." *Id.* at *12.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Kabul and the Najma Al-Jihad guesthouse in Jalalabad following September 11, 2001. JE 8 at 5.

According to the DIA, ███████████████████████████████████████

████████████████████████ JE 27 at 2. Esmail reportedly stated that he saw Usama bin

Laden enter the Najma Al Jihad guesthouse. JE 8 at 6.

In his First Declaration, Esmail admits to staying "at several guesthouses in Afghanistan,"

though he specifically disavows having stayed at any guesthouse in Jalalabad, maintaining that he

"told [his] interrogators that [he] stayed at Najeima al Jihad guesthouse in order to avoid torture."

JE 24 ¶ 28. But he asserts that he "never stayed in any guesthouse that [he] knew was run by

Osama bin Laden or al Qaeda." *Id.* Furthermore, he contends that respondents have no evidence

that only members of Al Qaeda were permitted to be guests. As to the Haji Habbash guesthouse

in particular, Esmail stated while at Bagram that "[t]he guesthouse was open to anyone that

needed a place to stay." JE 8 at 3. This assertion is corroborated, Esmail argues, by ISN 1457,

who reportedly stated that "Hajji Habbash was for everyone, new, old, coming to or leaving

Afghanistan, everyone stayed at the Hajji Habbash guesthouse." JE 90 at 2.

Respondents counter that the DIA has concluded that ███████████████████████████

█████████████████████████████████████████████████████████

████████████████████████ JE 27 at 3.

The Court infers from the record that Esmail stayed at the Haji Habbash guesthouse. The

Court finds it more likely than not that he stayed at other Al Qaeda guesthouses as well.[21]

---

[21]     As explained in the discussion of Issue Four, the parties dispute whether Esmail
willingly went to Jalalabad after September 11, 2001. Because, for the reasons described below,
the Court finds more credible the version of events that includes Esmail's having chosen to go to
Jalalabad, the Court also finds it more likely than not that he stayed at the Najma Al Jihad

31
SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Although respondents have not convincingly argued that every person who stayed at an Al Qaeda guesthouse was a member of Al Qaeda, it strains credulity to ask the Court to believe that after two years of intermittently residing at guesthouses—to which he was first led by a member of Al Qaeda—and attending training camps, Esmail did not know that he was staying at locations affiliated with Al Qaeda.

**3.      Issue Three: Whether Esmail attended the Institute of Islamic/Arabic Studies, which was directed by a high-ranking Al Qaeda leader.**

Respondents next argue that Esmail attended an Al Qaeda-affiliated academic institute. Esmail stated during several interrogations that he spent a number of months at this institution, called the Institute for Islamic/Arabic Studies. JE 2 at 1 ("Then [Esmail] went to Kandahar and studied at the school for Is[la]mic studies for four months."); JE 8 at 4 ("[Esmail] decided to stay at the guesthouse to attend a four (4) month religious studies semester at the Islamic Institute across the street."); JE 9 at 2 ("[Esmail] advised that he went to the Qandahar Institute for Islamic [S]tudies . . . to study [A]rabic and Islamic law.").[22] An SIR of an interrogation of another detainee provides more information about the Institute: "The mission of the Institute was

---

guesthouse there.

[22] 

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

to issue religious fatwa[s], teach the Koran and the Hadith, and to indoctrinate the young students about going to paradise if they give their lives for the Muslim cause." JE 34 at 2. Significantly, this detainee also reportedly stated that "[t]he Islamic Institute was financed directly by Usama bin Laden." *Id.* Furthermore, "Abu Hafs Al- Mauritania was the religious leader for the Islamic school in Qandahar." *Id.* at 1; *see also* JE 32 at 2 (IIR reporting that "the [Institute for Islamic Studies] director was Abu Hafs ((Al Mauritani))"). According to an IIR submitted by respondents, Abu Hafs was "the Sharia group committee leader of Al Qaida." JE 37 at 2.

