FILED WITH THE
COURT SECURITY OFFICER
CSO: _Wilkerson_
DATE: 5/26/10

~~SECRET~~

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAHMOAD ABDAH, et al.,**<br><br>Petitioners,<br><br>v.<br><br>**BARACK H. OBAMA, et al,**<br><br>Respondents. | **Civil Action No. 04-1254 (HHK)** |

## MEMORANDUM OPINION

Mohamed Mohamed Hassan Odaini (ISN 681), a Yemeni citizen, was seized by Pakistani authorities on March 28, 2002 and has been held by the United States at the naval base detention facility in Guantanamo Bay, Cuba since June 2002. Odaini has filed a petition for a writ of habeas corpus contending that he is unlawfully detained. Respondents in this case, President Barack H. Obama and other high-level officials in the United States Government, argue that Odaini is lawfully detained and therefore should remain in U.S. custody. The parties filed cross-motions for judgment on the record and appeared before the Court for a hearing on the merits of Odaini's petition on May 10 and 11, 2010. Upon consideration of the motions and the evidence presented at the merits hearing, the Court concludes that respondents have failed to demonstrate that the detention of Odaini is lawful. Therefore, Odaini's petition shall be granted.

## I. LEGAL STANDARDS

### A. Scope of the Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the

terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons,

in order to prevent any future acts of international terrorism against the United States by such

nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. at 224. The U.S. Supreme

Court has held that the District Court for the District of Columbia has jurisdiction over petitions

for writs of habeas corpus brought by detainees held at Guantanamo Bay pursuant to the AUMF.

*See Boumediene v. Bush*, 553 U.S. 723, —, 128 S. Ct. 2229, 2274 (2008); *Rasul v. Bush*, 542

U.S. 466, 483-84 (2004). The Supreme Court has provided "scant guidance," however, as to

whom respondents may lawfully detain under the statute. *Al-Bihani v. Obama*, 590 F.3d 866,

870 (D.C. Cir. 2010) (noting that the Supreme Court has "consciously le[ft] the contours of the

substantive and procedural law of detention open for lower courts to shape in a common law

fashion" (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion of

O'Connor, J.); *Boumediene*, 128 S. Ct. at 2276)).

In the absence of controlling law governing the question of by what standard to evaluate

the lawfulness of the detention of the individuals held at Guantanamo Bay, the Court shall rely

on the reasoning of other Judges of this Court who have thoroughly and thoughtfully addressed

this issue. Accordingly, consistent with Judge Bates's ruling in *Hamlily v. Obama*, 616 F. Supp.

2d 63 (D.D.C. 2009), the government may detain "those who are 'part of' the 'Taliban or al

Qaida forces.'" *Id.* at 69-70.[1] As Judge Walton ruled in *Gherebi v. Obama*, 609 F. Supp. 2d 43

(D.D.C. 2009), such membership requires that the person in question "have some sort of

'structured' role in the 'hierarchy' of the enemy force." *Id.* at 68.

---

[1]     "It is not in dispute that Al Qaeda is the organization responsible for September 11," *Al-Bihani*, 590 F.3d at 873, and is therefore among the entities to which the AUMF refers.

SECRET

## B. Burden of Proof

As stated in the Amended Case Management Order that governs this case, "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008). Accordingly, Odaini need not prove that he is unlawfully detained; rather, respondents must produce "evidence which as a whole shows that the fact sought to be proved," that Odaini was part of Al Qaeda, "is more probable than not." *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 & n.2 (D.C. Cir. 1994)); *see also Al-Bihani*, 590 F.3d at 878 (rejecting Guantanamo Bay detainee's argument that application of the preponderance of the evidence standard in his habeas case was unconstitutional). If respondents do not meet this burden, the Court must grant Odaini's petition and order his release.

## C. Evidentiary Issues

The Court notes at the outset two issues regarding the evidence in this case.

First, as explained in an order entered in this case on August 26, 2009 [#606], the Court has permitted the admission of hearsay evidence but considers at this merits stage the accuracy, reliability, and credibility of all of the evidence presented to support the parties' arguments. This approach is consistent with a directive from the D.C. Circuit. *See Al Bihani*, 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits."). The Court's assessment of the weight properly accorded to particular pieces of evidence appears throughout this memorandum opinion.

SECRET

SECRET

Second, the nature of the evidence before the Court is atypical of evidence usually presented in federal actions. Respondents have offered a variety of types of documents produced and used by government intelligence agencies that are not the direct statements of the individuals whose personal knowledge they reflect. The evidence in this case includes Form 40s ("FM40s"), Intelligence Information Reports ("IIRs"), Summary Interrogation Reports ("SIRs"), Memorandum for Records ("MFRs"), Field Documents ("FD-302s") ███████████████ ███████████████ FM40s are records of investigation activities, here witness interviews, conducted by the Criminal Investigation Task Force, a federal law enforcement agency. IIRs are Department of Defense documents for recording human intelligence.[2] SIRs ██████████ ████████████████████████████████ An SIR differs from an IIR, which might contain the same substantive information, because an SIR ████████ ████████████████████████████ MFRs are similar to SIRs. FD-302s are forms completed by FBI agents summarizing interviews. ██████████ ██████████████████████████████████ ████████████████████████████ Joint Exhibit ("JE") 32 at 7 (declaration of a Defense Intelligence Agency employee describing, *inter alia*, types of intelligence reports). Neither party called any live witnesses.

