SECRET



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAHMOAD ABDAH, et al.,** | |
| **Petitioners,** | |
| **v.** | **Civil Action No. 04-1254 (HHK)** |
| **BARACK H. OBAMA, et al,** | |
| **Respondents.** | |

## MEMORANDUM OPINION

Adnan Farhan Abd Al Latif (ISN 156), a Yemeni citizen, was seized by Pakistani authorities in late 2001 and has been held by the United States at the naval base detention facility in Guantanamo Bay, Cuba since January 2002. Latif has filed a petition for a writ of habeas corpus contending that he is unlawfully detained. Respondents in this case, President Barack H. Obama and other high-level officials in the United States Government, argue that Latif is lawfully detained and therefore should remain in U.S. custody. The parties filed cross-motions for judgment on the record and appeared before the Court for a hearing on the merits of Latif's petition on June 7 and 8, 2010. Upon consideration of the motions and the evidence presented at the merits hearing, the Court concludes that respondents have failed to demonstrate that the detention of Latif is lawful. Therefore, Latif's petition shall be granted.

## I. LEGAL STANDARDS

### A. Scope of the Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the

SECRET

SECRET

terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. at 224. The U.S. Supreme Court has held that the District Court for the District of Columbia has jurisdiction over petitions for writs of habeas corpus brought by detainees held at Guantanamo Bay pursuant to the AUMF. *See Boumediene v. Bush*, 553 U.S. 723, —, 128 S. Ct. 2229, 2274 (2008); *Rasul v. Bush*, 542 U.S. 466, 483-84 (2004). The Supreme Court has provided "scant guidance," however, as to whom respondents may lawfully detain under the statute. *Al-Bihani v. Obama*, 590 F.3d 866, 870 (D.C. Cir. 2010) (noting that the Supreme Court has "consciously le[ft] the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion" (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion of O'Connor, J.); *Boumediene*, 128 S. Ct. at 2276)).

    In the absence of controlling law governing the question of by what standard to evaluate the lawfulness of the detention of the individuals held at Guantanamo Bay, judges of this District thoroughly and thoughtfully addressed this issue, and this Court adopted the reasoning and conclusions of Judge Bates in *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009), and Judge Walton in *Gherebi v. Obama*, 609 F. Supp. 2d 43 (D.D.C. 2009), in its previous opinions ruling on these habeas petitions. Although the D.C. Circuit "has yet to delineate the precise contours" of the proper legal standard, it has consistently accepted the proposition that any individual who was "part of" Al Qaeda or the Taliban may be detained pursuant to the AUMF. *Barhoumi v. Obama*, — F.3d —, 2010 WL 2553540, at *8 (D.C. Cir. June 11, 2010); *see also Odah v. United States*, — F.3d —, 2010 WL 2679752 at *8 (D.C. Cir. June 30, 2010) ("The only remaining

question is whether all the evidence before the district court was sufficient to support its finding that al Odah was 'part of' the Taliban and al Qaeda forces."); *Bensayah v. Obama*, — F.3d —, 2010 WL 2640626, at *5 (D.C. Cir. June 28, 2010) (noting that "we have made clear . . . that the AUMF authorizes the Executive to detain, at the least, any individual who is functionally part of al Qaeda" (citations omitted)); *Awad v. Obama*, — F.3d —, 2010 WL 2292400, at *10 (D.C. Cir. June 2, 2010) (holding that demonstrating that "a detainee was part of the 'command structure' of al Qaeda" is sufficient but not necessary "to prove that a detainee is 'part of' al Qaeda"). Accordingly, in this case, the Court will assess whether respondents have shown that Latif is part of Al Qaeda or the Taliban.

## B.    Burden of Proof

As stated in the Amended Case Management Order that governs this case, "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008).[1] Accordingly, Latif need not prove that he is unlawfully detained; rather, respondents must produce "evidence which as a whole shows that the fact sought to be proved," that Latif was part of Al Qaeda or the Taliban, "is more probable than not." *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 & n.2

---

[1]    The D.C. Circuit has held that "[a] preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF." *Awad*, 2010 WL 2292400, at *9; *see also Al-Bihani*, 590 F.3d at 878 (rejecting Guantanamo Bay detainee's argument that application of the preponderance of the evidence standard in his habeas case was unconstitutional). It has yet to decide, however, whether that standard is required. *See Al-Adahi v. Obama*, — F.3d —, 3020 WL 2756551, at *3 (D.C. Cir. July 13, 2010) ("Although we doubt . . . that the Suspension Clause requires the use fo the preponderance standard, we will not decide that question in this case.").

