UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
IN RE: GUANTANAMO BAY               )        Miscellaneous No. 12-398 (RCL)
DETAINEE CONTINUED ACCESS           )        Civil Action Nos.
TO COUNSEL                          )        04-1254 (RCL), 05-1638 (CKK),
                                    )        05-2185 (RCL), 05-2186 (ESH),
                                    )        05-2380 (CKK)
                                    )
_____)


## MEMORANDUM OPINION[1]

## I.    INTRODUCTION

Eleven years after the September 11, 2001, attacks on the Pentagon and World Trade

Center and the subsequent invasions of Afghanistan and Iraq, 168 people captured in the Global

War on Terrorism remain detained at the United States Naval Base in Guantanamo Bay, Cuba

("Guantanamo").  This matter concerns six of those detainees.  At its heart this case is about

whether the Executive or the Court is charged with protecting habeas petitioners' right to access

their counsel.  Petitioners contend that the terms and conditions of this Court's 2008 Protective

Order ("Protective Order" or "P.O.") govern their access to counsel regardless of whether they

are currently petitioning for habeas relief.  The Government argues that once a detainee's habeas

petition is terminated, the Court's Protective Order expires and the Executive has the prerogative

of assuring counsel-access.  Upon consideration of the Motions [1, 2, 3, 4, 5, and 6], the

Combined Opposition [12], the Replies [19, 20, 21, and 26], the oral arguments, the entire record

herein, the applicable law and for the reasons below, the Court finds that the Protective Order

---

[1] The Court's original opinion contained a non-material factual error.  The Court now issues this Amended Opinion, which corrects the factual error.

governs access to counsel issues for Guantanamo detainees who have a right to petition for habeas corpus relief, whether or not such a petition has been dismissed or denied.[2]

## II.  BACKGROUND

### A.  Procedural Background.

In the process of litigating their individual habeas cases, petitioners Abdu Al-Qader Hussain Al-Mudafari (ISN[3] 40), Hayal Aziz Ahmed Al-Mithali (ISN 840), Mohammed Rajeb Abu Ghanem (ISN 44), and Zakaria Al-Baidany (ISN 1017) each moved to dismiss their habeas petitions, without prejudice, conditioned on their continued access to counsel under the Protective Order.  Resp. Opp. [12] at 1, Aug. 7, 2012.[4]  In the alternative, petitioners Al-Mudafari and Al-Mithali seek indefinite stays of their cases in order to ensure they continue to have access to counsel under the Protective Order.  *Id.*  Petitioners Uthman Abdul Rahim Mohammed Uthman (ISN 27) and Yasein Khasem Mohammad Esmail (ISN 522) had their petitions for habeas relief denied after full merits hearings.[5]  Counsel for these two petitioners requested permission under the procedures set out in the Protective Order to meet with his clients in May and August 2012.  Esmail & Uthman Reply [21] at 7, Aug. 13, 2012.  However, the

---

[2] The Court's ruling today is limited to counsel-access under the Protective Order for the purpose of litigating before Federal courts.

[3] "ISN" is the acronym for "Internment Serial Number," and each detainee currently housed at Guantanamo Bay has been assigned an ISN. *Bostan v. Obama*, 821 F. Supp. 2d 80, 82 n.1 (D.D.C. 2011) (citing *Al-Harbi v. Obama*, Civil Action No. 05–2479(HHK), 2010 WL 2398883, at *3 n. 2 (D.D.C. May 13, 2010).

[4] Petitioners have filed six motions in this case: Esmail Mot. [1]; Uthman Mot. [2]; Al-Mudafari Mot. [3]; Al-Mithali Mot. [4]; Ghanem Mot. [5]; and Al-Baidany [6].  Each motion was filed in the above captioned miscellaneous case on July 27, 2012.  Respondents filed a single Combined Opposition.  Resp. Opp. [12], Aug. 8, 2012.  Replies were also filed by petitioners Al-Baidany Reply [19], Al-Mudafari & Al-Mithali Reply [20], and Esmail & Uthman Reply [21] on August 13, 2012.  Petitioner Ghanem filed a brief Reply, in which he joined the Reply of petitioners Esmail and Uthman.  Ghanem Reply [26] at 1, Aug. 16, 2012.

[5] Uthman's petition for habeas relief was originally granted by the District Court. *Abdah v. Obama*, 708 F. Supp. 2d 9, 11 (D.D.C. 2010).  However, the D.C. Circuit reversed with instructions to deny the petition. *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011).  The District Court then denied Uthman's Petition, *Abdah v. Obama*, 2011 WL 1642462 (D.D.C. April 29, 2011), and Uthman's present case came to an end after the Supreme Court denied certiorari, *Uthman v. Obama*, No. 11-413, ---S. Ct.---, 80 U.S.L.W. 3678 (U.S. June 11, 2012).  Petitioner Esmail's (ISN 522) petition for habeas relief was denied in April 2010. *Abdah v. Obama*, 709 F.Supp.2d 25 (D.D.C. 2010).  After the D.C. Circuit affirmed, Esmail took no further appeal to the Supreme Court. *Esmail v. Obama*, 639 F.3d 1075 (D.C. Cir. 2011).

Government denied counsel's requests and barred counsel from meeting with either detainee unless counsel signed a Memorandum of Understanding (MOU), promulgated by the Government that would henceforth set the terms for counsel-access.  Esmail Mot. [1] at 2; Uthman Mot. [2] at 1.  Esmail and Uthman now move the Court for an Order affirming that the Protective Order continues to apply to them.  Resp. Opp. [12] at 1.[6]

The Government objects to court-ordered counsel-access under the Protective Order for all six petitioners and argues that the Protective Order ceases to control counsel-access in the absence of a pending or imminent habeas petition.  Resp. Opp. [12] at 1–2.  The Government believes that the Protective Order, or at least its counsel-access provisions, expires once a detainee's original habeas petition has been adjudicated on the merits or the case is dismissed.  *Id.* at 26–31; Hr'g Tr. 6–7, Aug. 17, 2012.  The Government warns that should the court find for the detainees in this case, such a holding would constitute an abuse of discretion as it would result in a permanent injunction without the required showing of actual harm necessary for such an "extraordinary remedy."  *Id.* at 2–3.

The universal nature of the counsel-access question cried out of singular resolution.  The Court, upon motion by Respondents, and after telephonic consultations on July 27 with counsels for various petitioners and the Government, and after further discussions with Judges Huvelle

---

[6] All petitioners save Al-Baidany also contend that the Protective Order should govern counsel-access during Periodic Review Board (PRB) proceedings, which were created by Executive Order 13,567 to provide a process for reviewing the justifications for continued detention.  Initially, petitioners Esmail and Uthman note that the MOU's terms, specifically paragraph 4, would prevent counsel from using information obtained pursuant to counsels' representation of detainees in habeas proceedings in PRB hearings.  Mot. [1, 2] at 3–4.  Petitioners Al-Mudafari and Al-Mithali simply note that they have retained counsel for PRB proceedings.  Mot. [3, 4] at 3.  And petitioner Ghanem simply notes that he has a right to counsel in PRB proceedings.  Mot. [5] at 3.  In their Replies, petitioners argue that the MOU, as opposed to the Protective Order, would bar counsel from using information obtained pursuant to the MOU in PRB proceedings.  Al-Mudafari & Al-Mithali Reply [20] at 11–13; Esmail, Ghanem & Uthman Reply [21] at 9–10.  The Government objects and argues that there is no justification for interfering in a strictly Executive matter that does not implicate habeas rights.  Resp. Opp. [12] at 31.  The Court does not believe that this issue is ripe for review.  None of the petitioners addressed whether the Court has jurisdiction over counsel-access during PRB proceedings.  Nor have the petitioners alleged that their access to counsel has yet been impaired.  Moreover, the Court has now invalidated the MOU.

and Kollar-Kotelly, decided to consolidate the disparate motions into a single miscellaneous case.  *See, e.g.*, Ghanem, et al. v. Bush, et al., 05-cv-1638 (CKK), Opp. & Cross-Mot. [264] at 2, July 26, 2012.  The above captioned miscellaneous case was opened and this Court entered a scheduling order for briefing and oral arguments. [7]  Sched. Order [7] at 1–2, July 27, 2012.  Oral arguments were held on August 17, 2012.

