UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UTHMAN ABDUL RAHIM MOHAMMED UTHMAN, <br><br> *Petitioner,* <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> *Respondents*. | Civil Action No. 04-cv-1254 (RCL) |

## MEMORANDUM OPINION

Petitioner Uthman Abdul Rahim Mohammed Uthman (ISN 27) ("Uthman"), a Yemeni national, challenges his continued detention at the United States Naval Station at Guantanamo Bay, Cuba. After his capture near Tora Bora in December 2001 and subsequent transfer to U.S. authorities, Uthman was taken to Guantanamo, where he remains in custody. This Court previously granted Uthman's petition for writ of habeas corpus, finding the Government could not demonstrate by a preponderance of the evidence that Uthman was part of al Qaeda. *Abdah v. Obama*, 708 F. Supp. 2d 9, 13, 23 (D.D.C. 2010) (Kennedy, H., J., presiding). On review, the D.C. Circuit reversed, finding the Government's evidence "more than sufficient" to justify Uthman's detention. *Uthman v. Obama*, 637 F.3d 400, 404 (D.C. Cir. 2011). The Supreme Court denied Uthman's petition for writ of certiorari. *Uthman v. Obama*, 567 U.S. 905 (2012). Uthman now argues that the Authorization for Use of Military Force (AUMF) does not authorize his continued detention, which he labels "punitive" and "excessive," and that his detention violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

Currently before the Court is Uthman's Motion to Grant Petition for Writ of Habeas Corpus ("motion" or "petition"). ECF No. 1072. After considering the motion, opposition, reply, and

1

supplemental briefs, the Court finds Uthman's continued detention lawful, and therefore **DENIES** his Motion to Grant Petition for Writ of Habeas Corpus.

## I. BACKGROUND

Petitioner Uthman Abdul Rahim Mohammed Uthman is a Yemeni national. *Uthman*, 637 F.3d at 402. In December 2001, Uthman was captured "at the Afghan-Pakistani border near Tora Bora," along with perhaps twenty or thirty others. *Id.* at 402, 402 n.1. Among these were "two al Qaeda members who were Osama bin Laden bodyguards and another man who was a Taliban fighter." *Id.* at 402. At the time of his capture, al Qaeda forces had gathered at Tora Bora "to wage a major battle against the United States and its allies." *Id.* On suspicion Uthman was a member of al Qaeda, he was transferred to Guantanamo in January 2002, where he remains today. *Id.*

In 2004, Uthman filed a petition for writ of habeas corpus in the U.S. District Court for the District of Columbia challenging his detention. *Id.* Uthman claimed that though he *was* in Afghanistan at the time of his capture, he "was not part of Al Qaeda," but instead had journeyed there "to teach the Quran to children." *Abdah*, 708 F. Supp. 2d at 13. Applying circuit precedent, the District Court determined that Uthman's detention would be lawful so long as the Government could show Uthman's membership in al Qaeda was "more probable than not." *Id.* (quoting *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000)). After reviewing the evidence, the District Court found that "Uthman (1) studied at a school at which other men were recruited to fight for Al Qaeda; (2) received money for his trip to Afghanistan from an individual who supported jihad; (3) traveled to Afghanistan along a route also taken by Al Qaeda recruits; (4) was seen at two Al Qaeda guesthouses in Afghanistan; and (5) was with Al Qaeda members in the vicinity of Tora Bora after the battle that occurred there." *Abdah*, 708 F. Supp. 2d at 22. Despite this "quite incriminating" evidence, the District Court concluded upon "close examination" that it was "not sufficient to carry respondents' burden." *Id.* at 23. In the Court's view, the Government had leveled

2

merely a charge of "guilt by association" against Uthman. *Id.* Accordingly, it granted Uthman's petition for writ of habeas corpus. *Id.*