Esmail contests the conclusions respondents draw from his actions. He argues that his attendance at the Institute is consistent with, and evidence of only, his devotion to religious studies. *See* JE 24 ¶ 4, 9 ("My studies [in high school] focused on religion and the Arabic language . . . . I planned to attend university and continue my studies so that I could become a teacher of Arabic. . . . In each city [in Afghanistan], I stayed in a guesthouse, read books, and studied the Koran and other Islamic texts."); JE 8 at 4 ("[Esmail] did not recall any discussions [at the Institute] relating to Al-Qaeda or jihad against the United States."). Esmail also argues that Abu Hafs, the Al Qaeda member who ran the Institute, held beliefs that contradicted those of Usama bin Laden. *See* PE 14 at 3 (excerpt from 9/11 Commission Report indicating that "Abu Hafs the Mauritanian reportedly even wrote Bin Ladin a message basing opposition to the attacks on the Qur'an"); JE 35 at 2 (IIR reporting that a Guantanamo detainee had heard Abu Hafs "talking about how wrong Usama ((bin Laden)) was for attacking the United States"). Esmail makes no assertions about his personal communication with Abu Hafs, but he presumably means to suggest that students at the Institute were not taught to blindly follow Usama bin Laden.

33
SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Indeed, Esmail asserts that he did not know that Usama bin Laden provided financial support to

the Institute; an IIR based on an interrogation of Esmail reports that he "stated that monetary

support for the Islamic Institute came from the Saudis." JE 10 at 2.

As to the arguments regarding Abu Hafs, respondents rejoin that the disagreement to

which Esmail refers occurred after September 11, 2001, by which time Esmail had already left

the Institute. Respondents presumably mean to suggest that Esmail could well have been

indoctrinated before Abu Hafs had reason to question Usama bin Laden's leadership.

The basic fact is undisputed: Esmail attended the Institute for Islamic/Arabic Studies in

Kandahar. Although Esmail may have believed he was receiving standard religious instruction,

the Court infers, given that the Institute was sponsored and led by key Al Qaeda figures, that

students there were taught Islamic doctrine in a manner twisted to serve the purposes of Al

Qaeda. But study of particular beliefs is not equivalent to the adoption of those beliefs; although

attendance at the Institute is certainly consistent with becoming a part of Al Qaeda, Esmail's

actions after attending the Institute are more probative of whether he actually did so.

4.   **Issue Four: Whether after September 11, Esmail associated with Al Qaeda leadership, fought at the Battle of Tora Bora, and was captured while retreating from the battle.**

The parties do not dispute that Esmail was in Kandahar on September 11, 2001. They

also agree that after the attacks on that date, he went to Kabul. They disagree as to the

significance of Esmail's decision to go to Kabul and as to what occurred next.

a.   **Respondent's version of events**

Respondents view Esmail's choice to go from Kandahar to Kabul after learning of the

34
SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

September 11 attacks as evidence that Esmail did not intend, despite what he told his

interrogators, to leave Afghanistan for Yemen. *See* JE 8 at 5 (reporting that Esmail told his

interrogator that after the "attacks in the United States," he "desired to go back to Yemen"); JE

24 ¶ 14 ("Before September 11, 2001, I decided to return to Yemen and to go back home. . . . I

was preparing to return when the September 11 attack on the United States occurred, and this

made me want to speed up my efforts to leave Afghanistan."). Respondents note that Kandahar

is close to Quetta, Pakistan, and that Esmail had entered Afghanistan by traveling from Quetta to

Kandahar. *See* JE 6 (SIR reporting Esmail's description of his travel route from Yemen to

Afghanistan). Rather than going east to Pakistan, respondents emphasize, Esmail traveled north

to Kabul, thereby remaining in Afghanistan.

  As to Esmail's actions after arriving in Kabul, respondents again base their allegations on

Esmail's statements. They assert that Esmail first spent a week at the Azam guesthouse in

Kabul. JE 8 at 5. Then he allegedly stayed at the Najim Al Jihad guesthouse in Jalalabad. *Id.*;

JE 9 at 3. Respondents assert that Esmail saw Usama bin Laden visit that guesthouse. JE 7 at 1

(SIR reporting that Esmail "last saw [Usama bin Laden] approximately 2 weeks before Ramadan

at Najm al Jihad guesthouse"); JE 68 at 2 (IIR reporting Esmail's responses to questions about

seeing Usman bin Laden at the guesthouse in November 2001). Respondents maintain that

Esmail next went to Tora Bora, JE 9 at 3 (FD-302 of interrogation of Esmail reporting that

Esmail stated he went from Jalalabad to Tora Bora); JE 14 (FD-302 reporting that Esmail stated

during an interview at Guantanamo Bay that "he was in Tora Bora to hide and denied he was

fighting although he admitted he had narrowly missed being shot by a tank"), which was the site