## II. ANALYSIS

**A.   The Evidence Before the Court Overwhelmingly Supports Odaini's Contention that He is Unlawfully Detained.**

The Court begins by summarizing the evidence in the record directly related to Odaini's

---

[2]       Human intelligence, or HUMINT, is "information derived from a person(s)." Joint Exhibit ("JE") 32 at 1.

4

SECRET

SECRET

case. This evidence consists of statements Odaini has made while in detention about his time in Pakistan, statements other Guantanamo Bay detainees seized at the same time and location as Odaini have made while in U.S. custody, and respondents' records regarding Odaini's detention.

## 1. Odaini's Statements

From the first time he was interrogated in American captivity to the declaration he created for use in this litigation, Odaini has told the same story. He was born in Taiz, Yemen[3] on September 20, 1983. JE 4 at 2 (SIR of interrogation at Bagram detention facility in Afghanistan on 2 ▮▮▮▮▮▮▮▮ JE 73 ¶ 1 (Declaration of Odaini dated January 29, 2009).[4] He is Muslim. JE 2 at 2 (FD-302 summarizing 2 ▮▮▮▮▮▮ interrogation at Guantanamo Bay). His father, who works for the Yemeni Security Service,[5] has two wives and sixteen children. JE 2 at 2; JE 27 at 1 (FD-302 summarizing 2 ▮▮▮▮▮▮ interrogation at Guantanamo Bay).[6] Odaini went to high school in his hometown. JE 2 at 1; JE 4 at 2. Odaini's father wanted Odaini to pursue religious studies in Pakistan after his graduation from high school in 2001. JE 2 at 2; JE 4 at 2; JE 47 at 4 (undated summary of Administrative Review Board ("ARB") proceedings for Odaini); JE 73 ¶ 3.

---

[3]    In some interviews, he provided his family's address and/or phone number in Taiz. *See* JE 2 at 1; JE 4 at 2.

[4]    The Court notes here for the purpose of emphasizing that the documents that serve as evidence in this case contain errors, whether of translation or reporting, that two of the interrogation reports in the record indicates that Odaini was born in April rather than September. JE 2 at 1; JE 29 at 1.

[5]    Neither party presented any evidence as to what the Yemeni Security Service is, although both accept, as suggested in some of Odaini's interviews, that it is an agency within the Yemeni government.

[6]    During at least one interview, Odaini provided his interrogator with the names, ages, and occupations or educational status of his six brothers, who ranged in age in 2002 from four to twenty-seven as well as the names of his nine sisters. *See* JE 2 at 2.

SECRET

Odaini's father provided his son with a passport, a visa for travel to Pakistan, a plane ticket to Lahore, Pakistan via Karachi, Pakistan, and money to take with him on his journey. JE 2 at 1, 2; JE 4 at 2; JE 27 at 2; JE 41 at 2 (MFR summarizing ███████ interrogation); JE 46 at 2-3 (undated transcript of Odaini's Combatant Status Review Tribunal ("CSRT") hearing); JE 73 ¶ 3.

████████████████████████████████████████████

After arriving in Lahore, Odaini took a bus to Raiwand, Pakistan, the site of the headquarters of an organization called Jama'at Al Tabligh. JE 2 at 2; JE 4 at 2; JE 27 at 2.[7]  In Raiwind, Jama'at Al Tabligh runs a center for the study of Islam, which thousands of students attend. JE 2 at 2.  Odaini studied there for approximately five months, between June 2001 and November 2002. *See* JE 4 at 2; JE 27 at 2; JE 73 ¶ 4.[8]  At some point, a man there[9] suggested to

---

[7]  Jama'at Al Tabligh means "The Party of Missionary Work." JE 95 at 1 (Letter from Qamar-ul Huda, Senior Program Officer, Religion and Peacemaking Center of Innovation, United States Institute of Peace, to Darold Killmer and Mari Newman, Partners, Killmer, Lane & Newman, LLP (February 23, 2009)).  Participation involves traveling with a small group of men to instruct Muslims in following Islamic practices. JE 96 at 1 (Letter from Barbara D. Metcalf, Professor of History at the University of Michigan to Darold Killmer and Mari Newman, Partners, Killmer, Lane & Newman, LLP (February 12, 2009)); *see also* JE 97 at 1 (Letter from Jamal J. Elisa, Professor of Religion, Amherst College to Baher Azmy, Seton Hall School of Law (December 13, 2004)) (explaining that the central principle of the movement "refers to the obligation of members of the Tablighi Jama'at to take time from their regular lives to travel and actively engage in spreading the message of the movement in the Muslim community"). An imam at the mosque Odaini attended in Taiz, who Odaini's father had known for many years, was a member of Jama'at Al Tabligh and directed Odaini to Raiwand. JE 4 at 2; JE 27 at 1.

[8]  At this school, Odaini "was taught the history of the Prophet Mohammed and Islam, how to conduct sermons, and the proper dress for conducting religious ceremonies." JE 2 at 2.

[9]  In one interrogation report, the author wrote that Odaini said the man, named Mohammed Ijaz, a Pakistani, "was on staff at the [Jama'at Al Tabligh] mosque." JE 2 at 2. In another, the interrogation report spells the name as "E'eghazi" and indicates that he was a Pakistani student. JE 4 at 2.

6
SECRET

SECRET

Odaini that he could complete his studies more quickly in an advanced course at Salafia

University in Faisalabad, Pakistan. JE 2 at 2; JE 4 at 2; JE 7 at 1 (FM40 summarizing ███████

███████ interrogation at Guantanamo Bay).