~~SECRET~~

(D.C. Cir. 1994)). If respondents do not meet this burden, the Court must grant Latif's petition and order his release.

## C.    Evidentiary Issues

The Court notes at the outset two issues regarding the evidence in this case.

First, as explained in an order entered in this case on August 26, 2009 [#606], the Court has permitted the admission of hearsay evidence but considers at this merits stage the accuracy, reliability, and credibility of all of the evidence presented to support the parties' arguments. This approach is consistent with a directive from the D.C. Circuit. *See Al Bihani*, 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits."); *see also Odah*, 2010 WL 2679752, at *5 (holding that "the law is against" a detainee who argued that some types of hearsay are not admissible in these Guantanamo Bay cases); *Awad*, 2010 WL 2292400, at *5 (reaffirming the rule articulated in *Al Bihani* and noting that a district court errs not by relying on hearsay, but by relying on "unreliable hearsay"). The Court's assessment of the weight properly accorded to particular pieces of evidence appears throughout this memorandum opinion.

Second, the nature of the evidence before the Court is atypical of evidence usually presented in federal actions. Respondents have offered a variety of types of documents produced and used by government intelligence agencies that are not the direct statements of the individuals whose personal knowledge they reflect. The evidence in this case includes Form 40s ("FM40s"), Summary Interrogation Reports ("SIRs"), Intelligence Information Reports ("IIRs"), Memoranda for Records ("MFRs"), Field Documents ("FD-302s"), and ███████████████████

4

~~SECRET~~

SECRET

FM40s are records of investigation activities, here witness interviews, conducted by the Criminal Investigation Task Force, a federal law enforcement agency. ██████████████ ████████████████████████████████████████████ IIRs are Department of Defense documents for recording human intelligence, which may contain information derived from an IIR.[2] █████████████ FD-302s are forms completed by FBI agents summarizing interviews. ████████████████████████████ Neither party called any live witnesses.

## II. ANALYSIS

The parties agree about certain facts of Latif's background and travel but dispute others. Latif, or ISN 156,[3] was born in 1976 and grew up in a village in Yemen called Udayn. It is undisputed that in 1994, he sustained head injuries as the result of a car accident and the Yemeni government paid for him to receive treatment at the Islamic Hospital in Amman, Jordan. According to Latif, his treatment was incomplete and, because he could not afford the follow-up care he needed to alleviate significant lingering discomfort, he sought charitable assistance. The parties agree that in 2000, Latif met a man named Ibrahim. Latif asserts that Ibrahim promised to arrange free medical care for him in Pakistan; respondents argue instead that Ibrahim was a recruiter for Al Qaeda who encouraged Latif to go to Afghanistan to receive military training and/or fight jihad.

---

[2]    Human intelligence, or HUMINT, is "information derived from a person(s)." Joint Exhibit ("JE") 36 at 1.

[3]    ISN stands for Internment Serial Number. Each detainee at Guantanamo Bay has been assigned such a number.

SECRET

The parties do not dispute that in August 2001, Latif left Yemen, went to Pakistan, and soon traveled to the area around Kabul, Afghanistan. Latif asserts that while in Afghanistan, he stayed at an Islamic studies center waiting for Ibrahim to arrange his medical treatment; respondents allege that Latif went to a military training camp and fought with the Taliban in an area north of the city. Respondents and Latif agree that Pakistani police seized Latif near the border of Afghanistan and Pakistan on an unknown date in late 2001. He was transferred to United States custody in late December of that year. In mid-January 2002, he was sent to Guantanamo Bay, where he has been held since.

This memorandum opinion describes and analyzes the evidence the parties have submitted to determine whether respondents have shown that Latif is lawfully detained pursuant to the AUMF.

A. ███████████████

████████████████████████████████████



6

SECRET



7

SECRET

SECRET



8

SECRET



**B.    Respondents' Case**

█████████████████████████ respondents argue that Latif was recruited to travel to Afghanistan by a member of Al Qaeda and received military training from, and then fought with, the Taliban.

**1.    Respondents argue that Ibrahim was Abu Khalud, an Al Qaeda facilitator.**

Respondents first argue that the person who persuaded Latif to travel to Afghanistan, ████████████████████████ is Abu Khalud, an Al Qaeda facilitator. It is not disputed that Abu Khalud also went by the name Ibrahim Ba'alawi.