>    **B.    Legal Background.**

In the ten years since the first detainees were brought to Guantanamo Bay, only a handful have been tried or convicted.  Despite this, the Government has fought to deny detainees the ability to challenge their indefinite detentions through habeas proceedings.  In a litany of rulings, this Court and the Supreme Court have affirmed that the Federal courts are open to Guantanamo detainees who wish to prove that their indefinite detentions are illegal.

In 2004, the Supreme Court rejected the Government's argument that the Federal courts had no jurisdiction to hear detainee habeas petitions.  *Rasul v. Bush*, 542 U.S. 466, 484 (2004).  Congress then twice amended the Federal habeas statute, 28 U.S.C. § 2241, in an effort to overturn the Supreme Court's ruling.  Congress first passed the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 109-148, 119 Stat. 2680 (2005), but the Supreme Court held that the provision of the DTA depriving courts of jurisdiction over detainee habeas petitions did not apply to cases pending when the DTA was enacted.  *Hamdan v. Rumsfeld*, 548 U.S. 557, 575–78 (2006).  Next, Congress passed the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600 (2006) (codified in part at 28 U.S.C. § 2241 & note), but the Supreme Court

---

[7] The motions under review here were originally filed in the following five cases: Abdah, et al. v. Obama, et al., 04-cv-1254 (RCL) (petitioners Esmail and Uthman);  Ghanem v. Obama, et al., 05-cv-1638 (CKK) (petitioner Ghanem); Al-Mudafari  v. Obama, et al., 05-cv- 2185 (RCL) (petitioner Al-Mudafari);  Al-Mithali v. Obama, et al., 05-cv-2186 (ESH) (petitioner Al-Mithali); Al-Baidany v. Obama, et al., 05-2380 (CKK) (petitioner Al-Baidany). Judges Huvelle and Kollar-Kotelly each referred their cases to the undersigned judge for resolution.  Al-Mithali, 05-cv-2186 (ESH), Order, Jul. 17, 2012; Al-Baidany, 05-2380 (CKK), Minute Order, Jul. 30, 2012.

invalidated the jurisdiction-stripping provisions of the MCA and declared that detainees have a constitutional right to petition for habeas relief. *Boumediene v. Bush*, 553 U.S. 723, 732 (2008). This Court and the Supreme Court also held that Guantanamo detainees have a concomitant right to the assistance of counsel. *Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004); *Al Odah v. United States*, 346 F. Supp. 2d 1, 5 (D.D.C. 2004).

These rulings raised significant questions about counsels' access to detainees and classified information. The Court first began to address this problem in *Al Odah*, where Judge Kollar-Kotelly found that the Court had power "to fashion procedures by analogy to existing procedures, in aid of the Court's jurisdiction and in order to develop a factual record as necessary for the Court to make a decision on the merits of" detainee habeas claims. 346 F. Supp. 2d at 6; *see also Harris v. Nelson*, 394 U.S. 286, 299 (1969). Using this power, she proposed a framework for detainee counsel-access. *Al Odah*, 346 F. Supp. 2d at 13–15. The Government subsequently moved for a Protective Order "to prevent the unauthorized disclosure or dissemination of classified national security information." *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 175 (D.D.C. 2004). Judge Joyce Hens Green was designated to coordinate and manage all Guantanamo proceedings and rule on common procedural and substantive issues. All then-pending Guantanamo cases, except those being heard by Judge Richard J. Leon, were transferred to Judge Green. In November 2004 she issued an "Amended Protective Order and Procedures for Counsel Access to Detainees," which set guidelines and procedures for counsel-access to both detainees and classified information. Judge Green's Protective Order was ultimately a boon for the Court, for the Government and for detainees, as it settled many issues that would have otherwise, no doubt, required a great deal of litigation over every minute issue of counsel-access.

Judge Green's Protective Order stood without objection for four years.  In light of the *Boumendiene* decision in 2008, the members of this Court again determined that a single judge should rule on common procedural issues in order to facilitate the expeditious resolution of Guantanamo habeas cases.  *In re Guantanamo Bay Detainee Litig.*, Miscellaneous No. 08-442 (TFH), Order [1] at 1–2, July 2, 2012.  Judge Thomas F. Hogan was designated, like Judge Green, "to coordinate and manage proceedings in all cases involving petitioners presently detained at Guantanamo Bay, Cuba." *Id.*  All then-pending Guantanamo habeas cases, and all such cases thereafter filed, were to be transferred to Judge Hogan for case management and coordination. [8]  *Id.*  Judge Hogan also determined that the Court should issue a new protective order.  After considering the parties' positions espoused both in written submissions and at a status conference, Judge Hogan issued a carefully crafted and thorough Protective Order that contained procedures for counsel access to detainees and to classified information.  *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143 (D.D.C. 2008) ("Protective Order" or "P.O.").  Judge Hogan's Protective Order was substantially similar to the Protective Order issued by Judge Green.

## III. THE GOVERNMENT'S PROPOSED MEMORANDUM OF UNDERSTANDING (MOU)

Despite the fact that the Government never opposed the Protective Order or brought any violations of the Protective Order to the Court's attention, at some point during the Summer of 2012 the Government felt it necessary to promulgate their own procedures for counsel-access at Guantanamo, which it styled as a "Memorandum of Understanding" (MOU). [9]  The MOU is

---

[8] The Order specifically excluded cases over which Judge Richard Leon presided as well as *Hamdan v. Bush*, 04-cv-1519.  *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH), Order [1] at 2 n. 1.

[9] The Government has requested amendments to the Protective Order.  *In re Guantanamo Bay Detainee Litig.*, 08-0442 (TFH), 2009 WL 2143732, at *1 (D.D.C. July 10, 2009); *see also Bostan*, 821 F. Supp. 2d at 85 n.7 (noting that the Court has previously amended the Protective Order).

meant to replace the Protective Order for those detainees whose cases have been dismissed or whose petitions have been denied on the merits.  The Government repeatedly avers that its proposed MOU provides "essentially the same" counsel-access provisions as the Protective Order.  Resp. Opp. [12] at 1, 15, 38, 40.  "The lady doth protest too much, methinks."  William Shakespeare, *Hamlet*, Act III, Scene II.  Far from providing "essentially the same" provisions, the MOU, in truth, significantly modifies the Protective Order.