On review, the D.C. Circuit reversed. *Uthman*, 637 F.3d at 402 (Kavanaugh, J.). Surveying both the District Court's findings and uncontested facts from the record, it found that evidence of Uthman's membership in al Qaeda easily satisfied the preponderance standard, and thus that his detention was lawful. *Id.* at 404. Specifically, the D.C. Circuit noted,

- "Uthman was captured in December 2001 in the vicinity of Tora Bora, an isolated, mountainous area where al Qaeda forces had gathered to fight the United States and its allies.
- When captured, Uthman was traveling with a small group of men, two of whom were al Qaeda members and bodyguards for Osama bin Laden and one of whom was a Taliban fighter.
- Leading up to his capture, Uthman's journey began at a religious school in Yemen where al Qaeda had successfully recruited fighters. The two al Qaeda members who were later captured with Uthman, as well as the Taliban fighter captured with Uthman, also attended the Furqan Institute.
- Uthman traveled to Afghanistan along a route used by al Qaeda recruits.
- Uthman lied to hide the fact that someone else paid for his travel to Afghanistan.
- While in Afghanistan, Uthman was seen at an al Qaeda guesthouse." *Id.* at 404.

The D.C. Circuit thought that Uthman's attempt to explain away these facts as nothing more than a series of innocent coincidences "strain[ed] credulity." *Id.* at 407. It would require believing that Uthman was "a kind of Forrest Gump in the war against al Qaeda"—always just so happening to appear in places of extraordinary significance to the war on terror. *Id.* Unwilling to indulge that remarkable claim, the panel overturned the judgment below and remanded with instructions to deny his petition. *Id.* at 407–08. The Supreme Court then denied his petition for writ of certiorari. *Uthman*, 567 U.S. at 905.

Fourteen years after his initial petition and seven years after the panel decision, Uthman filed the focus of this Opinion: his Motion to Grant Petition for Writ of Habeas Corpus. ECF No.

3

1072. The government then filed its response, ECF No. 1075, and Uthman his reply. ECF No. 1078. With the briefing complete, the motion is now ripe for review.

## II. LEGAL STANDARDS

Uthman's previous habeas petition centered on a question of fact—whether he was more likely than not an operative of al Qaeda. *Abdah*, 708 F. Supp. 2d at 12–13. His present challenge presents mostly questions of law—whether the uncontested duration of his detention is "excessive," "punitive," exceeds the scope of the AUMF, or violates Due Process. Motion at 5, 10, 15, ECF No. 1072. The Court will examine the merits of each claim according to the relevant legal doctrines in the sections that follow. The Court must also consider whether the conflict in which Uthman was captured continues today; a factual determination that will inform its legal analysis. As a general proposition, the Government must only demonstrate such facts by a preponderance of the evidence. *Ali v. Trump*, 959 F.3d 364, 372 (D.C. Cir. 2020) (citing *Uthman*, 637 F.3d at 403 n.3; *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010) ("Lest there be any further misunderstandings, let us be absolutely clear. A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF.")). With that admonition in mind, the Court proceeds to the substance of Uthman's filing.

## III. ANALYSIS

Uthman's motion sets forth two principle grounds for relief. First, he contends that "the AUMF does not authorize [his] detention." Motion at 5, ECF No. 1072. That is so, in his view, for three reasons: his detention has become "punitive," rather than a genuine mechanism to keep him off the battlefield; the government's AUMF authority has "unraveled" given developments in the war on terror; and, last, the "'particular conflict' in which Uthman was captured has ended." *Id.* at 13. Second, he argues that his "continued detention violates the Constitution's due process clause." *Id.* at 15. That is the case, he says, because his detention has become "arbitrarily divorced" from

the legitimate goal of preventing his resumption of hostilities. *Id.* at 18. Thus, it contravenes "the due process right to be free from the arbitrary deprivation of liberty at the hands of the government." *Id.* at 17. After considering and dismissing the Government's procedural objections to Uthman's petition, the Court will explain why neither of Uthman's grounds for relief succeed.