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

of a major battle between Al Qaeda and the United States in December 2001, JE 67 at 1-2

(declaration from DIA employee describing Tora Bora, a cave complex, and its bombing by the

United States in December 2001). During his interrogations, Esmail cited danger as an

explanation for his movements, noting that he went to Jalalabad because "Kabul wasn't safe," JE

9 at 3, "the mountains would be safer since the United States was going to bomb Jalalabad," and

"all of the Arabs were fleeing to Tora Bora because the Afghans wanted to kill or incarcerate

them," JE 8 at 5. He also suggested that he continued to want to return to Yemen, but could

not—and therefore remained at Tora Bora—because he did not have his passport. *See* JE 9 at 3

(FD-302 reporting that Esmail wanted to go to Yemen and that "[Esmail] didn't have his

passport and waited in Tora Bora"); JE 68 at 3 (IIR reporting that Esmail stated that he "had

planned to go back to Yemen for the holiday before the 11 September 2001 attacks, but [he] lost

[his] passport and [he] could not go").

Esmail was captured, respondents contend, retreating from Tora Bora with two other

men, identified as ISN 549 and ISN 242. *See* JE 1 at 1 (Kandahar detention facility intake form

noting that Esmail "surrendered with" two other men, one of who was injured, while

"descend[ing]" from mountains); JE 18 at 5 (IIR reporting that Esmail stated that ISN 549 "was

injured in Tora Bora" and Esmail "assisted [ISN 549] in fleeing Tora Bora"); JE 21 at 1 (SIR

summarizing interrogation of Esmail in July 2004 reporting that Esmail "stated that he met [ISN

242] while leaving the Tora Bora mountains").

Respondents are unable to point to a piece of evidence directly supporting the contention

that Esmail fought for Al Qaeda at Tora Bora, but they argue that the Court should nevertheless

36

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

infer that fact. The DIA has indicated that █████████████████████████

████████████████████████████████████████████████████████

██████████████ JE 26 at 4, so respondents contend that Esmail's presence in the area is

evidence that he was a fighter. Respondents also note that Esmail named a commander at Tora

Bora during his intake in U.S. custody in Kandahar, JE 1 at 2 (Kandahar detention facility intake

form noting that Esmail went "to Tora Bora, [commander] in Tora Bora was Hamz ((Falata))"),

suggesting that he was part of the Al Qaeda forces who fought under this individual.

     Furthermore, Respondents believe that the two other men with whom Esmail was

apprehended, who are now also detained at Guantanamo Bay, fought at Tora Bora. A report

generated from a database maintained at Guantanamo Bay regarding ISN 549 describes the

detainee as a "Yemeni fighter . . . positioned in the Tora Bora area with 10 other Arabs" who

"was injured in the bombing" and was arrested with Esmail. JE 109 at 2, 3. An IIR summarizing

an interrogation of ISN 549 reports that the detainee followed an order to go to Tora Bora, was

assigned to a particular position, was given a weapon, and was "wounded in the leg by a missile."

JE 108 at 1-2. An IIR of an interrogation of ISN 242 reports that that detainee stated he went to

Tora Bora and was arrested there with Esmail and ISN 549. JE 45 at 5. An SIR of a different

interrogation of ISN 242 reports he stated that he fled from Tora Bora with Esmail and that ISN

549, who was injured, was present. JE 44 at 1. Respondents argue that these consistent stories

lead to an inference that Esmail had been fighting at Tora Bora as well and was fleeing with

comrades.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

**b.     Petitioner's version of events**

Esmail argues that his decision to travel from Kandahar to Kabul does not have the

implications respondents suggest it does.  In his first declaration, Esmail states that before

September 11, 2001, he "had gotten over the woman [he] had wanted to marry" and whose

marriage to another man had prompted his trip away from home.  JE 24 ¶ 14.  After the

September 11 attacks, he intended to return to Yemen, but he "was delayed in leaving because

[he] wanted to meet and marry the sister of a Pakistani friend of [his]."  *Id.*  This delay, Esmail

argues, is not inconsistent with his repeated statements that he wanted to go to Yemen.  *See, e.g.*,

JE 8 at 5 (SIR reporting that Esmail stated he went to Kabul because he "desired to go back to

Yemen" and "hoped to go through Jalalabad, through Pakistan and into Yemen"); JE 60 at 2

(statement at CSRT hearing that "[w]hen [Esmail] went to Kabul, [his] plan was to go back [to

Yemen]"); JE 68 at 3 (IIR dated April 2002 reporting that Esmail stated he "had planned to go

back to Yemen for the holiday before the 11 September 2001 attacks").  Furthermore, Esmail

argues that it was rational to move from Kandahar, the capital of the Taliban regime and a likely

target of attacks by the United States, to Kabul, a city with which Esmail was familiar and which

was less connected to the Taliban.  There is no indication in the record, Esmail emphasizes, that

he received any order to go to Kabul or went with the intent to fight.