Odaini took this advice and, in November 2001, enrolled in Salafia University, where he

was one of approximately two hundred students. JE 2 at 2; JE 7 at 1; JE 40 at 1; JE 46 at 2, 4; JE

73 ¶ 5.[10] He lived in a university dormitory. JE 2 at 2-3; JE 7 at 1; JE 44 at 1 (FM40

summarizing ███████ interrogation at Guantanamo Bay); JE 46 at 1. Another student,

whose name was Emad, told Odaini he was welcome to visit Emad's off-campus home, which

was a guesthouse. JE 2 at 3; JE 4 at 2; JE 7 at 1; JE 46 at 5; JE 47 at 3; JE 73 ¶ 8. (The Court

will refer to this house as "Issa House," as it has been designated because a man named Issa, who

Odaini did not know, JE 4 at 3, and who did not live at the house, *see, e.g.*, JE 105 at 6, ran it,

*see, e.g.*, JE 5 at 1.) Odaini accepted this invitation on the evening of March 27, 2002, when he

went to Issa House for dinner; after spending the evening talking to other Yemeni, Salafia

University students who lived there about religion as well as "their past and where they lived in

Yemen," he decided to spend the night. JE 2 at 3; JE 4 at 3; JE 7 at 1; JE 46 at 6; JE 73 ¶ 9.[11]

There were other people in the house, but Odaini did not know them. JE 2 at 3; JE 44 at 1.

At around 2:00 a.m., Pakistani police raided the house and seized all of its occupants. JE

2 at 3; JE 7 at 1; JE 73 ¶ 10. ████████████████████████████████████

---

[10]     At Salafia, Odaini's "whole day consisted of memorizing the Koran and reciting
what he learned for the instructors." JE 2 at 2.

[11]     In many intelligence reports quoted in this opinion, all or some text appears in the
exhibit in all capital letters. For ease of reading, the Court will not reproduce quoted text in that
manner.

SECRET

SECRET



If this story is true, Odaini was not part of Al Qaeda or any other force associated with Al Qaeda and therefore without question is not lawfully detained.

## 2. Evidence Derived From Other Individuals Seized in the Raid of Issa House

The record before the Court includes intelligence reports summarizing interrogations of twelve other men seized in the raid of Issa House. These men made statements that corroborate various assertions reported in Odaini's interrogation summaries, suggesting that Odaini's explanation of events is true.

### i. ISN 679

According to an interrogation summary, ISN 679 "stated that he attended Salafeyah University and studied the Koran." JE 33 at 1 (FM40 summarizing  interrogation at Guantanamo Bay). At first ISN 679 "lived in the dormitory," but a man named Issa, who "was employed by Salafeyah University," "instructed [ISN 679] and four other students to go to the Issa House." *Id.* According to ISN 679's interrogation summary, Odaini was among the students to whom Issa gave this instruction. *Id.* ISN 679 "followed Issa's instructions and reported to the Issa House." *Id.* ISN 679 "stated that he did not observe or hear anyone

SECRET

SECRET

preaching about the Jihad or recruiting for the Taliban and Al Qaeda" at the house. *Id.*

ISN 679 has been released from Guantanamo Bay and returned to Yemen. JE 118 at 1 (Declaration of Amie Draves, Paralegal, Covington & Burling LLP, reporting information she viewed on the *New York Times* website).

### ii. ISN 680



When asked about his authority to invite people to Issa House, ISN 680 said "Americans do not understand his culture and how common such an[] act is to [his] culture." JE 76 at 2 (SIR of [redacted] interrogation of ISN 680). When asked "about the individuals [he] had arranged to stay at the house," Odaini[13] and ISN 688, ISN 680 "said that he had asked [Odaini] only to visit, although the night of the visit was the night of the raid" and that "the reason he had asked ISN 688 to stay at the house was because ISN 688 was homeless." *Id.*



---

[13]    ISN 680's name is Emad, JE 76 at 2, which, as noted, is the name by which Odaini identified the student he said invited him to Issa House.

SECRET

### iii.    ISN 684

ISN 684 stated during an interrogation at Guantanamo Bay that he spent time at the Jama'at Al Tabligh center in Raiwind. JE 49 at 1 (FM40 of 2⬛️⬛️⬛️⬛️ interrogation). He left, intending to go to Afghanistan, but was dissuaded from doing so and, after returning to Lahore, Pakistan, "met a Pakistani man who invited [ISN 684] to his home in Faisalabad." *Id.* After staying at the man's home for three days, ISN 684 told the man that he "wanted to attend a Tablique school in Multan, Pakistan," at which point ISN 684 was "sent by taxi to the Issa guesthouse located approximately one kilometer away." *Id.* ISN 684 "could not provide any information" about the other men seized in the raid of Issa House because "he kept to himself at the guesthouse studying the Koran and everyone else at the house did the same." *Id.*

### iv.    ISN 686

An interrogation summary describing the statements of ISN 686 reports that this detainee, a Yemeni, went to the "Raywarnd Religious Center [] in Lahore, Pakistan" to study Koran. JE 51 at 3-4 (IIR reporting information acquired from an FD-302 summarizing an interrogation of ISN 686 2⬛️⬛️⬛️⬛️). A man at this center "told [ISN 686] about the Salafia Unviersity in Faisalabad" where "many Arabs [were] studying," so ISN 686 traveled to Faisalabad and met with "the sheik of Al Salafia College." *Id.* at 4. The sheik "told [ISN 686] he couldn't stay at the college because [ISN 686] did not want to take classes but only wanted to memorize the Koran," and informed ISN 686 of "a house with other Arabs who were also interested in only memorizing the Koran." *Id.* ISN 686 was introduced to students who lived at the house, "and he went with them to the house where they asked the owner, ((Issa)), if he could stay." *Id.* at 4-5. ISN 686 stayed at Issa House until he was seized in the March 28 raid. *See id.* at 5.