Respondents point to statements reportedly made by other Guantanamo Bay detainees who traveled to Afghanistan at the suggestion of Abu Khalud to show, as to each statement █ ████████████ about Ibrahim, the similarities between their stories█████████████

First, respondents cite interrogation summaries that indicate that other men met Abu

Khalud in Taiz, Yemen, which is in the same area of Yemen as Udayn, the village where Latif

lived, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ JE 5 (IIR derived from an FD-302 dated 2████████████

summarizing an interrogation of ISN 193) at 4 (reporting that ISN 193 "stated Abu ((Khloud)),

also known as [] Ibraheim ((Ba'alawi)) is a prayer leader" at a mosque in Taiz); JE 11 (IIR

reporting information derived from an interrogation of ISN 1457 on 2████████████) at 3

(indicating that ISN 1457 said "Ibrahim ((Balaalawi)), aka Abu Khulud, was a facilitator in Taiz,

[Yemen]").

Next, respondents cite sources that indicate that Abu Khalud discussed jihad with men he

encouraged to go to Afghanistan for military training, ████████████████████████

*See* JE 7 (FD-302, dated 2████████, summarizing interrogation of ISN 498) at 1 (reporting

that ISN 498 said Abu Khalud talked about "the training camps in Afghanistan" and "how they

should travel to Palestine to fight the Jews"); JE 8 (FD-302, dated 2████████, of

interrogation of ISN 522) at 2 (reporting that ISN 522 said Abu Khalud told him he should go to

Afghanistan to receive military training so he could fight Russians in Chechnya).

Respondents further contend that Abu Khalud arranged travel for other detainees along

the same route Latif reportedly took to Afghanistan: Abu Khalud sent each detainee on a flight

from Sanaa, Yemen, to Karachi, Pakistan, and then by bus through Quetta, Pakistan to Kandahar,

Afghanistan. *See, e.g.*, JE 8 at 2-3 (reporting that ISN 522 told his interrogator that Abu Khalud

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

arranged for his trip, which involved a flight from Sanaa to Karachi, a bus ride to Quetta, and another bus ride to Kandahar).

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

Finally, other detainees told interrogators that Abu Khalud arranged for them to attend a military training camp and/or to fight in battle. ████████████████████████

███████████████████████████████████████████

███████████ JE 7 at 1 (reporting that ISN 498 said that after Abu Khalud recruited him, he went to Al Farouq, a training camp, and to the site of a battle north of Kabul, Afghanistan); JE 8 at 3-4 (reporting that ISN 522 said he attended "a training camp outside of Kabul" as well as other training camps after traveling to Afghanistan at the suggestion of Abu Khalud).

Respondents argue that Ibrahim's identity is significant. They assert that because Ibrahim was a facilitator for Al Qaeda who encouraged and assisted men who fought on behalf of the Taliban to travel to Afghanistan, their theory that Latif became a fighter after leaving Yemen is likely to be accurate.

2.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



12
SECRET

~~SECRET~~



Based on their contentions that Latif was recruited by Abu Khalud and trained and fought with the Taliban in Afghanistan, respondents ask the Court to conclude that Latif is lawfully detained.

**B.    Latif's Arguments**

Latif argues that respondents' reliance on ▮▮▮▮▮▮▮ is misplaced because the document is inherently unreliable and because more reliable reports ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ contradict the information it contains.  Latif asserts that the information in these other statements demonstrate that the man he met named Ibrahim was not Abu Khalud and that Latif neither trained nor fought with the Taliban but instead was in Pakistan and Afghanistan to seek medical care.

**1.    Latif argues that ▮▮▮▮▮▮▮ is not reliable.**

Latif asserts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and offers several reasons the Court should not rely on them.