For example, the Protective Order assumes that counsel for detainees have a "need to know," which allows them to view classified information in their own and related Guantanamo cases.  P.O. at ¶ I.D.28.  Counsel for detainees are also specifically allowed to discuss with each other relevant information, including classified information, "to the extent necessary for the effective representation of their clients."  *Id.*  And, the Protective Order assures that counsel have continuing access to certain classified information, including their own work-product.  *Id.* at ¶¶ I.D.23, 25.

The MOU, on the other hand, strip counsel of their "need to know" designations, and explicitly denies counsel access to all classified documents or information which counsel had "previously obtained or created" in pursuit of a detainee's habeas petition.  Resp. Opp. [12] at 11, MOU [12-1] at ¶ 8(b).  Counsel can obtain access to their own classified work product only if they can justify their need for such information to the Government.  MOU [12-1] at ¶ 8(b).  "Need to know" determinations for this and other classified information would be made by the Department of Defense Office of General Counsel (DoD OGC), in consultation with the pertinent classification authorities within DoD and other agencies.  *Id.*  However, there is no assurance that such determinations will be made in a timely manner.  As this Court is keenly aware from experience, the inter-agency process of classification review can stretch on for

months.  It is very likely that this provision would result in result in lengthy, needless and possibly oppressive delays.  It would also require counsel to divulge some analysis and strategy to their adversary merely to obtain their past work-product.  Further, the MOU countermands the Protective Order and specifically denies counsel for detainees the privilege of sharing information amongst themselves in the pursuit of representing their clients unless specifically authorized to do so by "the appropriate government personnel."  *Compare* Protective Order at ¶ I.D.28 *with* MOU [12-1] at ¶ 8(a)(10).  The MOU does not define who such personnel would be.

While this Court is empowered to enforce the Protective Order, all "disputes regarding the applicability, interpretation, enforcement, compliance with or violations of" the MOU are given to the "final and unreviewable discretion of the Commander, Commander, Joint Task Force-Guantanamo Bay" (JTF-GTMO).  MOU [12-1] at ¶ 8(f).  The MOU further gives the JTF-GTMO Commander complete "authority and discretion" over counsels' access to classified information and to detainees, including in-person visits and written communications.  *Id.* at ¶ 6.  Apparently, the MOU also gives the Government authority to unilaterally modify its terms.  Resp. Opp. [12] at 11, n.3 ("Although not stated in the MOU itself, the Government has advised petitioners' counsel that . . . it anticipates limiting the number of attorneys who may have continued access to a detainee under the MOU to two.  Similarly, the Government also anticipates limiting the number of translators for each detainee to one.").   Importantly, the MOU is only applicable to attorneys who have represented detainees under the Protective Order; there are no provisions allowing for attorney substitutions or for new counsel.  *See* MOU [12-1] at ¶ 3.

Unlike the Protective Order, which repeatedly states that the Government may not unreasonably withhold approval of matters within its discretion, the MOU places no such reasonableness requirement on the Commander of JTF-GTMO.  *See, e.g.*, P.O. at ¶ II.11.b.

Because the MOU does not come into effect until countersigned by the Commander at JTF-GTMO, the Commander could presumably refuse to sign the MOU, leaving a detainee in the lurch without access to counsel. *Id.* at ¶ 11. The MOU also states that both the "operational needs and logistical constraints" at Guantanamo as well as the "requirements for ongoing military commissions, periodic review boards, and habeas litigation" will be prioritized over counsel-access. *Id.* at 8(c). This provision is particularly troubling as it places a detainee's access to counsel, and thus their constitutional right to access the courts, in a subordinate position to whatever the military commander of Guantanamo sees as a logistical constraint.

## IV.    **STANDARD OF REVIEW**

The foundation of the Supreme Court's habeas jurisprudence is that the Great Writ lies at the core of this Nation's constitutional system, and it is the duty of the courts to remedy lawless Executive detention.

> Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land. The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint.

*Rasul*, 542 U.S. at 474 (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 218–219 (1953) (dissenting opinion)). The *Boumediene* decision rested in great part on the importance of the Great Writ to our system of government. *Boumediene*, 553 U.S. at 738–46, 797. As the Supreme Court noted, the Constitutional right to petition for habeas relief is a "fundamental precept of liberty." *Id.* at 739; *see also Harris*, 394 U.S. at 290–91 (The Great Writ serves as the "fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action."). The Framers considered the Great Writ an "essential mechanism in the separation-of-powers scheme" because it serves as check against "undivided, uncontrolled

power" that is endemic in the "pendular swings to and away from individual liberty."

*Boumediene*, 553 U.S. at 742-43. "It is from [the separation-of-powers] principles that the

judicial authority to consider petitions for habeas corpus relief derives." *Id.* at 797.

The long history of the Great Writ also firmly establishes that it is the high duty of the

Court, not the Executive, to "call the jailer to account" in habeas proceedings, *Boumediene*, 553

U.S. 745–46 (internal citations omitted), and to ensure that access to the courts is "adequate,

effective, and meaningful," *Bounds v. Smith*, 430 U.S. 817, 822 (1977). *See also Harris*, 394

U.S. at 292. Practically, this means "that the privilege of habeas corpus entitles the prisoner to *a

meaningful opportunity to demonstrate* that he is being held pursuant to 'the erroneous

application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting *INS v. St.

Cyr*, 533 U.S. 289, 302 (2001)) (emphasis added).

In the context of Guantanamo Bay habeas litigation, "access to the Court means nothing

without access to counsel." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005). They are

inseparable concepts and must run together. [10]

> To say that Petitioners' ability to investigate the circumstances surrounding their capture and detention is "seriously impaired" is an understatement. The circumstances of their confinement render their ability to investigate nonexistent. Furthermore, it is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation. Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system. Finally, this Court's ability to give Petitioners' claims the "careful consideration and plenary processing" which is their due would be stymied were Petitioners to proceed unrepresented by counsel.

*Al Odah*, 346 F. Supp. 2d at 9. This reasoning holds true whether petitioners are seeking to file a

habeas petition or are actively litigating one.

---

[10] Indeed, the Government agrees that "the right to counsel attaches to the prisoner's right of access to the courts." Hr'g Tr. at 52.

V.     **ANALYSIS**

The Government maintains that in absence of an "active or impending" habeas case, or where it is "speculative" that a detainee will bring a renewed petition, "the primary responsibility for . . . respecting rights of counsel access the detainee may have[] should fall in the first instance to the [E]xecutive branch."  Resp. Opp. [12] at 2–3; Hr'g Trans. at 6–7, 15.  The Government further argues that this Court has no power to address the counsel-access question unless and until petitioners' demonstrate that the counsel-access voluntarily provided by the Government's MOU "has impeded their ability to present new habeas petitions to the Court."  Resp. Opp. [12] at 15.[11]  The Government's reasoning is substantially flawed and confuses the roles of the jailer and the judiciary in our constitutional separation-of-powers scheme.  The Court is simply not obliged to give the Executive the opportunity to create its own counsel-access provisions before stepping in and fashioning such procedures.  To do so would be to allow the Government to transgress on the Court's duty to safeguard individual liberty by "calling the jailer to account." *Boumediene*, 553 U.S. at 745–46.