  1. *Is Uthman's Present Filing Procedurally Barred?*

The Government contends "as an initial matter" that the Court should not entertain Uthman's Motion because its "procedural posture" is "fundamentally flawed." Response at 8–9, ECF No. 1075. The Government's understanding is that Uthman's filing represents an attempt to either renew his original petition or to obtain relief from the denial of that petition under Rule 60(b). *Id.* at 8; *see also* Fed. R. Civ. P. 60. If it is the first option, the Government says that Uthman's failed first petition must be *res judicata* with respect to his present motion, since "it was [already] judicially determined that he is so detainable." Response at 8–9, ECF No. 1075. If it is the second, the Government says, then Uthman has no good arguments for relief under the various provisions of Rule 60(b). Grounds (b)(1)–(b)(3) are time barred, the judgment is not void under (b)(4), (b)(5) is not relevant because the prior judgment is not executory, and his detention is not among those "extraordinary circumstances" that might justify relief under (b)(6). *Id.*

So what is Uthman filing here? A "renewal" of his old petition, a Rule 60 attack on the judgment denying that old petition, or a second, new petition? In his reply, Uthman makes some arguments about (b)(5) and (b)(6)—that his detention is an inequitable or "extraordinary" circumstance justifying relief—but then he gets to the heart of the matter: his present "Motion" is really "a new petition for habeas relief." Reply at 3, ECF No. 1078. Uthman is not attacking the 2011 denial of his first petition on the grounds the denial was defective for mistake, fraud, or anything else. He is not re-litigating the claim that he is not al Qaeda and was only in Afghanistan

5

to teach the Quran. Instead, he is asserting new and distinct arguments. True, he argued in his 2004 petition that his detention was "arbitrary" and violated Due Process. Petition at 17, ECF No. 1. But back then he claimed it was "arbitrary" because he was not actually a terrorist, and so was being held without cause. *Id.* at 9. Now that the D.C. Circuit has said he most likely was, he has changed his tack: even if he *was* part of al Qaeda, his new petition argues, his *continued* detention no longer can be justified as "a temporary wartime expedient." Motion at 1, ECF No. 1072. Essentially, Uthman argues, *continuing* to detain him in light of allegedly changed circumstances in the war on terror may now be arbitrary in a way it might not have been in 2011, 2010, or 2004.

That is the crux of his arguments about the AUMF as well. His initial petition avers to the AUMF only briefly, and back then he claimed that Congress's grant of authority extended only to the "persons" who "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001," or who "harbored such organizations or persons." Petition at 11, ECF No. 1. Because, he argued, he was not among them, his detention was inconsistent with the AUMF. *Id.* The D.C. Circuit foreclosed that argument too in 2011, finding the evidence "more than sufficient" to show he was probably an al Qaeda operative. *Uthman*, 637 F.3d at 404. So, again, he changes his tack: even if he *was* part of al Qaeda, his new motion claims, his detention *now* "has become punitive" in duration, and therefore violates the AUMF. Motion at 5, ECF No. 1072. Given that Uthman's new filing has all the elements of a new petition, the Court will simply treat it as one. *Cf. Al Warfari v. Obama*, No. 09-2368 (RCL), 2015 WL 4600420, at *7 (D.D.C. July 30, 2015), *vacated and appeal dismissed as moot*, No. 15-5266 (D.C. Cir. 2016) (recognizing that when a movant's filing has all the elements of a new petition, it may be treated as such).

That is not the end of the inquiry, though. If Uthman *is* filing a second habeas petition, is his first failed petition *res judicata* against the second? There is disagreement among the