As to what occurred after his arrival in Kabul, Esmail's story diverges significantly from

the one respondents describe.  Esmail asserts that shortly after his return to Kabul, he "was

kidnapped at a marketplace . . . by men in Taliban clothing who said they were Taliban religious

police."  JE 24 ¶ 15.  These kidnappers then allegedly took Esmail "to a house in a village" that

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

he cannot identify, where they held him until mid-December 2001. *Id.* Esmail maintains that the kidnappers next took him "to a place in the mountains near the Afghanistan-Pakistan border where they picked up two other Yemenis." *Id.* One of these men was wounded. *Id.* Then the kidnappers allegedly took Esmail to a prison in Jalalabad, and next a prison in Kabul, before he was transferred to American custody and brought to Bagram. *Id.* ¶¶ 16, 17. Esmail notes that he first explained that these events had occurred at his CSRT hearing, *see* JE 60 at 2,[23] when he first recanted the alleged lies—including about his activities after September 11—he had told his interrogators to avoid torture.

In addition to offering this different version of events, Esmail now specifically recants some of the statements on which respondents rely. He denies staying at a guesthouse in Jalalabad, asserting that his statements to the contrary were the product of abuse. PE 1, Ex. D ¶ 28 ("I never stayed at any guesthouse in Jalalabad. I told my interrogators that I stayed at Najeima al Jihad guesthouse in order to avoid torture."). He also denies having ever seen Usama

---

[23]     The summary of Esmail's statement regarding this issue appears in the hearing report as follows:

> When the attacks took place I was not in Kabul, I was in Kandahar. When I went to Kabul, my plan was to go back. I was going to go from Kabul back to Yemen during the hot season. They first day I got to Kabul, I went to the market. Some Afghani people picked me up and said they were security. They drove me to a city that I didn't know. They took me to a house. I found out I was kidnapped and the people I stayed in were not security. The house I stayed in was watched. I was told if I left they would kill me. From the first attack until the 26th day of Ramadan. They told me they would take me to a house with Arabs in it. They took me to an Afghani place in Tora Bora. I stayed there one day and they brought a wounded person and another guy.

JE 60 at 2.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

bin Laden and similarly explains that he fabricated stories about seeing him to prevent

mistreatment. *Id.* ¶ 22 ("[T]he Americans beat me until I told them I had seen Osama bin Laden

several times. But that was a lie to stop the beatings. I never saw him."). Finally, he insists he

"was not a fighter" and "did no fighting at Tora Bora or anywhere else." *Id.* ¶ 29.

### c. Conclusion

The Court is not persuaded by Esmail's attempt to paint his decision to travel from

Kandahar to Kabul after September 11 as innocent. None of Esmail's explanations for this

decision is entirely logical or persuasive. He contends he wanted to return to Yemen along a

route that began in Kabul, but he does not explain what advantage such a route had over leaving

Afghanistan by going from Kandahar to Quetta. He maintains he wanted to meet a possible

bride, but he offers no additional details—such as who his Pakistani friend was, where this

woman was located, or whether he had plans to be introduced to her—to support that assertion.

Finally, he argues that by going to Kabul, he distanced himself from the Taliban; the Court is not

convinced that Esmail actually applied this reasoning, which he does not mention in any

interrogation or declaration, to his decisionmaking. Furthermore, Esmail's decision to remain in

Afghanistan is suspicious. The Court notes in particular that by staying in an Al Qaeda

guesthouse, Esmail placed himself in the company of Al Qaeda members who were prepared to

engage in military conflict.