SECRET

SECRET

### v. ISN 687

ISN 687 "traveled to Faisalabad, Pakistan on the advice of a male Palestinian by the name of Ali, who[m] [ISN 687] met at the Jamat Tabligh, located in Raywan, Pakistan." JE 26 at 1 (FM40 summarizing interrogation of ISN 687 in Guantanamo Bay on ███████████). ISN 687 stayed at Issa House "for approximately two months before being captured by the Pakistani Police." *Id.* He told his interrogator that "his main purpose for being at the house was to continue his medical treatment for his back." *Id.*[14] He "participated in reading the Koran with other occupants of the guesthouse." *Id.*

ISN 687 identified Odaini as a "follower[] of the Jamat Tabligh." *Id.*[15]

ISN 687 has been released from Guantanamo Bay and returned to Saudi Arabia. JE 118 at 1.

### vi. ISN 688

ISN 688 admitted in an interrogation that he knew several Al Qaeda operatives and spent a year and a half on the "front lines of Kabul." JE 18 at 1-2 (SIR of █████████ interrogation).

---

[14]    The Court notes that ISN 687's assertion that he "was tak[ing] prescription medication that he had been prescribed by a doctor in Karachi, Pakistan," JE 26 at 1, █ ████████████████████████ ISN 691, whose circumstances are described below, also stated that he was sick while at Issa House and that the "medication [he] was taking in Pakistan . . . was in the house with [him]." JE 77 at 5.

[15]    In █████████, Odaini was interrogated for the purpose of collecting information about ISN 687. When shown a photograph of ISN 687, Odaini told his interrogator that "he first saw this individual in a jail in Pakistan" and "later learned that this individual had been at [Issa House] in Faisalabad on the same night as [Odaini] had stayed at the guesthouse. [Odaini] stated that he had only spent one night at the guesthouse, and as such, didn't know or recognize many of the other residents." JE 44 at 1. Odaini added that "as far as he knew, ISN 687 was not a student at Salifast University." *Id.*

11

SECRET

SECRET

He then explained that after being "dropped off at a mosque in Faisalabad where he stayed for three weeks," he met ISN 680, who "invited [ISN 688] to stay at the house where [ISN 680] was staying," which was Issa House. *Id.* at 2. ISN 688 moved to Issa House and was there for three weeks before being seized in the raid. *Id.*[16]

ISN 688 identified a photo of Odaini as "Mohammed Odani who was a student at Salafia University and present at the house upon [ISN 688']s arrival." *Id.*

      vii.    **ISN 690**



----

[16] In testimony before the CSRT, ISN 688 described a quite different version of events, denying that he had ever been in Afghanistan. JE 105 at 7 (undated summary of transcript of CSRT proceedings). There too, however, he said he met "Ahmed Abdullah"—ISN 680, *see* JE 76 at 1—who brought him to Issa House. JE 105 at 3-4. ISN 688 said he "didn't have any relationships with anyone in that house" and "[the other students] were trying to inspire me and to do the religious things, like look at my religion because most of the students were studying the Koran and all things related to religious studies." *Id.* at 4 (alteration in original). He also mentioned that he was not "in harmony" with the students at the house because he "used to use drugs and hashish and things like that," *id.*,

SECRET

Koran student" who "arrived at the house the day that they were all arrested." JE 53 at 3 (MFR

summarizing[2]          interrogation of ISN 690 at Guantanamo Bay).

### viii.   ISN 691

ISN 691 traveled from Yemen to Pakistan to learn about Islam. JE 77 at 2-3, 16-17

(undated, unidentified document that appears to be a CSRT transcript). He took a tour of Salafia

University but did not become a student there. JE 6 at 1, 2 (FM40 summarizing interrogation of

ISN 691 at Guantanamo Bay on September 16, 2003); JE 77 at 6. He was directed to Issa House,

which he believed "was the property of Jaamia Salafeyah University," by people at the university.

JE 6 at 1. He became ill, so he "decided to stay" at Issa House "to get treated and get well." JE

77 at 9. He was there for approximately a month and a half before the March 28, 2002 raid. JE 6

at 1.

When shown a photograph of Odaini, ISN 691 stated that Odaini was an occupant of Issa

House. JE 6 at 1. During his CSRT hearing, ISN 691 called Odaini as a witness, and ISN 691

told the CSRT that "[Odaini] came in the night we were arrested." JE 77 at 15.

### ix.   ISN 692

ISN 692 testified as a witness in Odaini's CSRT hearing.[18] *See* JE 46 at 8. ISN 692 told

the CSRT he is from Yemen, and when he flew to Pakistan because he was interested in

---

[18]   The witness was identified by name, rather than ISN number, during the hearing,
JE 46 at 8, but it is apparent from the record that Alah Ali Bin Ali is ISN 692, JE 52 at 1
(identifying ISN 692 as Ala'a Ali Bin Ali).

SECRET

attending university, people he met suggested that he go to Issa House. *Id.* at 12-14. He stayed

at Issa House, which "belonged to the university," for approximately three months. *Id.* at 12.

Although he wanted to enroll at Salafia University, he did not become a student because,

although staying at the house was free, he "ran out of money" necessary to "buy clothes and

books." *Id.* at 11-12. ISN 692 made essentially the same assertions during a July 2003

interrogation at Guantanamo Bay. JE 52 at 1 (FM40 summarizing ███████ interrogation).

He told the CSRT that he met Odaini at Issa House and that Odaini, like "[t]he majority"

of people at the house, "was a student at the Salafi University." JE 46 at 8-9, 15. ISN 692

testified that Odaini "live[d] at" Issa House "[j]ust the day he was arrested," when he was visiting

"4 or 5 friends he knew." *Id.* at 11.

ISN 692 has been released from Guantanamo Bay and returned to Yemen. JE 118 at 1.

     **x.**    **ISN 695**

ISN 695 admitted "he was a member of a group that opposed Qadaffi's regime in Libya."

JE 5 at 1 (FM40 summarizing interrogation of ISN 695 at Guantanamo Bay ███████

███ ). ISN 695 reportedly stated that he traveled from Afghanistan to Pakistan and was

ultimately directed to Issa House. *Id.* He was told "that he would be safe at this guesthouse

because it belonged to Al Solafiya University and students from the university resided at the

house." *Id.*

ISN 695 told an interrogator that "upon his arrival at the guesthouse . . . he was greeted by

several of the students" and that "there were Islamic books located inside of the house, and the

students mostly engaged in reading the Koran. [He] reported that he did not hear the students

discussing the Taliban or Al Qaeda." *Id.*

SECRET

ISN 695 identified Odaini from a photograph as "a student at Al Solafiya University" and "noted that [Odaini] arrived at the house approximately two days prior to them being captured by the Pakistani Police." *Id.* at 2.

Another Judge of this Court denied ISN 695's habeas petition on the basis of evidence about his activities before his arrival at Issa House. Government Exhibit 4 (transcript of hearing in *Khalifh v. Obama*, Civil Action No. 05-1189, dated April 20, 2010).

### xi. ISN 702

The record of this case indicates that ISN 702 told his interrogators that he "could not communicate with anyone in [Issa H]ouse because he does not speak Arabic." JE 124 at 2 (interrogator notes summarizing a ███ interrogation at Bagram).[19] This Court granted the petition for a writ of habeas corpus filed by ISN 702 on May 13, 2010. *Al-Harbi v. Obama*, Civil Action No. 05-2479 (D.D.C. May 13, 2010).

### xii. ISN 728

ISN 728 accompanied a friend to Afghanistan but wanted to go to Pakistan, so he traveled by vehicle and "was smuggled into the country." JE 58 at 1 (FD-302 summarizing ███ ███ interrogation of ISN 728 at Guantanamo Bay). ISN 728 "next made his way to Faisalabad, Pakistan," where he "stayed in a house owned by a Pakistani" after being sent there by three Yemeni men who were from his hometown who he had met in Faisalabad." *Id.* There

---

[19]     Respondents attempt to paint ISN 702 as a member of Al Qaeda, citing an interrogation summary of this detainee in which he admits to attending Al Farouq, an Al Qaeda military training camp. JE 13 at 1. (This interrogation summary does not discuss Issa House.) It is not relevant to the outcome of this case whether ISN 702 attended Al Farouq, so the Court will make no determination regarding that issue. The Court notes, however, that it recently presided over the merits hearing for ISN 702 and is well aware that there is conflicting evidence in respondents' possession as to this point, none of which is part of this record.

SECRET

SECRET

were "approximately 14 other people" in the house, "some of whom were students and some who appeared sick." *Id.* While ISN 728 was staying at this house, "Pakistani authorities raided the home and arrested everyone inside. [ISN 728] stated he did not know why he was arrested." *Id.*

### xiii. Conclusion

The consistency of these statements as they relate to Issa House and Odaini speaks for itself. To emphasize what is, to any reasonable reader, an obvious point, the Court notes that each of the men who identified Odaini stated that he was, as he asserts, a student.

### 3. Events Subsequent to Odaini's Seizure

There are several indications in the record that respondents themselves have repeatedly concluded that Odaini is not part of Al Qaeda.

After his initial seizure, Odaini was held in Lahore and then taken to Islamabad, Pakistan. JE 2 at 3; JE 73 ¶¶ 11-12. He was transported to Bagram, Afghanistan, then Kandahar, Afghanistan, and ultimately to Guantanamo Bay, Cuba. JE 2 at 3; JE 73 ¶¶ 13-15. He was told shortly after being taken into custody and upon arrival at Guantanamo Bay that he would be released within two weeks. JE 73 ¶¶ 11, 16. Odaini has been repeatedly interrogated while in U.S. custody, and has consistently told the story described in this memorandum opinion. He has also consistently, explicitly denied membership in Al Qaeda. *See, e.g.*, JE 2 at 2 ("[Odaini] related he first heard about Al Queada while he was in Pakistan. . . . According to [Odaini] he did not like what Al Queada and Usama Bin Laden did on 11 September 01. During that time, [Odaini] said he was in Pakistan studying religion. . . . [Odaini] explained he has no personal knowledge of Al Queada, Usama Bin Laden, or the Taliban."); JE 44 at 1 ("[Odaini] denied ever being approached by a Taliban or Al Qaida recruiter. He also denied ever being pressured by

SECRET

[Salifast University] to travel to Afghanistan to fight. . . . [Odaini] also denied any knowledge concerning the possibility some of the men living at [Issa House] might have been aligned with, or sympathetic to the Taliban or Al Qaeda."); JE 46 at 5 (reporting that when asked if he was "ever a member of Al Qaida," Odaini replied "[n]ever" and that he "only heard of Al Qaida here in Guantanamo"); JE 47 at 2 (reporting that Odaini said he "[did]n't know anyone from al Qaida."); JE 42 at 1 ("[Odaini] denied any affiliation with Al Qaeda and did not believe the fourteen people captured with him were Al Qaeda").

In June 2002, just after Odaini's arrival at Guantanamo Bay, based on the assessment that Odaini "appeared to be telling the truth," an interrogator's report indicated: "Recommend [Odaini] be utilized to identify individuals at house in Faisalabad ███████[1] Pending ██████████████████████████, [Odaini] should be considered for repatriation." JE 40 at 3 (MFR summarizing ██████[2] interrogation at Guantanamo Bay).

██████████████████████████████████████████████[2]

████████████████████████████████████████████████

████████████████████████████

In April 2004, nearly two years after Odaini's arrival at Guantanamo Bay, an employee of the Criminal Investigation Task Force ("CITF") of the Department of Defense reviewed five interrogations of Odaini and wrote that "[t]here is no information that indicates [he] has clear ties to mid or high level Taliban or that he is a member of Al Qaida." JE 101 at 2 (Memorandum by ████████████[3] The employee reported that "CITF believes that further investigation is unlikely to produce new information relevant to this case" and, "in the absence of further information," he "recommend[ed] the release of [Odaini] under a conditional release agreement."

SECRET

*Id.* at 4.

A memorandum of the Joint Task Force Guantanamo of the Department of Defense dated June 2004 summarizes information collected about Odaini, indicates that "[t]here is no information to confirm Taliban or Al Qaeda ties on his part," and concludes that Odaini "may be transferred to another country or released ██████████████████" JE 102 at 2 (Regional Team Memo Assessment for purposes of evaluating whether to retain ISN ██████ ██████ or begin processing for transfer (June 5, 2004)).

In February 2007, four and a half years after Odaini's arrival at Guantanamo Bay, a Staff Judge Advocate for the Department of Defense, Office for the Administrative Review for the Detention of Enemy Combatants, sent an email to Odaini's counsel. JE 78 (Email sent by ██████████████ but signed by ██████████████, to, *inter alia*, David Remes (Feb. 22, 2007, 1:57 PM)). The email indicated that "[t]hrough either the Administrative Review Board (ARB) process or the process DOD had in place prior to ARBs, your client has been approved to leave Guantanamo, subject to the process for making appropriate diplomatic arrangements for his departure." *Id.*[20] Needless to say, Odaini was not released from Guantanamo Bay.

In June 2009, an attorney representing respondents in this case sent an email to Odaini's counsel indicating that "[t]he Guantanamo Review Task Force has completed its review of [Odaini]'s case" and "[a]s a result of that review, [Odaini] has been approved for transfer from Guantanamo Bay." JE 79 at 1 (Email from Robert J. Branman, Department of Justice, to Brian Foster, et al. (June 30, 2009, 4:54 PM)). The email indicates that "the United States will take

---

[20]    The email also noted that "such a decision does not equate to a determination that your client is not an enemy combatant, nor is it a determination that he does not pose a threat to the United States or its allies." JE 78 at 1.

SECRET

appropriate diplomatic steps, consistent with the national security and foreign policy interests of the United States, to facilitate [Odaini]'s transfer from Guantanamo Bay to an appropriate destination country." *Id.*

In response to the information in the June 2009 email, on September 9, 2009, the Court granted respondents' motion to stay this case [#623]. In November 2009, the Ambassador of the Republic of Yemen to the United States signed a declaration indicating that "[t]he government of Yemen is willing to accept" Odaini, as well as other Yemenis held at Guantanamo Bay, "back to their home country of Yemen." JE 98 at 1 (Declaration of Abdulwahab Alhajjri).[21] On January 8, 2010, respondents informed the Court that, pursuant to a decision by President Obama, no Guantanamo detainees approved for transfer were to be sent to Yemen. On January 13, 2010, the Court lifted the stay of this case [#743]; shortly thereafter, it set the date for a merits hearing regarding Odaini.

**B.      Respondents Have Failed to Show that Odaini is Lawfully Detained.**

Pursuant to an order the Court issued in advance of the merits hearing in this case, the parties identified the issues in dispute and structured their presentations to address each issue in turn during the hearing. Accordingly, respondents first argued that Odaini's stay in Issa House supports the conclusion that he is lawfully detained and second that his version of events is so implausible as to further support denial of the writ of habeas corpus. Both arguments fail.

---

[21]      The ambassador added that "it is the Yemeni government's position that, if any man named . . . has been cleared by the Inter-Agency Review Team established pursuant to President Obama's Executive Order, he should be transferred to Yemen immediately." JE 98 at 1-2.

SECRET

~~SECRET~~

1.    **Issue one: whether Odaini's stay at Issa House supports the conclusion that he is lawfully detained**

Respondents insist that Odaini's presence at Issa House demonstrates that he is part of the Al Qaeda–affiliated network of a man named Abu Zubaydah. They vehemently argue that the fact that the occupants of Issa House allowed Odaini to come inside demonstrates that he was, like them, part of this network.

Respondents made a lengthy presentation, citing portions of Abu Zubaydah's diary, JE 9; JE 10; JE 60, as well as testimony about Abu Zubaydah by another man who apparently knew him in Afghanistan, JE 8; JE 66; JE 67, designed to show that Abu Zubaydah supported Al Qaeda in its efforts to fight the United States. In particular, Abu Zubaydah was allegedly involved in assisting men in traveling to Afghanistan to train for fighting before September 11, 2001 and in fleeing Afghanistan after the United States attacked that country. Abu Zubaydah feared for his own safety after the September 11 attacks, when the United States began searching for Al Qaeda operatives, so he did not want to be recognized by anyone who was not part of his network. Although Odaini has submitted some evidence calling into question Abu Zubaydah's importance and the strength of his connection to Al Qaeda, *see* JE 120; JE 121, the Court need not reach those questions. For purposes of this opinion, the Court will assume that respondents' allegations about Abu Zubaydah are true. These allegations do nothing to change the appropriate outcome in Odaini's case.

i.



20

SECRET



*Id.* ¶ 20. Based on this statement, respondents argue that the Court should find that Odaini is part of Al Qaeda and therefore lawfully detained. The Court will not do so. It is standard practice to tell jurors evaluating expert testimony that if "they [find] that the opinion is not based on sufficient education or experience, . . . the reasons supporting the opinion are not sound, or . . . the opinion is outweighed by other evidence, [they may] completely or partially disregard the opinion." Criminal Jury Instructions for the District of Columbia (4th ed. 2008), Instruction 1.08.

###### a.     Guesthouses in general

SECRET

SECRET



To the contrary, some of the men seized at Issa House stated directly that the house was not a tightly controlled environment. JE 5 at 1 (reporting that ISN 695 said that upon arrival at Issa House, "his handbag was not inspected, nor did anyone question where he came from" and that "the guesthouse did not have any specific rules as people were allowed to come and go as they pleased"); JE 49 at 1 (reporting that ISN 684 noted "[t]here were no restrictions imposed on visitors at the house").

b.

c.

SECRET



SECRET

SECRET



**d.**

SECRET

SECRET



e.

SECRET

SECRET



some of the men seized at Issa House stated during interrogations that they had not met Abu Zubaydah. JE 33 at 1 (reporting that ISN 679 stated he did not recognize a photograph of Abu Zubaydah); JE 76 at 2 (reporting that when an interrogator asked ISN 680 during a 2006 interrogation about a connection between Issa and Abu Zubaydah, ISN 680 responded "that he has heard this name [Abu Zubaydah] many times, but only from interrogators").[25]



---

[25]     Odaini also denied ever having seen Abu Zubaydah. JE 7 at 1 ("[Odaini] was shown a photograph of Abu Zubaida. [Odaini] advised that he recognized the photograph because previous Interviewers showed it to him. [Odaini] stated that he heard of the name Abu Zubaida from previous American Interviewers.").

SECRET

SECRET



SECRET

SECRET



28

SECRET

~~SECRET~~



f. ▮▮▮▮▮

ii. ▮▮▮▮▮▮▮▮

UNCLASSIFIED//FOR PUBLIC RELEASE



UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



### iii. Conclusion

Respondents make additional, minor arguments in which they focus on certain statements from the interrogation summaries described above in an effort to incriminate Odaini. The Court acknowledges that there may have been Issa House residents whose activities before arriving at the house were questionable and perhaps render them detainable pursuant to the AUMF. But nothing in respondents' presentation demonstrates by a preponderance of the evidence, or anything close to it, that Odaini's presence at Issa House supports his detention.

### 2. Issue two: Whether Odaini's version of events present a plausible account of his activities

Remarkably, respondents find ways to argue that Odaini's statements to interrogators are so inconsistent and implausible as to call into serious question his truthfulness. They then make the leap that Odaini has been untruthful because he is covering up his involvement in Al Qaeda. As to each point respondents make and as to the general assertion that Odaini's statements are unreliable, the Court disagrees.

---

[29] In an interrogation summary, ISN 703 repeated that he had spoken to "Dawoud," who "appeared to be running things in [the Faisalabad H]ouse," and that "Dawoud asked [ISN 703] a lot of questions." JE 16 at 3 (FM40 summarizing interrogation a Guantanamo Bay noting that "[ISN 703] did not appear to be deceptive"). Again, there is no indication that ISN 703 knew who this man was or that he had any connection to Al Qaeda.

SECRET

SECRET

### i. Odaini's visa

████████████████████████████████████████████████████████████ Odaini believed, or at least told his interrogators, that

he had a three-month visa. JE 4 at 2; JE 27 at 2. During an interrogation █████, he said "he

was unconcerned about over[]staying his visa and stated renewing the visa was as simple as

visiting any police station in Pakistan. Once he arrived in Pakistan, [Odaini] never renewed his

visa in the nine months he was there." JE 27 at 2. When asked about his visa in 2004, Odaini

"stated he didn't think about fixing it while he was there." JE 28 at 1 (FM40 summarizing

████████████ interrogation). In 2006, when "confront[ed with] the discrepanc[y]" that "his

Pakistan visa states his travel was [for] medical treatment," Odaini responded that "his father

filled out the paper[]work and medical visa[]s are cheaper." JE 29 at 2.

Respondents argue that this visa and Odaini's statements about it demonstrate that he is a

liar. It is only possible—and barely possible—to reach this conclusion if one begins with the

view that Odaini is a part of Al Qaeda and searches for a way to believe that allegation regardless

of its inconsistency with an objective view of the evidence. Odaini has said repeatedly that his

father arranged for his passport and visa, so anything questionable about those documents cannot

be imputed to Odaini, who was a seventeen-year-old high school student at the time they were

obtained. It seems likely that Odaini did not even know what the visa said, given how simple-

minded it would be to lie about the number of months the visa lasted knowing respondents were

SECRET

in possession of it. Furthermore, even if Odaini was involved in the decision to obtain a visa for travel other than for the purpose of study, that the visa purports to be for medical travel is in no way an indication that Odaini was traveling to join a terrorist organization.

In their effort to make Odaini appear suspicious, respondents contended during the merits hearing that Odaini could have obtained a student visa had he truly been traveling for that purpose. First, respondents have submitted no evidence about the availability of Pakistani visas for students from Yemen; perhaps he could not have obtained such a visa. Second, Odaini has offered a logical explanation for having a medical visa. Although respondents argued at the hearing that Odaini's father could easily have afforded a more expensive type of visa, the Court simply will not draw any conclusions from respondents' conjecture that Odaini's father could have chosen to purchase a more costly (by how much, there is no indication) visa. Certainly Odaini's father was not concerned with keeping his son's paperwork in order so that his son would have a clean record upon being seized by Pakistani police working with the United States government.

In sum, nothing about Odaini's visa is evidence that he was in any way connected to Al Qaeda.

### ii.    Odaini's arrival at Issa House

Respondents rely on the reported statement of ISN 688 that Odaini was present at Issa House when ISN 688 arrived there weeks before the March 28, 2002 raid to demonstrate that Odaini's statements—here, in particular, the claim that he was not a resident of Issa House, but merely a visitor there—are false. *See* JE 18 at 2 (SIR of interrogation of ISN 688). The Court rejects this proposition. ISN 688 is the only man seized in the raid of Issa House who said that

SECRET

Odaini was there for any extended period of time. There is absolutely no basis to credit ISN 688's statement over Odaini's and the comments of several other detainees that are consistent with Odaini's assertions. *See, e.g.,* JE 2 at 3 (Odaini's statement that he arrived at Issa House the night of the raid); JE 76 at 2 (ISN 680's statement that Odaini came to Issa House the night of the raid); JE 53 at 3 (ISN 690's statement that Odaini came to Issa House the night of the raid); JE 77 at 15 (ISN 691's statement that Odaini came to Issa House the night of the raid); JE 52 at 11 (ISN 692's statement that Odaini was only at Issa House the night of the raid).[31] It is a misrepresentation of the evidence before the Court to point only to ISN 688's statement, which is so clearly outweighed by the rest of the record.[32]

### iii.   Jama'at Al Tabligh

Respondents argue that there is an inculpatory inference to be made from Odaini's connection to Jama'at Al Tabligh. Despite admitting repeatedly that Jama'at Al Tabligh is a large, respected movement with the legitimate purpose of teaching about the Islamic faith, respondents argue that Odaini's statements about it are suspicious.[33] Respondents have presented some evidence to show that members of Al Qaeda used the organization as a cover for their true

---

[31]    Odaini even responded to the allegation that he was at Issa House for longer than one night during ▉▉▉ interrogation, stating that "this is not true" and "the university could prove it." JE 29 at 2.

[32]    Furthermore, the length of Odaini's stay is irrelevant to the Court's ruling here. ISN 688, like all the other men who identified Odaini, said that Odaini was a student at Salafia University. JE 18 at 2. His interrogation simply does nothing to incriminate Odaini.

[33]    At the merits hearing, respondents argued repeatedly that because Odaini's statements are unreliable, it might not even be true that Odaini went to the Jama'at Al Tabligh center. Respondents' argument is not convincing. They have not shown that Odaini is untruthful or unreliable. They have also offered no evidence whatsoever suggesting that Odaini was anywhere other than the center for his first several months in Pakistan.

SECRET

activities and purposes. JE 30 at 3-4 (IIR reporting that Usama bin Laden used Jama'at Al Tabligh preachers to spread his message and that Jama'at Al Tabligh activity was banned in Afghanistan). But they have no basis upon which to argue that Odaini was anything other than a religious student or that anything questionable took place at the center in Pakistan.

### iv.     Inconsistencies in Odaini's statements

Respondents argue that inconsistencies in Odaini's statements demonstrate that he is untruthful. The Court again notes that respondents distort the evidence. For example, respondents point out as inconsistencies that, according to interrogation summaries, Odaini said on one occasion that the man who suggested he go to Salafia University was a student of the Jama'at Al Tabligh center, JE 4 at 2, and on another that he was an employee at the Jama'at Al Tabligh mosque, JE 2 at 2. They also note that Odaini's interrogation summaries indicate that he said he went to Issa House on a Thursday, JE 4 at 4, but the evening before the raid, March 27, 2002, was a Wednesday. These issues are minor and therefore insignificant. They may be the result of translation or reporting errors, or it may be that Odaini was uncertain of the identity of the man who told him about Salafia University and mistaken about the day of the week on which he was seized. The suggestion that these small discrepancies give rise to an inference that Odaini was lying to hide that he was fighting for Al Qaeda is simply unreasonable.

### v.     Cover story

Respondents also argue that Odaini's assertion that he was a student is a cover story the occupants of Issa House had agreed to use. Only by refusing to deviate from a predetermined conclusion could this explanation of consistent statements from so many men over so many years seem at all reasonable. This theory ignores the fact that several occupants of the house did not

SECRET

claim to be students but nevertheless said that Odaini was a student. *See* JE 18 at 2; JE 53 at 3; JE 46 at 9, 15. Furthermore, to find that Odaini's version of events is a cover story in the complete absence of information suggesting that he was anything other than a student would render meaningless the principle of law that places the burden of proof on respondents rather than Odaini.

## C.    Conclusion

Respondents have kept a young man from Yemen in detention in Cuba from age eighteen to age twenty-six. They have prevented him from seeing his family and denied him the opportunity to complete his studies and embark on a career. The evidence before the Court shows that holding Odaini in custody at such great cost to him has done nothing to make the United States more secure. There is no evidence that Odaini has any connection to Al Qaeda. Consequently, his detention is not authorized by the AUMF. The Court therefore emphatically concludes that Odaini's motion must be granted.

## III. CONCLUSION

For the foregoing reasons, Odaini's petition for a writ of habeas corpus shall be granted. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

May 26, 2010