First, Latif argues that the circumstances of ▮▮▮▮ creation call into question its reliability. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13

~~SECRET~~

SECRET



14

SECRET

SECRET



15
SECRET

SECRET



In addition to these arguments about the document itself, Latif places great emphasis on the fact that ███████████ are not corroborated by any other evidence in the record. Respondents have not produced, he notes, any evidence that any other detainee ever said he saw Latif at a guesthouse, training camp, or battlefield. *See* JE 80 (Department of Defense Criminal Investigation Task Force Memorandum recommending Latif's release) at 2 ("No other detainees have identified [Latif], except as having been seen at various detention facilities."). Furthermore, Latif points out that respondents themselves appear not to have relied on ███████████ in assessing his detention. Specifically, the Department of Defense determined in 2004 that Latif

16

SECRET

SECRET

"is not known to have participated in combatant/terrorist training," JE 79 (Joint Task Force

Guantanamo Memorandum recommending transfer of Latif for continued detention in another

country, dated ███████████ at 5, and respondents determined in 2007 that Latif should be

transferred away from Guantanamo Bay "subject to the process for making appropriate

diplomatic arrangements for his departure," Pet'r's Mot. to Set Hearing Dates for ISN 156 [], Ex.

A (email from Department of Defense employee to counsel for Latif (Feb. 22, 2007)) at 1 [#728],

which was not completed.

## 2. Latif argues that Ibrahim was not Abu Khalud.

Latif asks the Court to consider other evidence in the record ███████████████

Specifically, as to respondents' assertion that Abu Khalud encouraged Latif to travel to

Afghanistan, Latif argues that the statements he has made about Ibrahim Alawi during various

interrogations while held at Guantanamo Bay demonstrate that the man who encouraged him to

leave Yemen was not Abu Khalud.

First and most significantly, Latif has repeatedly asserted that Ibrahim was a humanitarian

who offered to help arrange free medical care for him. *See* JE 25 at 1 ("[Latif] went to a local

relief agency –Hikmat– seeking financial assistance for his medical problems and met an

individual named Ibrahim ((Aliwee)), who offered him help. . . . Ibrahim told [Latif] that he

could get [Latif] free medical help in [Pakistan]."); JE 24 (FD-302 summarizing ███████████

interrogation of Latif) at 1 ("[Latif] contacted the Al Hijma organization and dealt with an

individual named Ibrahim A'lim. A'lim recommended a hospital in Pakistan and told [Latif] that

his organization, Al Hijma, would pay for his treatment . . . ."); JE 27 (FD-302 summarizing ███████

██████ interrogation of Latif) at 1-2 ("Latif met a man from his home town Ebb, Yemen,

SECRET

named Ibrahim ([Last Name Unknown]) who collected money and controlled a charity called

Gameiat Al Hekma. . . . Ibrahim collected money for his charities from all of the Gulf states. . . .

Latif indicated that the reason he traveled to Afghanistan from Yemen was to seek medical

treatment for his injured ear. The trip was sponsored by Gameit Al Hekma. . . ."); JE 28 (FD-302

dated 2 ████████ summarizing interrogation of Latif) at 1 ("[Latif] was in Pakistan because

Ibrahim Alawi, a Yemeni man who was a humanitarian, took him to the hospital there."); JE 29

(FM40 summarizing 2 ████████ interrogation of Latif) at 1 ("[Latif] met Ibrahim Aliwee, who

was associated with Al-Hikmah, a charitable organization. Aliwee told [Latif] that he could

receive free medical care in Pakistan."); JE 31 (Enemy Combatant Election Form, dated March

28, 2005) at 1 (noting that "[i]n response to the allegation that Ibrahim Aliwee is a probable

member of al Qaida, [Latif] stated that Ibrahim only provided humanitarian aid and did not know

of any of his affiliations"). Latif notes that other than ████████████████████████ which,

as explained, he argues is not reliable, there is no suggestion in the record that anything about

Latif's interactions with Ibrahim indicated that Ibrahim had any connection to Al Qaeda, the

Taliban, or any other terrorist group.

  Second, Latif asserts it is significant that the name he used when describing

Ibrahim—Ibrahim Alawi—is different from the name other detainees have used when talking

about Abu Khalud—Ibrahim Ba'alawi. All reports of Latif's statements in the record indicate

that Latif said the man he met was named Ibrahim Alawi, or some variant of that last name,

without a "B." *See* ████████████████████████ JE 23 at 1 (referring to

"Ibrahim ((Aliwee))"); JE 25 at 1 (referring to "Ibrahim ((Aliwee))"); JE 24 at 1 (referring to

"Ibrahim A'lim"); JE 86 at 4 (referring, in less than fully clear handwriting, to "Ibrahim Allum"

SECRET

or perhaps another name beginning with the letters "Ali"). All but one of the detainees whose

interrogation summaries are included in the record because they refer to Abu Khalud use the

name Ibrahim Ba'alawi. *See, e.g.*, JE 5 at 4 (referring to "Ibraheim ((Ba'alawi))"); JE 92 (FD-

302 summarizing ████████ interrogation of ISN 223) at 1 (referring to "Ibrahim B'alawi");

JE 11 at 3 (referring to "Ibrahim ((Balaalawi))"); *but see* JE 57 (SIR summarizing ████████

interrogation of ISN 688) at 1 ("[ISN 688] explained that his facilitator Rahim Allawi and Abu

Khullud are the same person.").[10] Expert declarations Latif submitted to the Court indicate that

Alawi and Ba'alawi are different, common names in Yemen, JE 94 (Decl. of Abdul-Ghani Al-

Iryani) ¶ 2; JE 95 (Decl. of Jonathan A. C. Brown) ¶ 2, suggesting, Latif asserts, that Latif and

the other detainees would not have mistaken one for the other.

    Latif further notes that he has never referred to the Ibrahim he met as Abu Khalud,

whereas the detainees whose interrogation reports are cited do use that name. *See, e.g.*, JE 3

(FM40 summarizing interrogations of ISN 39 on ████████) at 1 ("[ISN 39] advised

Abu Khalud Al-Yemeni . . . assisted in facilitating his travel from Yemen to Afghanistan."); JE 5

at 4 ("[ISN 193] stated Abu ((Khloud)) . . . paid for [ISN 193]'s travel to Pakistan and

Afghanistan."); JE 8 at 1 ("[ISN 522] met an individual at the mosque named Abu Khalud.").

    Latif also argues it is significant that the physical description he gave of Ibrahim does not

match the descriptions of Abu Khalud included in the interrogation reports of several other

---

    [10] Latif suggests that because this outlier detainee also apparently pronounced "Ibrahim" without the "B" sound—he said "Rahim," JE 57 at 1—he might have had some sort of speech impairment that prevented him from pronouncing "Ba'alawi" correctly. He also notes that another statement this detainee reportedly made to interrogators conflicted with the statements of several other detainees such that this Court found, in another Petitioner's case, that it was not credible. *See Abdah v. Obama*, — F. Supp. 2d —, 2010 WL 2326041, at *11.

UNCLASSIFIED//FOR PUBLIC RELEASE

detainees. According to notes an FBI interrogator took during an interrogation of Latif in May 2002, Latif said Ibrahim was "30-40 [years] old," five feet seven inches tall, "skinny," with "fairer" skin and a "big beard." JE 86 at 4. Other men described Abu Khalud as younger and heavier, and some noted that he had a noticeable injury to or scar on his face. *See* Petitioner's Exhibit ("PE") 1 (2002 IIR containing a "biographic report on Ibrahim ((Alawi))" whose alias was "Abu ((Khulut))," based on information from a detainee held at Bagram) at 1-2 (noting Abu Khalud was born in 1975—27 years before the IIR was created—listing Abu Khalud's weight as "heavy" and build as "a little rotund," and stating that in 1996, Abu Khalud "had a plastic plate on the left side of his skull, where he had been shot in Bosnia"); JE 96 (SIR of Oct. 17, 2004 interrogation of ISN 498) at 1 (reporting that ISN 498 described Abu Khalud as "very fat" and "slightly older than the detainee," who was twenty-six years old at the time of the interrogation, but stated that Abu Khalud "has no distinguishing marks such as scars"); JE 43 (SIR summarizing Oct. 13, 2005 interrogation of ISN 215) at 2 (reporting that ISN 215 said Abu Khalud "was approximately 30-years-old in 2001," "was a big guy, well-built, maybe 80 or 90 kilos," the equivalent of about two hundred pounds); JE 8 at 1 (reporting that ISN 522 said Abu Khalud was twenty-seven years old, had a "[l]arge" build, and had a "[r]ound scar in middle of forehead from bullet injury); JE 6 at 1 (reporting that ISN 223 said Abu Khalud had a "stocky" build but had no scars).

According to Latif, other details counter respondents' contention that Ibrahim Alawi and Abu Khalud are the same person. Several detainees said that Abu Khalud was from Taiz, Yemen or was affiliated with a mosque there, *see, e.g.,* JE 5 at 4 (reporting that ISN 193 said Abu Khalud was a "prayer leader" at a mosque in Taiz); JE 6 at 1 (reporting that ISN 223 said Abu

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Kahlud was from Taiz); JE 8 at 1 (reporting that ISN 522 met Abu Khalud at a mosque in Taiz),

but Latif said Ibrahim was from Ibb, a town near but distinct from Taiz, and was affiliated with

humanitarian organizations, *see* JE 25 (SIR of ██████ interrogation of Latif) at 1

(reporting that Latif said "Ibrahim was from a town called Ibb," that he met Ibrahim at "a local

relief agency" called "Hikmat," and that Ibrahim "ran his own relief type agency called –Jamiat

An-Nur–"); *see also* JE 65 at 1 (map of Yemen showing the locations of Ta'iz and Ibb). In

addition, an interrogation report indicates that a detainee said Abu Khalud had a daughter named

██████ PE 1 at 2, but Latif told an interrogator that Ibrahim had a son named ██████ and a

daughter named ██████ JE 86 at 4.

Because, according to Latif, Ibrahim Alawi was not Abu Khalud, Latif's interaction with

Ibrahim does not make it likely that Latif traveled for the purpose of participating in military

training or fighting or was inclined to do so.

### 3. Latif argues that he left Yemen in search of free medical care.

#### i. Latif's explanation

As to respondents' allegations that Latif trained and fought with the Taliban, Latif argues

that his alternative explanation of his activities between August and December 2001 contradict

and disprove them.[11] During the many interrogations in which Latif has participated ██████

---

[11] ██████████████████████████████████████

██████ He stated during his Combatant Status Review Tribunal ("CSRT") hearing that "[t]he
information in the unclassified summary" before the Tribunal, which included the allegation that
he was "an al Qaida fighter" and "train[ed] at the al-Farouq training camp in Afghanistan," was
"incorrect" and "not about me." JE 30 (undated transcript of CSRT proceedings) at 3-4. In
March 2005, apparently in preparation for an Administrative Review Board ("ARB") proceeding,
and then again at the ARB hearing itself, Latif said he did not travel to fight or train. JE 31 at 1;
JE 33 at 1. The declaration he prepared for use in this litigation asserts that the allegation that his

SECRET

SECRET

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Latif has repeatedly said that he left Yemen solely for the purpose of receiving medical treatment. He asserts that he was in a car accident as a teenager and was injured severely enough to have been sent to a hospital in Amman, Jordan for treatment. JE 24 at 1; JE 25 at 1; JE 26 (SIR summarizing ▇▇▇▇▇▇▇ interrogation of Latif) at 1; JE 27 at 1; JE 29 at 1; JE 34 ¶¶ 2-3. The damage to his skull was not fully corrected, however, and he continued to have problems with his hearing and other discomfort after returning to Yemen. JE 24 at 1; JE 25 at 1; JE 33 (summary of Latif's ARB proceedings) at 4-5; JE 34 ¶ 4. He could not afford follow-up medical care, so, he says, he sought out assistance from charitable organizations. JE 24 at 1; JE 25 at 1; JE 27 at 1; JE 29 at 1; JE 30 at 6; JE 34 ¶¶ 5-6. As explained, Latif asserts that he met Ibrahim Alawi in this capacity. JE 24 at 1; JE 25 at 1; JE 27 at 1; JE 29 at 1; JE 33 at 2, 5, 7; JE 34 ¶ 7. Ibrahim told Latif he could arrange free medical care in Pakistan, so in August 2001, Latif decided to make the journey. JE 24 at 1-2; JE 25 at 1; JE 29 at 1; JE 33 at 2; JE 34 ¶¶ 7-8. Latif flew from Yemen to Pakistan and traveled to Kandahar, Afghanistan to find Ibrahim, who was apparently in Kandahar at the time. JE 24 at 1; JE 25 at 2; *but see* JE 34 ¶ 8 (stating that Latif went directly to Kabul to find Ibrahim). Latif explains that he was not able to receive care right away—Ibrahim was too busy to help him immediately—so he stayed at an Islamic studies center near Kabul while he waited for treatment. JE 25 at 2; JE 48 at 1; JE 29 at 1; JE 30 at 8, 9; JE 33 at 2; JE 34 ¶ 9. In November 2001, after Kabul became the target of bombing, Latif was advised to flee the area. JE 25 at 2; JE 29 at 1. Latif asserts that he

---

"purpose in going to Afghanistan was to fight jihad" is "not true." JE 34 ¶ 10; *see also id.* ¶ 12 ("I have never received any weapons training, from the Taliban, at any training camp, or anywhere else. I have never participated in military fighting in Afghanistan or anywhere else.").

SECRET

SECRET

stayed in a village, at the home of a man named Mohammed, for approximately a month and then found an Afghani guide to lead him to the Pakistani border. JE 25 at 2; JE 48 at 2. There is no dispute that Latif was seized near that border in late 2001.

This version of events is corroborated, Latif argues, by various pieces of evidence in the record. First, Latif has submitted to the Court a letter, dated August 21, 1994, from a doctor at the Islamic Hospital in Amman, Jordan confirming that Latif "was admitted" on July 9, 1994 "following a head injury." JE 32 at 6 (also noting that Latif suffered a "broken skull" and there was "blood concentration and hemorrhage above the left eye, and a hole in the left eardrum"). He has also included in the record before the Court a letter dated August 18, 1999 from Yemen's Ministry of Public Health indicating that "[w]e recommend that [Latif] return to the previous center outside for more tests and therapeutic and surgical procedures at his own expense." Id. at 10 (explaining that Latif "is hard of hearing" and "a wide circular hold was detected in his left eardrum"). Furthermore, there are indications in the record that when Latif was seized traveling from Afghanistan to Pakistan, he was in possession of medical records. JE 46 at 1 (noting that Latif was seized in a "[b]order [t]own in [Pakistan]" with "medical papers"); JE 66 (unidentified government document compiling information about Latif) at 2 (stating that "[Latif] had medical papers but no passport or weapon" when he "surrendered himself to [Pakistani] authorities").[12]

---

[12]    Respondents argue that these indications are evidence only that Latif said he had medical records with him at the time he was seized rather than that he in fact had them. They point to evidence in the record that Latif was in possession of money when captured, see JE 53 at 1 (document recording chain of custody of Pakistani currency), to demonstrate that Latif possessed only money when he was transferred to U.S. custody. But that evidence does not exclude the possibility that Latif had other items at the time he was sezied. Because respondents do not present evidence that counters the notations in government documents that Latif held medical records when taken into Pakistani custody, the Court does not credit their argument.

SECRET

**ii.    Respondents' counterarguments**

Respondents counter that Latif has told interrogators inconsistent stories, which they assert demonstrates that Latif is lying to cover up his true activities. They highlight two documents to support this contention. First, they point to the intake form completed when Latif came into United States custody, which reports that Latif "went to [Pakistan] for treatment of an ear problem," and that Latif "was in Kabul," where he "claims he went just to look around about 4-5 months ago" and where he "stayed [for] 3-4 months." JE 46 at 2. Respondents argue that the note about "look[ing] around" is an indication that Latif essentially said he was a tourist in Kabul, which is distinct from the idea that he stayed at the Islamic studies center. They also note that the form contains no reference to Ibrahim or a car accident. Next, respondents point to a document labeled "Knowledgability Brief," which indicates that Latif "travelled [sic] to Afghanistan to help Ibrahim ((Aliwee)) improve the Islamic studies center in Kabul." JE 23 at 1. Respondents argue that this story is inconsistent with Latif's contention that he was at the center awaiting treatment and note that it does not mention a car accident or injuries.

Respondents also point to smaller inconsistencies in Latif's retelling of his story. In particular, in 2⬛⬛⬛⬛, Latif reportedly told an interrogator that he followed written instructions to meet Ibrahim in Kandahar and traveled to Kabul only after staying with Ibrahim there. JE 25 at 2-3. But in 2⬛⬛⬛⬛, Latif reportedly told an interrogator that he traveled directly to Kabul to find Ibrahim, JE 29 at 1, and in his 2009 declaration, Latif stated that he believed he would meet Ibrahim in Pakistan but went on to Kabul to find Ibrahim there, JE 34 ¶ 8. In addition, respondents note that Latif has said that he stayed at the hospital in Jordan for three months after his car accident, JE 24 at 1; JE 34 ¶ 3, but the evidence in the record

SECRET

demonstrates that he was only there for five days, JE 32 at 6.

Finally, respondents assert that some of Latif's allegations are unlikely to be true. They argue that records from his arrival at Guantanamo Bay undercut his assertions of being disabled by indicating that Latif had "no significant medical illness or injuries while detained at Kandahar detention facility" and "denie[d] significant medical [history]." JE 54 at 1, 3. Furthermore, they submit a declaration from a physician who concluded that Latif was physically able to be a fighter. JE 55 (Decl. of ███████████████████ (May 25, 2010)) ¶ 12.[13] Respondents also argue that had Latif been at an Islamic studies center near Kabul, he would not have stayed there until November 2001, JE 34 ¶ 8-9, by which date civilians have been fleeing for months, *see* JE 91 (LARA HAYES & BORGINA BRUNNER, "TIMELINE: THE TALIBAN") at 1 (indicating that "Afghans begin fleeing Kabul" in mid-September 2001)). Instead, respondents assert, leaving the Kabul area at the time the Taliban abandoned that city, *see id.* at 3 (noting that the Taliban had left Kabul by November 13, 2001), suggests that Latif was with Taliban forces.

**C.    The Court's Findings and Conclusions**

The evidence upon which respondents primarily rely, ██████████████ is not sufficiently reliable to support a finding by a preponderance of the evidence that Latif was recruited by an Al Qaeda member or trained and fought with the Taliban. The document

---

[13]    Latif has submitted a declaration from another physician who noted that because "medical screening for transfer by air or inprocessing is expedient and time sensitive," such screening "often do[es] not identify clinical problems that later become apparent." PE 6 (Decl. of Stephen N. Xenakis, M.D. (June 6, 2010)) ¶ 15. This physician looked at Latif's medical records and found that the evidence of a "linear skull fracture" and lingering "symptoms of headaches, impairments in memory and concentration, and losses in hearing and vision" would disqualify Latif from United States military service. *Id.* ¶ 19.

SECRET

~~SECRET~~

contains information that, ███████████████ would support a conclusion that Latif's detention is lawful, and the Court does not take its contents lightly. But the Court cannot credit that information because there is serious question as to whether ████ accurately reflects ████ ████ the incriminating facts ██████ are not corroborated, and Latif has presented a plausible alternative story to explain his travel.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

    In addition, it is significant that, as Latif emphasizes, there is no corroborating evidence for any of the incriminating statements ████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████ Accordingly, although the Court does not disregard █████████████ it will not find it more likely than not

~~SECRET~~

SECRET

that respondents' allegations that Latif trained and fought with the Taliban are true.

The Court makes this ruling having taken into consideration the explanation of events Latif has offered. Latif's story is not without inconsistencies and unanswered questions, but it is supported by corroborating evidence provided by medical professionals and it is not incredible. The Court does not accept respondents' contention that Latif must be lying because he has told more than one cover story. That theory is based on two isolated statements. The first, an indication that Latif said he went to Kabul to "look around," JE 46 at 2, does not contradict Latif's version of events, in which he went to Kabul to wait for treatment. Furthermore, the document's reference to an ear problem, suggestion that Latif arrived in Kabul approximately five months earlier, and indication that he was elsewhere for the month preceding capture are all consistent with his story. The second statement on which respondents rely, an indication that Latif said he was helping at the Islamic studies center, may be the result of a misunderstanding or mistranslation. Given the opportunity at his ARB proceeding to respond to the contention that he was helping Ibrahim at the Islamic studies center, as suggested in the Knowledgability Brief, JE 23 at 1, Latif stated that the truth was just the opposite. JE 33 at 7 (reporting that in response to a statement that "[i]t says in the Unclassified Summary that you traveled to Afghanistan to help Ibrahim," Latif said "[h]im to help me, not me helping him").

Respondents' other arguments attacking the credibility of Latif's story are similarly unconvincing. The smaller inconsistencies to which respondents have pointed may be no more than misstatements or mistranslations; even if some details of Latif's story have changed over time, for whatever reason, its fundamentals have remained the same. The timing of his departure from Kabul is not sufficient to create an inference that he was involved in fighting. Whether

SECRET

SECRET

Latif was sufficiently physically impaired as to make it impossible for him to fight is not a crucial question; much more important is that the evidence shows that Latif did have an injury that continued to affect him in 2001 and for which he might therefore have sought treatment. This exculpatory information contributes to the Court's finding that respondents have not proven by a preponderance of the evidence that Latif was in Afghanistan to train and fight with the Taliban.

Because respondents have not demonstrated by a preponderance of the evidence that Latif was part of Al Qaeda or an associated force, the Court concludes that his detention is not lawful under the AUMF. Accordingly, his petition must be granted.

## III. CONCLUSION

For the foregoing reasons, Latif's petition for a writ of habeas corpus shall be granted. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

July 21, 2010