As an initial matter, the Court is somewhat nonplussed as to why the counsel-access issue is being re-litigated at all.  This Court faced a very similar issue in *Al Odah*.  The Government there allowed Guantanamo detainees to meet with counsel under Government issued "Procedures for Counsel Access to Detainees at Guantanamo Bay, Cuba."  346 F. Supp. 2d at 5.  Judge Kollar-Kotelly, in a well-reasoned opinion, flatly rejected the Government's proposed procedures.  *Id.* at 9–14.  She held that "the Government . . . [was] not entitled to unilaterally

---

[11] The Government later avers that petitioners have no freestanding right to counsel, and that in the domestic context, the Sixth Amendment right to counsel does not attach until the commencement of adversarial proceedings. Resp. Opp. [12] at 24 n.9, 37.  But this case is not about detainees' right to counsel.  The Government has conceded that petitioners here have a right to counsel.  Hr'g Tr. at 7.  This case concerns the rules under which detainees, who are already represented by counsel, can continue to meet with their counsel absent a habeas petition currently before the Court.

impose procedures that abrogate the attorney-client relationship" and that petitioners' "access to attorneys [was] not a matter of Government discretion." *Id.* at 5, 10.

The Protective Order has been in place for nearly four years and there is no record that its provisions have threatened classified information or caused any harm to the military's operation of the Guantanamo Bay Naval Base. The Government itself argues that the MOU and the Protective Order provide essentially the same protections. In the first instance, this raises the question of why the Government felt it necessary to promulgate the MOU at all. The old maxim "if it ain't broke, don't fix it" would seem to caution against altering a counsel-access regime that has proven safe, efficient, and eminently workable. Indeed, the Government had no answer when the Court posed this question in oral arguments. The best that they could muster was to argue that the Protective Order simply left a vacuum of procedural rules in the absence of an "active or impending" habeas petition. Of course, when it comes to power, the Government, as much as nature, abhors a vacuum.

### A. The Judiciary, and not the Executive, is Charged with Ensuring Access to the Courts.

Regardless, the Government's position here, while not unreasonable, is untenable. The Government's argument is presumes that petitioners who are not actively litigating habeas petitions do not have the same need to access their counsel as detainees who are currently litigating. The Government presented no case law to substantiate this two tiered regime or to support this assumption, and the Court finds none. Instead, the Government argues that the courts have been leery of involving themselves in the operation of jails, and that it would inappropriate for the Court to involve itself, at this point, with the Executive's determination of what procedures appropriately provide counsel-access to detainees. Resp. Opp. [12] at 23–25.

The Court cannot disagree that in the prison context access to counsel is merely a "means

for ensuring a reasonably adequate opportunity to presented claimed violations of fundamental constitutional rights to the court." *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (internal quotation marks omitted).  The Court likewise agrees that in the prison context, the political branches of government are responsible for running their own facilities and "manag[ing] prisons in such fashion that official interference with the presentation of claims will not occur." *Id.* at 349.  But it does not follow that the judiciary has secondary responsibility for ensuring prisoners have adequate access to the courts.

At the outset, the Government's reason simply falls flat because, as the Government itself notes, "the detention facility [at Guantanamo Bay] . . . is not a corrections facility."  Resp. Lt'r [28] at 2, Aug. 21, 2012.  If it were, under Navy Regulations, detainees would have unconditional access to their attorneys.  Dep't of Navy Corrections Manual, Art. 1640-80, Sec. 3 ¶ 2.c (Mar. 29, 2011), *available at* http://www.public.navy.mil/bupers-npc/reference/instructions/BUPERSInstructions/Documents/1640.22.pdf  ("Under no condition shall any prisoner be prevented from consulting or corresponding with counsel or the authorized representative of counsel . . . .").

But even in the prison context, the Supreme Court has zealously guarded against policies that threaten prisoners' ability to effectively challenge their detention.  It has held, in no uncertain words, that the "state and its officers may not abridge or impair a prisoner's right to apply to a federal court for a writ of habeas corpus."  *Ex parte Hull*, 312 U.S. 546, 549 (1941).  Such abridgment need not be conspicuous or direct.  For example, the Supreme Court has mandated that prisoners must be provided with access to law libraries or "alternative sources of legal knowledge," and "with paper and pen to draft legal documents[,] with notarial services to authenticate them, and with stamps to mail them."  *Bounds*, 430 U.S. at 817, 823–25 (1977).

The Supreme Court has likewise invalidated backdoor attempts to prevent inmates from filing habeas petitions, such as policies that ban jailhouse lawyers from assisting other inmates prepare court filings, *Johnson v. Avery*, 393 U.S. 483, 489 (1969), and those requiring indigent prisons to pay filing fees, *Burns v. Ohio*, 360 U.S. 252, 257 (1959). In *Casey*, the Supreme Court affirmed that prisons must ensure that illiterate and non-English-speaking prisoners have meaningful access to the Courts.  *See* 518 U.S. 343, 355–56 (1996).

While the Executive may have the responsibility for regulating its facilities, the Court is charged with ensuring that prisoners are "provided with the tools . . . to challenge the conditions of their confinement." *Casey*, 518 U.S. at 355.   This is especially true in the context of Guantanamo:  "The gravity of the separation-of-powers issues raised by these cases and the fact that these detainees have been denied meaningful access to a judicial forum for a period of years render these cases exceptional." *Boumediene*, 553 U.S. at 772.  As petitioners Uthman and Esmail point out, the "legal framework for uncharged Guantanamo detainees is dynamic and fluid, subject to change for any number of reasons," including changed domestic and international circumstances, and amended legal and regulatory schemes.  Reply [21] at 7.  Even the Government agrees that "assistance of counsel can be instrumental to proper decision-making about whether and when to file a new habeas petition."  Resp. Opp. [12] at 21–22.  The Court does not see how these petitioners, who speak no English, have no legal training, and who cannot be expected to remain up to date with new legal and political developments can have the requisite tools to bring habeas petitions without access to counsel.

**B.    The Government's MOU Transgresses on the Judiciary's Duty to Ensure Detainees Have Access to the Courts by Giving the Military Unreviewable**

**Discretion over Counsel-Access Questions.**

The MOU not only threatens separation-of-powers principles by usurping the judiciary's duty to ensure access to the courts, it also takes from the courts the power to adjudicate controversies relating to the MOU. The MOU gives the military commander of Guantanamo "final and unreviewable discretion" over "disputes regarding the applicability, interpretation, enforcement, compliance with or violations of" the MOU. MOU [12-1] at ¶ 8.f. Such controversies will necessarily implicate detainees' access to the courts. If applied, the MOU would also allow the Commander, JTF-GTMO to deny petitioners access to counsel whenever he deems the "operational needs or logistical constraints" justify it. MOU [12-1] at 8(c). The Government has already exercised this broad, unimpeded discretionary power; it informed petitioners' counsel that "it anticipates limiting the number of attorneys who may have continued access to a detainee under the MOU to two" and one translator. Resp. Opp. [12] at 11, n.3. A document so one-sided that it gives one party the power to unilaterally modify its provisions renders any rights provided by such a document meaningless and illusory. Far from merely putting in place rules governing how it will run its own facilities and protect classified information, Hr'g Tr. at 14–15, the Government wants to place itself as the sole arbiter of when a habeas petitioner is "seeking" to challenge their own detention and when a habeas case is "impending," and thus when they can have access to counsel. But "access to the Court means nothing without access to counsel." *Al-Joudi*, 406 F. Supp. 2d at 22. Thus, the MOU actually gives the Government final, unreviewable power to delay, hinder, or prevent access to the courts.

Moreover, the Government actions thus far demonstrate that it cannot be trusted with such power. The Government does not contest that petitioners' right to habeas relief includes a continuing right to file a habeas petition even after denial on the merits or dismissal without

prejudice.  Resp. Opp. [12] at 21.  And, the Government concedes that detainees "seeking to challenge the lawfulness of their detention, whether for the first time, or thereafter, are entitled to the assistance of counsel."  *Id.* at 2.  Nor does the Government question that "assistance of counsel can be instrumental to proper decision-making about whether and when to file a new habeas petition."  *Id.* at 21–22.  Yet, the Government believes that the petitioners bringing the present action have only demonstrated a "conjectural" desire to bring future habeas claims, and regardless of how helpful counsel might be to that decision-making process, these petitioners do not qualify for counsel-access under the Protective Order.  *Id.* at 24.

The Court is satisfied that these petitioners have made plain their desire to continue challenging the legality of their detention.  Petitioners Al-Mudafari and Al-Mithali seek indefinite stays of their habeas proceedings, and Petitioner Ghanem seeks leave to dismiss without prejudice to re-file.   This evidences that each intends to continue fighting their detention, just at a later date.  Petitioner Al-Baidany specifically avers that he intends to re-file for habeas relief.  Reply [19] at 2.  And counsel for Uthman and Ismail submit that they "have asked counsel to pursue every legal avenue to achieve their release," and counsel has assured the Court that he "*will* file for habeas petitions or [commence] other legal proceedings on their behalf."  Reply [21] at 6.  These petitioners have demonstrated more than merely a conjectural desire to bring habeas petitions.  Indeed, they have either active or impending petitions.  Thus, by its own rubric, the Government should allow these petitioners access to counsel under the Protective Order.

### C.     The Government Lacked Authority to Issue the MOU.

It is clear that the Government had no legal authority to unilaterally impose a new counsel-access regime, let alone one that would render detainees' access to counsel illusory.

Because it is emphatically the duty of the Courts to assure access to habeas relief, *Harris*, 394 U.S. at 292, and because "petitioners' access to attorneys is not a matter of Government discretion," *Al Odah*, 346 F. Supp. 2d at 10, the Government's MOU is null *ab initio*. If the Court here were to allow the Executive to substitute its MOU for the Protective Order, regardless of whether it provides "essentially the same" counsel-access provisions or not, Resp. Opp. [12] at 1, 15, 38, 40, the Court would be abdicating its great responsibility to guarantee that its doors remain open to these detainees. *C.f. United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). If the separation-of-powers means anything, it is that this country is not one ruled by Executive fiat. Such blanket, unreviewable power over counsel-access by the Executive does not comport with our constitutional system of government. Therefore, it is the opinion of this Court that the Protective Order continues to govern detainee-counsel access for the purpose of bringing habeas petitions so long as detainees can bring habeas petitions before the Court.

> ### D.   The Court's Holding is Consistent with its Equitable Powers.

The Government argues that the Court's holding here turns the Protective Order into a permanent injunction without the showing of harm needed for such an injunction. The Court disagrees. As an initial matter, the Court's holding does not convert the Protective Order into a permanent injunction. The Protective Order remains in place only as long as detainees are held at Guantanamo Bay and can petition for habeas relief or bring other claims before the Federal courts, and no longer. Had, for example, the Obama Administration closed the Guantanamo Bay detention facility as it promised, the Court's Protective Order would no longer have any effect, except as to those provisions regulating disclosure of classified and protected information. *See* Executive Order 13492, 74 Fed. Reg. 4897 (Jan. 22, 2009). The Protective Order itself and the

Court's holding today are little more than an appropriate exercise of the Court's equitable powers in pursuit of its charge to ensure detainees have adequate access to the courts.

"Habeas corpus is at its core, an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319 (1995), and judges have "broad discretion" to fashion appropriate remedies, *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987).  It may extend beyond simply ordering the release of a petitioner, *Carafas v. LaVallee*, 391 U.S. 234 (1968), and is to "be administered with the initiative and flexibility essential to insure that miscarriages of justices within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291 (1969).  Habeas corpus "never has been a static, narrow, formalistic remedy; its scope has been to achieve its grand purpose-the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963).  In "reviewing the legality of Executive detention . . . its protections . . . [are] strongest."  *Rasul*, 542 U.S. at 474 (citations omitted).

The Supreme Court has noted that its "scope and flexibility—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes— have always been emphasized and jealously guarded by courts . . . ."  *Harris*, 394 U.S. at 291. Courts are inherently empowered to "requir[e] additional measure to assure meaningful access [to the courts]," *Bounds*, 430 U.S. at 824, and to "authorize such proceedings with respect to development . . . of the facts . . . as may be necessary or appropriate in aid of [its habeas jurisdiction]," *Harris*, 394 U.S. at 300 (citation and internal quotation marks omitted).  In *Al Odah*, this Court confirmed that, where it "is clear . . . that Petitioners are entitled to present the facts surrounding their confinement to the Court[], [i]t is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to their detention."  346 F. Supp. 2d at 7 (citing *Harris*, 394

18

U.S. at 300).  And in *Boumediene*, the Supreme Court specifically left access-to-counsel issues to the discretion of the District Court.  553 U.S. at 796.

Invoking the Court's equitable power in Guantanamo cases is particularly appropriate because this class of cases is *sui generis*.  *See Boumediene*, 553 U.S. at 772.  Petitioners are not being held in a state or federal detention facility where they can freely send mail, meet with family or phone a friend.  Petitioners here, and their fellow detainees, have been held virtually *incommunicado*, and some, including petitioner Ghanem, have been detained for more than a decade.  Mot. [5] at 4.  Most petitioners do not speak English and other detainees are completely illiterate.  Al-Mudafari & Al-Mithali Reply [20] at 9 n.3.  Petitioners hail from foreign lands with wildly different legal systems.  Any understanding they may possess of the American legal system is likely fraught with confusion and misconceptions.

The Protective Order was put in place to provide counsel with sufficient access to detainees and to classified information so that detainees could appropriately prosecute habeas petitions.  Therefore, the Court's holding here, that the Protective Order remains in effect even after a habeas petition has been dismissed or denied, does nothing more than ensure that detainees have access to the courts, through their counsel, and that detainee's counsel-access is "adequate, effective, and meaningful."  *Bounds*, 430 U.S. at 822.

**E.     The History and Terms of the Protective Order Makes it Clear that the Protective Order Remains in Effect After the Dismissal or Denial of a Habeas Petition.**

The Government argues that under the terms of the Protective Order, all provisions, save those regulating disclosure of classified information, necessarily expire at the termination of an individual petitioner's habeas case.  Resp. Opp. [12] at 28–31, Hr'g Tr. at 6–7.  As to the provisions regulating disclosure of classified information, the Court agrees with the Government.

*See* P.O. at ¶¶ I.D.31, I.E.41, I.G.52.  However, the Court cannot agree that these provisions, by implication, prove that the rest of the Protective Order was intended to expire after a petitioner's case is dismissed or denied.  To the contrary, the terms of the Protective Order and the history behind its creation sufficiently evidence that it applies to Guantanamo cases as a class, and that it remains in effect so long as petitioners have the right bring habeas or other cases before the Court, not merely when a habeas petition is being actively heard.

The Protective Order was not created in a vacuum.  It was issued in response to the Government's initial position, that detainees' access to counsel was purely within the Executive's "pleasure and discretion."  *Al Odah*, 346 F. Supp. 2d at 5.  It was the result of a deliberative process that included oral and written input from the Government and petitioners.  It took into consideration that the District Court, as the Court of first resort, is always concerned with the just and expeditious determination of cases and seeks judicial economy whenever possible.  *See In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH), Order [1] at 1–2.

The preamble to the Protective Order affirms that it was meant to apply to "all aspects of these coordinated matters."  P.O., 577 F. Supp. 2d at 145.  The coordinated matters were "all case involving petitioners presently detained at Guantanamo Bay, Cuba" that "have been filed or *may be filed in the future*. . . ."  *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH), Order [1] at 1–2 (emphasis added).  The Court understands the terms "all aspects" and "cases that have been filed or may be filed" to include all possible legal scenarios, including voluntary dismissal or other periods of inaction, such as between the filing of successive habeas petitions.  Section I paragraph 20 specifically notes that "petitioners' counsel in *these and other proceedings*" will have access to classified materials, including attorney work-product.  P.O. at ¶¶ I.13, I.20 (emphasis added).  And, "petitioners' counsel" was defined as "attorneys employed

or retained by or on behalf of a petitioner for purposes of representing the petitioner in *habeas*

*corpus or other litigation* in federal court." *Id.* at ¶ I.11 (emphasis added). Clearly, the order

was meant to apply to petitioners who were contemplating bringing cases, but who had not yet

filed pleadings with the Court. Finally, the Order mandates that all "documents containing

classified information prepared, possessed or maintained by, or otherwise provided to,

petitioners' counsel" would not be destroyed until the "final resolution of these cases, including

all appeals." *Id.* at ¶ I.33. These provisions read together make it abundantly clear that the

Protective Order's applicability lasts beyond the denial or dismissal of a petitioner's habeas case

and stretches to the class of present and future cases which have been, or may be, filed by

detainees at Guantanamo Bay.

Beyond this fact, the Government's reading of the Protective Order would lead to

unreasonable conclusions and create multiple regimes of counsel-access for habeas cases. For

example, a petitioner whose habeas claim was denied by the District Court would lose access to

counsel at the moment the Court's order was published because any appeal would be

"speculative" at that time. Petitioner's attorneys would then have to go through the process of

signing the MOU before they would be able to again meet with or speak to their client to

determine whether the detainee wished for them to file an appeal. But the MOU mandates that it

will not come into effect until countersigned by the Commander of JTF-Guantanamo, at his

discretion. MOU [12-1] at ¶ 11. Under these rules, the Government could simply withhold

access to counsel for any amount of time it wished. Moreover, if the Government signed the

MOU, the MOU would lose force at the moment petitioner made plain his desire to appeal the

District Court's ruling, because the petitioner's case would then be "impending." At that

moment, the petitioner's attorneys would again be covered by the Protective Order. The

Protective Order cannot be understood to create such a confusing counsel-access scheme.

## VI. SUFFICENT EVIDENCE EXISTS FOR THE COURT TO ISSUE A PERMANENT INJUNCTION IF IT SO DESIRED

The Government argues that under the Supreme Court's ruling in *Casey*, detainees must show "actual harm" before the Court has authority to step in and provide procedures for counsel-access.  Resp. Mot. [12] at 24; Hr'g Tr. at 8.  The Government maintains that petitioners here cannot show any such harm because counsel-access is provided under its MOU and because petitioners can access the Court via regular mail.  Resp. Mot. [12] at 38.

The Government's reliance on *Casey* is misplaced.  As an initial matter, the Government provided no evidence that the "actual harm" standard applicable in *Casey*, a case involving access to the courts in the domestic prison context, is appropriate for determining counsel-access questions involving detainees at Guantanamo Bay, especially when the Supreme Court has specifically left such questions to the discretion of the District Court.  *Boumediene*, 553 U.S. at 796.  The facts in *Casey* are also distinguishable.

*Casey* dealt with inmates held by the Arizona's Department of Corrections (ADOC) who complained that inadequate prison law libraries and legal assistance programs inhibited their access to the courts.  518 U.S. at 346–48.  After finding harm, the district court directed a special master to investigate and issue a report containing remedial measures, which the Court adopted as a permanent injunction.  *Id.*  The Supreme Court reversed and held that these prisoners could not establish harm simply by arguing that the "prison's law library or legal assistance program is subpar in some theoretical sense."  *Id.* at 351.  The Court also took issue with the permanent injunction.  It faulted the district court because the remedial plan was developed by a law professor in New York, rather than by ADOC officials, and it was created "through a process that failed to give adequate consideration to the views of state prison officials."  *Id.* at 362–63.

While the prisoners in *Casey* may have been in a prickly situation, they certainly were afforded more protections and access to courts than detainees at Guantanamo. The difference between the two is as stark as the difference between the tropical climate of Cuba and the desert climate of Arizona. Prisoners in Arizona had been tried and convicted. They could send mail through the U.S. Postal Service. They could phone friends and family who could assist them with securing representation. And there was no evidence that prisoners, who were represented by counsel, would be restricted from meeting with counsel. In contrast, detainees at Guantanamo have been held without charge or trial, are generally not permitted visitors other than  members of the International Committee for the Red Cross, and their mail is subject to review, redaction and seizure by the military. Al-Mithali Mot. [4] at 3.

What's more, *Casey* affirmed the District Court's finding that at least two illiterate and non-English-speaking prisoners suffered actual harm because the ADOC Procedures did not provide them with adequate access to the courts. 518 U.S. at 355–56. If illiterate prisoners who could nevertheless communicate with family, friends and counsel were deemed to lack sufficient access to the courts, there can be little doubt that the Guantanamo detainees, whose are in a far more vulnerable position, and who have been denied access to their own counsel, have likewise suffered an injury which the Court may rightfully redress using its equitable powers.

Unlike the circumstances in *Casey*, the Protective Order was requested by, and developed in consultation with, the Government. Judge Hogan, a wise and experienced jurist who had previously served as the Chief Judge of this Court, and not some mere law professor, carefully considered the pleadings and oral arguments of the parties, and the history of Guantanamo habeas litigation before issuing the Protective Order. Far from providing remedial measures, the Protective Order simply reaffirmed counsel-access procedures that had been in place for four

years.

**A.    There is Sufficient Evidence to Find that Petitioners Would Suffer Actual Harm Absent Court-Ordered Counsel Access.**

But even under *Casey*, the Court need only find "past or imminent official interference with individual inmates' presentation of claims to the courts," before issuing an injunction to prevent such harm.  518 U.S. at 349.  As the Court has repeatedly said, in the context of Guantanamo Bay, "access to the Court means nothing without access to counsel."  *Al-Joudi*, 406 F. Supp. 2d at 22.  It follows that any regulations that imminently threaten detainees' access to counsel likewise threaten their access to the courts.  There is no question that the Government here has already interfered and continues to interfere with detainees' presentation of claims to the Court.  Petitioners Esmail and Uthman have been denied access to counsel since May 2012. Esmail & Uthman Reply [21] at 7.  All other petitioners in this case are threatened with losing access to counsel under the Protective Order.  While the Government maintains that counsel-access is nevertheless provided by the MOU, as described in sections III and V.B., *supra*, the MOU gives the Commander of JTF-GTMO immense discretionary authority to unreasonably deny detainees access to counsel.

All petitioners here are represented by private counsel, acting pro bono.[12]  The costs associated with such representation are immense.  Partners and associates, who would otherwise

---

[12] The Court would like to note that pro bono counsel in these cases have worked diligently to provide detainees with competent legal counsel.  It would have been difficult and costly for the Court to manage its Guantanamo docket without the help of pro bono counsel.  They have acted in the highest spirit of our profession.  As *The Atlantic* magazine so eloquently put it,

>At its core, pro bono legal work is charity work. It is done by those with a particular expertise -- lawyers, paralegals, investigators -- on behalf of those who cannot afford to help themselves. It is both a gift and an ethical obligation that the legal community in America has undertaken since before the Revolution. . . .  [Detainees held at Guantanamo Bay] deserve under our rule of law to be represented by attorneys.  This is so because by providing these men with lawyers we say, both to the detainees and to the rest of the world, that we are better, that we are fairer, than those we fight.

Andrew Cohen, *In Defense of Pro Bono Legal Service, Whatever Form It Takes*, The Atlantic, August 24, 2012, *available at* http://www.theatlantic.com/national/archive/2012/08/in-defense-of-pro-bono-legal-service-whatever-form-it-takes/261465/.  The Court could not agree more.

be billing clients at rates certainly exceeding $500 an hour, have to spend two days to travel back and forth to Guantanamo Bay. Esmail & Uthman Reply [21] at 10. To balance the requirements of their practice and their pro bono work, it is not unusual for law firms to designate a team of attorneys to represent detainees, and individual attorneys often represent multiple detainees. Al-Mudafari & Al-Mithali Reply [20] at 6. *Id.* at 6–7. This allows pro bono counsel to take turns visiting detainees as their schedules allow. *Id.* But the Government's unilateral amendment to the MOU would allow only two attorneys to have access to any particular detainee. Resp. Opp. [12] at 11 n.3. Detainees could be left without representation for long stretches if these attorneys were unable to visit detainees because of other pending matters. If an attorney decided to withdraw representation, the detainee could be left without representation because the MOU only allows those attorneys who had previously signed the Protective Order to provide representation to detainees under the MOU's terms. *See* MOU [12-1] at ¶ 3.

The change to the MOU likewise restricts the number of translators who will be allowed access each detainee to one. Resp. Opp. [12] at 11, n.3. Because the number of private translators holding security clearances sufficient to allow access to Guantanamo is necessarily limited, this restriction would further intrude on counsels' ability to meet with detainees, as coordinating the schedules of a limited number of counsels and a single translator with the military is likely to become prohibitively difficult. Al-Mudafari & Al-Mithali Reply [20] at 6–7; Esmail & Uthman Reply [21] at 16 n.9. And the Court simply cannot countenance placing the "operational needs and logistical constraints" at Guantanamo ahead of detainees' constitutional right to access to counsel. MOU [12-1] at 8(c).

**B.**     **The History of Detainee Litigation Provides Sufficient Evidence of Past Interference to Satisfy *Casey*.**

25

The Government notes that if counsel-access under the MOU proves unworkable, petitioners could simply request the Court's intervention at that point. Hr'g Tr. at 10–11. But, under the last two protective orders, the Court was forced to step in multiple times to ensure counsel-access. It is likely that that the Court would be called on to decide future counsel-access issues under the MOU, but without the benefit of precedents governing the Protective Order. For example, petitioner's counsel averred that under the MOU the Government would have the power to read attorney-counsel mail and listen to privileged conversations, both procedures that were specifically rejected in *Al Odah*. Hr'g Tr. at 60–61, *Al Odah*, 346 F. Supp. 2d at 4–5. The Court can see nothing from the face of the MOU that would prevent the Government from requiring counsel to submit to such procedures. For its part, the Government did not guarantee such procedures would be off the table, but instead countered that counsel merely "misunderstood" the MOU and noted that that is not how the MOU "process is meant to work." Hr'g Tr. at 62. Thankfully, even if the Court wished to issue a permanent injunction, it would not have to wait for such issues were ripe for review. *Casey* allows the Court to consider past interference with detainees' presentation of claims in order to satisfy the actual harm requirement. 518 U.S. at 349. While the Court will not review the whole history of detainee counsel-access litigation, a few cases suffice to legitimize the Court skepticism of the Government's promises to provide adequate counsel-access under the MOU.

In *Adem v. Bush*, the Government attempted to create a procedural loophole in order to deny counsel-access. Petitioner Adem, who did not speak English, asked a fellow detainee who did and who had counsel to communicate to his counsel that Adem desired to challenge his detention. 425 F. Supp. 2d 7, 9 (D.D.C. 2006). Pro bono counsel took the case and filed a habeas petition on Adem's behalf. *Id.* After securing the necessary clearances, petitioner's

counsel was denied access to Adem because counsel could not present "written evidence" of representation.  *Id.*  This presented a comical catch-22 as such evidence was something that counsel could not obtain without first being allowed to meet with her client.  The Government first suggested that counsel mail a letter, which was impossible because the legal-mail provisions of the Protective Order were inapplicable before counsel presented evidence of representation.  *Id.* at 10 n.5.  The Government then proposed that the "only acceptable way to confirm" a detainees desire to be represented by counsel was to have the detainee "sign a form and send it through the 'non-legal mail' channels," a process whose efficacy the Court was skeptical of.  *Id.* at 24–25.  The Court found that petitioner Adem had the right to meet with counsel in absence of any written evidence of representation under the terms of the Protective Order.  *Id.* at 8.

In a series of cases, the Court has been forced to demand that the Government allow counsel to review detainee medical records in order to assure that detainees are not being put in such a state by the Government as to render their right to habeas review meaningless.  In *Tumani v. Obama*, counsel argued that the conditions of petitioner's detention had caused such severe mental illness that the detainee was no longer able to participate in his habeas action.  598 F. Supp. 2d 67, 70 (D.D.C. 2009).  The Government countered that there was no evidence of significant interference with petitioner's ability to assist counsel.  *Id.*  The Court sided with the petitioner and ordered production of the detainee's medical records.  *Id.* at 71.

In *Al-Joudi v. Bush*, counsel learned that petitioners, who were participating in a hunger strike, were being mistreated.  406 F. Supp. 2d at 15.  Petitioners' filed an Emergency Motion to Compel requesting that the Government provide counsel with his clients' medical records or allow counsel telephonic access to detainees.  *Id.* at 15–16.  Counsel testified that he had been informed that the Government had shackled or otherwise placed restraints on detainees' arms,

legs, waist, chest, knees and head, and had inexperienced medical staff place intravenous lines to force feed detainees.  *Id.*  At other times, detainees were force fed by tubes that were inserted, without anesthesia, in the nose and traveled down to the stomach, which caused severe pain and bleeding.  *Id.* at 16–17.  There were also allegations that tubes from one detainee were removed and inserted into another detainee without being sterilized or cleaned, which could have resulted in deadly infections.  *Id.*  The Government denied all the allegations, but refused to provide detainee-specific medical records or allow telephonic conversations.  *Id.*  The Government argued that there was "no adequate legal basis for Petitioners' requested relief" and that such relief would constitute impermissible judicial oversight and "second-guessing" of the Executive's policies.  *Id.* at 20–21.

The Court was unimpressed with the Government's "trust us" argument.  It reasoned that "[u]nless Petitioners' counsel can have access to their clients, and know their true medical conditions, including whether they are in imminent danger of death, so as to counsel them in order to persuade them to stay alive, it is obvious that their ability to present their claims to the Court will be irreparably compromised."  *Id.* at 22.  The Court considered the detainees' position, as persons who did not speak English and who were "totally unfamiliar with the United States legal system," and the public interest of the United States before holding that "in order to properly represent Petitioners, their counsel must have access to them, be able to communicate with them and must be made aware if their clients are in such fragile physical condition that their future ability to communicate is in imminent danger."  *Id.* at 21–22.[13]

---

[13] The Court in *Al-Joudi* applied a four-factor test for preliminary injunctions, which is the same as the test the Government proposed for a permanent injunction in this case.  *Compare* 588 F. Supp. 2d at 19 *with* Resp. Opp. [12] at 14.  The *Al-Joudi* Court found that irreparable harm was established by showing that the health of a vulnerable person was threatened, that the likelihood of success on counsel-access claims was established, that there was no substantial injury to the Government when weighed against the irreparable injury to the petitioners, and that the public interest of the United States was "served by ensuring that habeas petitioners have access to counsel so that they can meaningfully challenge their detention. . . ."  *Al-Joudi*, 588 F. Supp. 2d at 19–23.  The Court here believes,

In *Husayn v. Gates*, petitioner alleged that medications prescribed for him by doctors at Guantanamo cause him to become incoherent, psychotic, and interfered with his ability to write and speak. 588 F. Supp. 2d 7, 9 (D.D.C. 2008). Petitioner's counsel sought, *inter alia*, access to all of the detainee's medical records, and the right to consult with and disclose the detainee's medical records to an independent physician. *Id.* The Government objected that the requested remedy would constitute an intrusion into the petitioner's conditions of confinement, which is precluded from judicial review under the MCA. *Id.* The Court held for the detainee and ordered the Government to provide counsel with copies of the detainee's medical records. *Id.* at 12. The Court reasoned that the requested information and access did not interfere with the Executive's prerogative to run the Guantanamo detention facility, but was rather "a legitimate and important effort to provide effective representation and present the court with appropriate information affecting the lawfulness of his detention." *Id.* at 11. The Court noted that if the detainee's "right to present his case with the assistance of counsel is to have any meaning, his counsel must be able to" assess whether the petitioner's physical and mental condition would undermine his right to assist in his own habeas action. *Id.* at 9, 11 (internal quotation marks omitted).

### C.   Requesting that Petitioners Proceed *Pro Se* or Write to the Court If They Seek Assistance of Counsel Does Not Provide Adequate Access to Counsel.

The Government has taken the quite preposterous position that petitioners are not being denied access to the courts because petitioners can proceed *pro se* or "send letters to the Court requesting initiation of habeas case, or submit the form that the Government makes available to Guantanamo detainees for that very purpose." Resp. Opp. [12] at 25. The Court cannot take this contention seriously. It is uncontested that most if not all of the detainees are illiterate in English, if not in their native tongue. While the Government says that forms made available to

without deciding, that if it analyzed the present case under the Government's proposed four-factor test, the Court would come to the same result as the Court in *Al-Jourdi*.

detainees for the purposes of communicating with the Court are forwarded to the Court, the Government provides no timeline for doing so. *Id.* Nor has the Government has put forward any documentation of the procedures that are in place to ensure that detainees can complete the forms that they are provided with. While the Government also argues that detainees can communicate with the Court or with their counsel through "non-legal mail," the Court has been given no guarantee that detainees will be provided with paper, pens or pencils to write letters, that they will be given envelopes or stamps to mail them, that they will be shown how to properly address mail, or that illiterate detainees will receive any assistance. What's more, non-legal mail is subject to review and censorship by the military. *Id.* And, mail would certainly have been an option unavailable to detainees in *Husayn* or *Al-Joudi*, whose medical conditions left them unable to think or write.

Indeed, the Court has sufficient reasons to doubt that the Government will guarantee detainees the ability to access the Courts through the mail. In the past, the Government's attempts to notify detainees of their rights and to make sure they can exercise those rights were "marginally effective at best." *Adem*, 425 F. Supp. 2d at 15. Although the Government notified detainees of their right to file for habeas relief, the Government failed to explain what habeas relief meant. *Id.* The Governments forms notifying detainees that they could obtain legal representation used "so much legal and technical language" that the Court "doubt[ed] it would mean much of anything to an individual not already familiar with the United States legal system." *Id.* at 18 n.19. Translations of the detainees' notice of rights were poor and confusing, and the government made no provisions to notify illiterate detainees of what the notice said. *Id.* at 16. Some detainees simply mailed back blank sheets because they did not understand and were not told that more was necessary in order to obtain counsel. *Id.* at 12 n. 9. Guantanamo

staff was prohibited from assisting detainees in any way and they were not allowed to answer detainees' questions regarding their rights. *Id.* As related in *Adem*, mailing a letter to counsel certainly did not guarantee it would arrive. *Id.* at 18, 25. Indeed, it was in light similar concerns that the Protective Order specified precise procedures for sending and receiving legal mail. *See* P.O. at ¶¶ II.D.12–II.D.13.

For detainees whose petitions have been heard and denied, the Government's argument is even less persuasive. The Court agrees with petitioners Uthman and Esmail that the "legal framework for uncharged Guantanamo detainees is dynamic and fluid, subject to change for any number of reasons," including changed domestic and international circumstances, and amended legal and regulatory schemes. Reply [21] at 7. Filing successive petitions will necessarily require analysis of these constantly evolving circumstances. And, the Government has conceded that under the MOU, petitioners' access to information, legal and non-legal, is at the unreviewable discretion of the Executive. Nothing would stop the Government from withholding relevant information or preventing the Government from unreasonably denying access to counsel if it fears that new legal developments would benefit a detainee. In such circumstances, the Court would almost certainly be again called on to determine counsel-access issues.

The Government also argues that the Court is interfering with the Executive's prerogative to control classified information. Resp. Opp. [12] at 35. This objection does not pass the smell test. The Protective Order has stood unopposed for nearly four years. The Government requested the Protective Order specifically to protect classified information. The Court is aware of no leaks of classified information under the Protective Order or otherwise in these Guantanamo cases. Interestingly, the Government's MOU specifically incorporates provisions

of the Protective Order that protect classified and other protected information from disclosure without adding new protections (except for stripping counsels' need to know).  MOU [12-1] at ¶ 3.  The Government seems satisfied that the Protective Order appropriately protects classified and other protected information, and, therefore, the Court is certain that its holding here, which merely affirms that the Protective Order remains in effect, does nothing to challenge the Government's rights to protect classified information.

### VII.    <u>CONCLUSION</u>

The Court has an obligation to assure that those seeking to challenge their Executive detention by petitioning for habeas relief have adequate, effective and meaningful access to the courts.  In the case of Guantanamo detainees, access to the courts means nothing without access to counsel.  And it is undisputed that petitioners here have a continuing right to seek habeas relief.  It follows that petitioners have an ongoing right to access the courts and, necessarily, to consult with counsel.  Therefore, the Government's attempt to supersede the Court's authority is an illegitimate exercise of Executive power.  The Court, whose duty it is to secure an individual's liberty from unauthorized and illegal Executive confinement, cannot now tell a prisoner that he must beg leave of the Executive's grace before the Court will involve itself. This very notion offends the separation-of-powers principles and our constitutional scheme.

For the foregoing reasons, the Court finds that the Protective Order continues to govern access to counsel for all petitioners in the above captioned case.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on September 6, 2012.