6

authorities on that point. *Compare, e.g.,* Andrew Kent, *Do* Boumediene *Rights Expire?*, 161 U. PENN. L. REV. PENNUMBRA 20, 28–32 (2012) (arguing a failed first petition might preclude the second) *with* Stephen I. Vladeck, *Access to Counsel,* Res Judicata, *and the Future of Habeas at Guantanamo*, 161 U. PENN. L. REV. PENNUMBRA 78, 82 (2012) (arguing that it would not). So why the disagreement? At common law and well into the twentieth century, it was firmly established that *res judicata* did not even apply to habeas petitions. Vladeck, *supra* at 82; *Sanders v. United States*, 373 U.S. 1, 8 (1963) ("The inapplicability of res judicata to habeas, then, is inherent in the very role and function of the writ."). Courts, instead, were left to police meritless petitions under the abuse of the writ doctrine, by which they could exercise discretion to reject duplicative petitions. Vladeck, *supra* at 82. In the context of collateral attacks on criminal convictions, Congress undoubtedly has made—and the Supreme Court upheld—some inroads upon that principle. *E.g.*, 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). In the conviction universe, there is now indeed "a modified res judicata rule" against successive petitions. *Felker v. Turpin*, 518 U.S. 651, 664 (1996).

But the D.C. Circuit has informed us that the procedures in the conviction context are not necessarily the same as in the detention context. *Al-Bihani v. Obama*, 590 F.3d 866, 876 (D.C. Cir. 2010) ("Habeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions."). And with "pure executive detention," as scholars have pointed out, a one-and-done model would not make much sense. Steve Vladeck*, Habeas, Res Judicata, and Why the New Guantanamo MOU is a Big Deal*, LAWFARE (July 17, 2012, 5:13 PM), https://www.lawfareblog.com/habeas-res-judicata-and-why-new-guantanamo-mou-big-deal; Vladeck, *supra* at 84. Habeas challenges to convictions, which contest the verdict or sentence, usually do not hinge "upon when—or how often—[they are]

7

relitigated." Vladeck, *supra* at 84. With detention, though, the "same source of detention authority may, in fact, apply differently as time goes on." *Id.* The authority backing the detention might expire, or surrounding circumstances might change such that detention is no longer warranted. On those considerations, the Court finds that *res judicata* does not bar Uthman's present, second petition.

Nor, relatedly, does the Court think Uthman is abusing the writ. *See Sanders*, 373 U.S. at 11 (stating that a later petition was not an abuse so long as it "relied on a ground not previously heard and determined."). As was said above, Uthman's new petition is not merely re-hashing his claims from 2004. Instead, he is making new arguments that logically were not available earlier in his detention. He could not have complained about nearly two decades of confinement back in 2004, when he had just been committed to Guantanamo. Nor could he have advanced the changed circumstances argument about the war on terror and whether it is still ongoing today.

All that is to say the posture of Uthman's petition is not "fundamentally flawed." He's not barred by Rule 60(b), *res judicata*, abuse of the writ, or any other principle of which the Court is aware. Instead, his petition is amenable to judicial review. And as such, the Court now turns to the petition's merits.

2. Is Uthman's Continued Detention Unauthorized Under the AUMF?

As a practical matter, should the Court decide Uthman's statutory claim first, or should it first entertain his claims about constitutional due process? Uthman suggests the Court should entertain his statutory claim first, because doing so—and construing the statute in Uthman's favor—would "avoid" the "serious constitutional issues" attending to his due process argument. Motion at 7, ECF No. 1072 (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–47

8

(1936) (Brandeis, J., concurring)). But that depiction of avoidance is not quite right, or at least is not the complete picture.

When lawyers talk about "constitutional avoidance," the idea really includes two distinct phenomena. One was laid out by Justice Brandeis in his classic concurrence in *Ashwander*. *Ashwander*, 297 U.S. at 346–47 (Brandeis, J., concurring). There he suggested that as a matter of judicial restraint and "governance," courts generally should endeavor to resolve cases on non-constitutional grounds and should entertain constitutional questions only when necessary. *Id.* at 346. The other notion of avoidance is a more rulized version of Justice Brandeis's sentiment, which has now achieved the status of a canon of interpretation. *See* CALEB NELSON, STATUTORY INTERPRETATION 146–47 (2011). The "canon" of avoidance suggests that when a statute is susceptible to two or more interpretations, the court should adopt whichever interpretation avoids a difficult constitutional question. *Id.* at 147. Uthman says to interpret his detention as beyond the AUMF to avoid considering his due process argument, apparently relying on the latter notion of avoidance. But that canon is not helpful here. As the Court explains below, the AUMF is not susceptible to the interpretation Uthman pushes. And the constitutional question presented by rejecting his statutory arguments, frankly, is not that difficult. *Cf. Ali*, 959 F.3d at 373 ("[B]ecause the specific constitutional claims that Ali presses have already been considered and rejected by circuit precedent, there are no constitutional rulings to be avoided."). The Court does intend to heed Justice Brandeis's original advice about the order of operations, though, and so will consider the statutory claims before advancing to arguments about due process.

Reduced to a syllogism, Uthman's argument about the AUMF is something like this: The AUMF, by its terms, authorizes the executive "to use all necessary and appropriate force" against those persons or organizations who facilitated or aided the 9/11 attacks. Motion at 4, ECF No.

9

1072; 50 U.S.C. § 1541. The United States has "substantially destroyed" al Qaeda, the "conflict" in which Uthman was captured has wrapped up, and he is being detained as punishment, rather than to prevent his return to the battlefield. *Id.* at 14, 8, 6. Therefore, his detention is no longer "necessary and appropriate" under the AUMF, and so he must be let free. *Id.* at 11.

The Government counters that the conflict in which Uthman was captured remains active, and thus his detention is not "punitive," but a valid tool under the AUMF to keep him from taking up arms.[1] Response at 22–30, ECF No. 1075. The Government has supplied several hundred pages of record evidence to that effect. It points to multiple declarations from President Trump that al Qaeda remains a threat in Afghanistan and, if anything, has only spread to new global outposts. *E.g.*, Remarks by President Trump on the Strategy in Afghanistan and South Asia (Aug. 21, 2017, at 5), ECF No. 1075–8 ("[T]he security threats we face in Afghanistan and the broader region are immense."). The U.S. continues to kill terrorists in Afghanistan, ECF No. 1075–13, and terrorists continue to kill Americans. ECF No. 1075–14. Then-Secretary of Defense Mattis pointed out that the potential for transnational terrorist attacks springing from the region remains ever-present. ECF No. 1075–10. And FBI Director Wray cautions that though al Qaeda still hungers for "spectacular attacks" in the style of 9/11, U.S. efforts to disrupt the organization have led it to pursue the comparatively "small-scale" killing of Americans. ECF No. 1075–22.

Uthman's chief reaction to these exhibits is to argue that they do not show the "*particular conflict*" in which he was captured drags on. Reply at 7, ECF No. 1078. He says the real fight is against new groups that did not exist at the time of 9/11, like ISIS–K, and that to the extent al Qaeda persists, it has spread far beyond its original strongholds in Afghanistan. *Id.* at 7–8. These

---

[1] As the Government points out, Congress also endorsed "[d]etention under the law of war without trial until the end of hostilities authorized by the Authorization for the Use of Military Force" in 2012's National Defense Authorization Act. Response at 16, ECF No. 1075; Pub. L. No. 112–81, § 1021(c)(1), 125 Stat. 1562.

10

arguments are baseless. Contrary to Uthman's brief, the Government's exhibits extensively describe the continued fight against al Qaeda in Afghanistan. *E.g.*, Remarks by President Trump on the Strategy in Afghanistan and South Asia (Aug. 21, 2017, at 5), ECF No. 1075–8 (noting that the U.S. maintains operations in Afghanistan to secure the goal of "crushing al Qaeda"). And why, exactly, would al Qaeda and the original conflict in Afghanistan metastasizing across the globe be a reason for Uthman's *release*? If anything, that fact would make it *easier* for him to rejoin the fight.[2]

After surveying these briefs and the record evidence, the Court concludes that the Government has easily established that the conflict in which Uthman was captured continues. That is fatal to his claims about the AUMF. Uthman is not being "punished simply for having been part of an enemy force." Motion at 6, ECF No. 1072. He is being detained to prevent him from resuming his role as a foot-soldier against the United States in a conflict still raging. His argument about the length of his detention, then, is no argument at all. Yes, it has been long, but it has been "long because the armed conflict out of which it arises has been long, continuing to the present day." *Ali*, 959 F.3d at 370 (denying a similar petition). As the Supreme Court has stated, "Congress' grant of authority for the use of 'necessary and appropriate force' [includes] the authority to detain for the duration of the relevant conflict." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004). That conflict has been protracted and tough, no doubt. But as the Government points out, that "enemy forces have prolonged the fighting by not laying down their arms . . . is more reason for the United States to continue to detain [them], not less." Response at 27, ECF No. 1075. Because Uthman's detention "still serves the established law-of-war purpose of preventing captured individuals from returning

---

[2] The Court is unpersuaded by Uthman's repeated claim that because the war on terror has *changed*, the "particular conflict" in which Uthman was captured has "end[ed]." Reply at 7–8, ECF No. 1078. Imagine a Wehrmacht soldier captured in 1939, when Germany's ambitions still appeared relatively local in scope. Would it be an argument for his release in 1942 that Germany had begun operations in North Africa and had invaded deep into the Soviet Union?

11

to the field of battle and taking up arms once again," the Court finds it congruent with the AUMF. *Ali*, 959 F.3d at 370 (upholding the denial of habeas relief to a detained enemy combatant who argued his continued detention exceeded the scope of the AUMF).

    *3. Does Uthman's Detention Violate the Constitution's Due Process Clause?*

Since Uthman's arguments about the AUMF were not sufficient to resolve this dispute, the Court now turns to his claims about due process. Uthman argues that his detention has become "arbitrarily divorced" from its original purpose of keeping him off the battlefield. Motion at 18, ECF No. 1072. He charges that the Government has transformed his "erstwhile affiliation with an enemy force" into "the mark of Cain" and functional life imprisonment. *Id.* And he complains that his detention has been longer than some of the sentences received by former detainees. *Id.* at 19. That is another reason he is suffering from "arbitrary imprisonment," in his view, which he says runs afoul of the Constitution. *Id.* at 15–18.

So why, exactly, does Uthman think he is covered by the due process protections of the Fifth Amendment? He does not quite say. The closest his briefing comes to making an argument to that effect is that the Suspension Clause applies at Guantanamo, and so the Due Process Clause must as well. *Id.* at 17 (citing *Boumediene v. Bush*, 553 U.S. 723, 769–71 (2008)). Uthman's theory is that if the Suspension Clause so applies, then detainees must have some rights they can assert through habeas, like the right against arbitrary detention, and that right, he says, must flow from due process. Motion at 17, ECF No. 1072. So he thinks the Suspension Clause is just a mechanism to vindicate rights secured in the Fifth Amendment. *Id.* But that is quite the leap. Why doesn't the guarantee against arbitrary detention inhere in the Great Writ itself, and why isn't the Suspension Clause alone sufficient to secure that guarantee? The Supreme Court, after all, "was careful *not* to couch its [*Boumediene*] holding in terms of individual rights." Vladeck, *supra* at 79.

That was probably because of the longstanding view that the Due Process Clause does not apply to foreign nationals without property or presence inside the United States's sovereign territory. *See, e.g.*, *Kiyemba v. Obama*, 555 F.3d 1022, 1027 (D.C. Cir. 2009) *vacated by* 559 U.S. 131 (2010) *and reinstated as amended by* 605 F.3d 1046 (D.C. Cir. 2010) ("Decisions of the Supreme Court and of this court—decisions the district court did not acknowledge—hold that the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States.") (internal citations omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (describing the holdings of both *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990), and *Johnson v. Eisentrager*, 339 U.S. 673, 784 (1950), as establishing the proposition that the "Fifth Amendment's protections do not extend to aliens outside the territorial boundaries."). So on that received wisdom, Uthman's due process arguments should have fallen stillborn in this or any court in the country.

But as Uthman's petition was pending, the D.C. Circuit appeared to breathe some life into his due process claims. In its 2019 decision *Qassim v. Trump*, 927 F.3d 522, 524–25, 527–29 (D.C. Cir. 2019), the D.C. Circuit explained that it was an incorrect reading of circuit precedent to assume that detainees at Guantanamo are not afforded protections under due process. It then remanded the case so the district court could work through discovery and, if necessary, reach Qassim's due process objections to the information he had been provided. *Id.* at 531–32. The Government, in its supplemental briefing, dismisses *Qassim* as a "narrow holding [with] little bearing on Petitioner's Motion." Response to Notice of Supp. Auth., ECF No. 1094. Uthman says the case refutes the idea he is not entitled to levy his due process objections. Notice of Supp. Auth., ECF No. 1093. The Court understands *Qassim* to mean that Uthman is no longer categorically excluded from the ambit of due process. *Qassim*, 927 F.3d at 527–28.

13

The scope and content of Uthman's due process rights might have been a tough question absent the old lodestar of our habeas jurisprudence that detainees in his position were not entitled to such protections. But pursuant to its new, "issue-by-issue" exposition of those rights, *Ali*, 959 F.3d at 369, the D.C. Circuit has most recently instructed us that whatever a detainee's claims under the Fifth Amendment, they surely are not of the variety Uthman asserts. In *Ali v. Trump*, the D.C. Circuit considered—and rejected—due process claims virtually indistinguishable from Uthman's. *Id.* at 370–73 (decided May 15, 2020). An Algerian national, Abdul Razak Ali, there contested the denial of his habeas petition on the grounds that his seventeen-year detention in Guantanamo violated substantive and procedural due process. *Id.* at 366. He claimed his detention was "arbitrary" and "punitive" because it had become "untethered to any ongoing, individualized purpose to detain him." *Id.* at 369–70. Substantively, he argued, his detention "shock[ed] the conscience," and procedurally, he said the Government would have to justify it by clear and convincing evidence. *Id.* at 370, 372.

The panel squarely rejected both claims. *Id.* It underscored the Circuit's "repeated[]" holding that the Government must prove a detainee's enemy combatant status by only a preponderance of the evidence. *Id.* at 372. And it reasoned that Ali's detention—though "long"—was lawful. *Id.* at 370. That was so "because the armed conflict out of which [his detention arose] has been long, continuing to the present day." *Id.* But that the conflict continues only showed that Ali's detention continues to serve its "original and legitimate purpose"—keeping him off the battlefield. *Id*. The panel explained that circuit precedent has long established that "detentions [may] last for the duration of hostilities." *Id.* at 372. Precisely because "this is a long war with no end in sight," it is necessary to detain combatants, in some cases, for a long time. *Id.* at 373. Ali's due process claims, then, were without merit. *Id.* at 370–73.

14

Just as Ali's due process claims failed, so too must Uthman's. Like Ali, Uthman was adjudged to belong to an enemy force. *Uthman*, 637 F.3d at 404. He was not snatched at random on some pretended offense. And like Ali, Uthman has been detained for nearly two decades. But neither Ali's nor Uthman's detentions are "punitive" or "arbitrary." *Arbitrary*, Black's Law Dictionary (9th ed. 2009) ("[F]ounded on prejudice or preference rather than on reason or fact."). As with Ali, the conflict in which Uthman was captured continues to this day. The original and lawful purpose of his detention—to prevent him from again taking up arms against this country—persists. Uthman unquestionably may be detained "for the duration of hostilities." *Ali*, 959 F.3d at 372. Under this Circuit's precedent, he has no contrary right arising from the Due Process Clause. For that reason, his petition must fail.

## IV. CONCLUSION

For the above-stated reasons, the Court **DENIES** the Motion to Grant Petition for Writ of Habeas Corpus. A separate Order consistent with this Memorandum Opinion shall issue this date.

Date: 8/28/20

Royce C. Lamberth
United States District Judge