Regarding what occurred after Esmail arrived in Kabul, Respondents' version of events is

much more credible than the one Esmail now offers. Respondents' story is based on the

consistent and logical narrative of Esmail's travels after going to Kabul that Esmail provided to

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

his interrogators shortly after the events took place. Esmail's new story, on the other hand, is not

logical. It strikes the Court as unlikely that kidnappers would take Esmail, who was allegedly

already captured, from a city or village into mountainous terrain where travel is difficult. *See* JE

67 at 1-2 (declaration of DIA employee describing Tora Bora cave complex as "situated in the

White Mountains of Eastern Afghanistan" and noting ███████████████████████

████████████████████████████████████████████

████████████████████████████ Therefore, the Court finds

it is more likely than not that Esmail intentionally went from Kabul to Jalalabad and on to the site

of the battle at Tora Bora.

The Court, necessarily dealing in probabilities, finds that because Esmail went to Tora

Bora, he was more likely than not an Al Qaeda fighter. The Court accepts the contention that

Esmail wanted to leave particular locations because of bombing and fear for his safety; these are

rational and not blameworthy motivations. But, although the Court also credits Esmail's

assertion that he wanted to go back to Yemen, it is undisputed that he did not do so. That he

chose instead to move closer to, and ultimately arrived at, Tora Bora indicates that he had a

connection to Al Qaeda. Only an individual who was part of that group would feel safe traveling

with fighters to the site of a battle. Moreover, Esmail had received extensive training in the use

of military weapons. It is reasonable to infer that he would have made use of that training while

at the location of a battle. Furthermore, evidence in the record demonstrates that Esmail was

taken into custody along with ISN 242 and ISN 549. These men were involved in the battle at

Tora Bora. Though neither says he saw Esmail fighting, the Court can and will draw inferences

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

from this evidence.  It is quite unlikely that Esmail would have been with these two men,

especially one who was wounded in battle, if he were not part of the Al Qaeda forces at Tora

Bora.[24]

## C.    Conclusion

In sum, the Court finds based on reliable evidence that Esmail (1) traveled to Afghanistan

at the urging of an Al Qaeda facilitator, (2) attended Al Qaeda military training camps, (3) stayed

at guesthouses which, if not exclusively patronized by Al Qaeda members, were at least affiliated

with that organization, (4) took a religious studies course at an Institute sponsored by Al Qaeda,

(5) remained in Afghanistan after the attacks of September 11, 2001, and (6) went to Tora Bora,

the site of a major battle against the United States, where he acted as a fighter for Al Qaeda.

Accordingly, the Court concludes that respondents have shown by a preponderance of the

evidence that Esmail was "part of" Al Qaeda and is therefore lawfully detained.  *Hamlily*, 616 F.

Supp. 2d at 69-70.[25]  Although the record does not contain direct evidence that Esmail

---

[24]     The Court recognizes that its findings as to this issue are based largely on
circumstantial evidence.  But courts have held in a variety of circumstances that circumstantial
evidence can be as probative as direct evidence.  *See, e.g., Doe v. U.S. Postal Serv.*, 317 F.3d
339, 343 (D.C. Cir. 2003) (noting in discussing evidence in a civil case in which plaintiff
attempted to prove that a statutory violation had occurred that "we generally draw no distinction
between the probative value of direct and circumstantial evidence" (citations omitted)); *United
States v. Gates*, 807 F.2d 1075, 1080 (D.C. Cir. 1986) ("As a general rule, circumstantial
evidence is as pertinent as direct evidence to the establishment of guilt or innocence in a criminal
case." (citations omitted)).

[25]     The D.C. Circuit has written, in dicta, that evidence that a detainee "attended Al
Qaeda training camps in Afghanistan and visited Al Qaeda guesthouses . . . would seem to
overwhelmingly, if not definitively, justify the government's detention" of that individual.  *Al-
Bihani*, 590 F.3d at 873 n.2.  The Court need not evaluate the significance of this statement
because the evidence in this case demonstrates that Esmail did more than stay in Al Qaeda
guesthouses and attend Al Qaeda training camps.  Because he served as a fighter for Al Qaeda,

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

"receive[d] and execute[d] orders" as a member of Al Qaeda, *Gherebi*, 609 F. Supp. 2d at 68, the

Court infers from its conclusions about Esmail's actions that he did act, most significantly by

joining the forces at Tora Bora, at the command of Al Qaeda leaders.

### III. CONCLUSION

For the foregoing reasons, Esmail's petition for a writ of habeas corpus shall be denied.

An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

April 8, 2010

---

Esmail may be lawfully detained pursuant to the AUMF.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE